1  Gary E. Klausner (SBN 69077)
   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
2  10250 Constellation Boulevard, Suite 1700
   Los Angeles, California 90067
3  310.229.1234 (T)
   310.229.1244 (F)
4  Email: gek@lnbyb.com

5  Eric D. Madden (*pro hac vice* application to be filed)
   REID COLLINS & TSAI LLP
6  Thanksgiving Tower
   1601 Elm Street, 42nd Floor
7  Dallas, Texas  75201
   214.420.8900 (T)
8  214.420.8909 (F)
   Email:  emadden@rctlegal.com
9
   Angela J. Somers (*pro hac vice* application to be filed)
10 Anne M. Bahr (*pro hac vice* application to be filed)
   REID COLLINS & TSAI LLP
11 One Penn Plaza, 49th Floor
   New York, New York 10119
12 212.344.5200 (T)
   212.344.5299 (F)
13 Email:  asomers@rctlegal.com; abahr@rctlegal.com

14 *Counsel for Solution Trust, as Trustee of the AWTR Liquidation Trust*

15          **UNITED STATES BANKRUPTCY COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
16                **LOS ANGELES DIVISION**

17 In re:

18 AWTR LIQUIDATION INC., f/k/a
   RHYTHM AND HUES, INC.,
19
                              Debtor.
20 _____
   SOLUTION TRUST, as Trustee of the AWTR
21 LIQUIDATION TRUST,

22                              Plaintiff,

23 v.

24 JOHN PATRICK HUGHES, PAULINE TS'O,
   KEITH GOLDFARB, LEE BERGER,
25 PRASHANT BUYYALA, RAYMOND
   FEENEY, DAVID WEINBERG, CCC
26 DIAGNOSTICS LLC, RHYTHM & HUES
   SDN. BHD, and 2100 GRAND LLC,
27
                              Defendants.
28

Case No. 2:13-bk-13775-NB

Chapter 11

Adv. No. _____

**ORIGINAL COMPLAINT**

1

## ORIGINAL COMPLAINT

Solution Trust, as Trustee (the "Trustee") of AWTR Liquidation Trust, the duly authorized successor-in-interest to AWTR Liquidation, Inc., f/k/a Rhythm And Hues, Inc. ("R&H"), files this Original Complaint against the above-captioned defendants and alleges and avers as follows:

## SUMMARY OF ACTION

1.      R&H was a company that offered artistically brilliant, financially valuable and top-quality visual effects and computer-generated animation services to the Hollywood film industry.  Its work was at the heart of Hollywood's highest-grossing feature films, including *Django Unchained*, *The Hunger Games* and *The Lord of the Rings*.  In addition to making money for Hollywood's studios, R&H achieved creative and aesthetic excellence by winning Academy Awards for *Babe*, *The Golden Compass* and *Life of Pi*.  R&H also received multiple Scientific and Technical Achievement Awards from the Academy of Motion Picture Arts and Sciences.

2.      Unfortunately, despite the quality of its work and the demand for its services, R&H failed because its officers and directors, including John Patrick Hughes, Pauline Ts'o and Keith Goldfarb, recklessly and blatantly breached fiduciary duties they owed to R&H.  While claiming to promote a caring and artistic corporate culture that enhanced R&H's value, Hughes, Ts'o and Goldfarb breached their duties of loyalty, due care, and good faith by directing R&H to engage in risky transactions with entities they or their family members owned or controlled.  Such transactions included: (a) transfers of millions of dollars to a biotech start-up company founded by Hughes's father-in-law in return for unsecured notes that were eventually sold to Hughes for one dollar; (b) a transfer of software rights critical to R&H's business to a company owned by Hughes, Ts'o and Goldfarb for no consideration whatsoever; and (c) a real estate transaction in which Hughes, Ts'o and Goldfarb received millions of dollars from R&H to invest in a property with potential upside to them while R&H bore all the downside risk.   Ironically, while proselytizing about R&H's special corporate culture and their concern for its labor force, Hughes, Ts'o and Goldfarb pillaged R&H with little concern about the consequences.

2

3.      R&H could ill afford these costly, self-interested transactions as Hughes, Ts'o, Goldfarb and other directors and officers also engaged in reckless operational practices that they knew or should have known would cause serious damage to R&H.  In breach of their duties of care and good faith, these directors and officers caused R&H to:  (a) limit its customer base so it was beholden to only three studios; (b) submit reckless bids that resulted in detrimental studio contracts; (c) neglect to secure, process or pursue essential change-order provisions and procedures in order to collect on otherwise grossly unprofitable projects with the studios; (d) underutilize hundreds of employees that enjoyed excessive benefit policies; and (e) waste valuable net operating losses, thereby sacrificing valuable tax refunds.

4.      Moreover, other R&H officers and directors, if not actively involved in the wrongful acts, were completely derelict in their duties by failing to halt these primary actors from engaging in acts that clearly constituted breaches of their fiduciary duties.  The other officers and directors abdicated their responsibilities by failing to recognize, monitor, approve or prevent these deleterious acts of which they were or should have been aware.    Instead, these officer and directors displayed an unexcused pattern of inattention, seemingly indifferent to the disastrous direction that R&H was headed.

5.      As a result of the actions of Hughes, Ts'o and Goldfarb, and the lack of attention or action by the other officers and directors, R&H deteriorated rapidly and could not remain a financially viable entity.   R&H ultimately collapsed in bankruptcy only eleven days before winning its third Academy Award.  Thereafter, its assets were liquidated for a fraction of R&H's former value, leaving its creditors with millions of dollars in unpaid claims.

**PARTIES**

6.      Solution Trust (a/k/a SltnTrst LLC), the Trustee of the AWTR Liquidation Trust (the "Trust"), is a California limited liability company with its principal place of business located at 29209 Canwood Street, Suite 210, Agoura Hills, California 91301.  On February 13, 2013, (the "Petition Date"), R&H filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), thereby commencing the above-captioned bankruptcy case in this Court. The Trust was created, and the Trustee was appointed, pursuant to

the Liquidation Trust Agreement and the Joint Chapter 11 Plan of Liquidation of AWTR Liquidation Inc. (the "Plan"), which this Court confirmed in the bankruptcy case on December 13, 2013. The Plan expressly retained all causes of action belonging to R&H and/or its bankruptcy estate, including the claims asserted in this Complaint, for post-confirmation enforcement by the Trust under 11 U.S.C. § 1123(b)(3)(B).

7.     John Patrick Hughes ("Hughes") is a citizen of the State of California. He may be served with process at his residence, which is located at 3534 Purdue Avenue, Los Angeles, California 90066, or such other location or address where he can be found. Hughes was a member of R&H's board of directors and, as its President, Treasurer, and at times, Chief Financial Officer, was an R&H officer during the events described in this Complaint. Hughes was married to Pauline Ts'o at the time of those events.

8.     Pauline Ts'o ("Ts'o") is a citizen of the State of California. She may be served with process at her residence, which is located at 3534 Purdue Avenue, Los Angeles, California 90066, or such other location or address where she can be found. Ts'o was a member of R&H's board of directors and, as Art Director, Vice President for Development and HR Manager, was an R&H officer during the events described in this Complaint. Ts'o was married to Hughes at the time of those events.

9.     Keith Goldfarb ("Goldfarb") is a citizen of the State of California. He may be served with process at his residence, which is located at 11707 Darlington Avenue, Apartment 8, Los Angeles, California 90049, or such other location or address where he can be found. Goldfarb was a member of R&H's board of directors during the events described in this Complaint.

10.     Hughes, Ts'o and Goldfarb are collectively referred to as the "Primary D&Os" in this Complaint.

11.     Lee Berger ("Berger") is a citizen of the State of California. He may be served with process at his residence, which is located at 27476 Revere Way, Agoura Hills, California 91301, or such other location or address where he can be found. Berger was a member of R&H's

board of directors and, as President of its Film Division, was an R&H officer during the events described in this Complaint.

12.    Prashant Buyyala ("Buyyala") is a citizen of the State of California.  He may be served with process at his residence, which is located at 4463 Emerald Street, Torrance, California 90503, or such other location or address where he can be found.  Buyyala was a member of R&H's board of directors and, as its Managing Director of International Operations, was an R&H officer during the events described in this Complaint.

13.    Raymond Feeney ("Feeney") is a citizen of the State of California.  He may be served with process at his residence, which is located at 281 Linda Vista Avenue, Pasadena, California 91105, or such other location or address where he can be found.  Feeney was a member of R&H's board of directors during the events described in this Complaint.

14.    David Weinberg ("Weinberg") is a citizen of the State of California.  He may be served with process at his residence, which is located at 305 Cherry Drive, Pasadena, California 91105, or such other location or address where he can be found.  Weinberg was a member of R&H's board of directors and, as its Chief Financial Officer, was an R&H officer during the events described in this Complaint.

15.    Berger, Buyyala, Feeney and Weinberg are collectively referred to as the "Other D&Os" in this Complaint.  The Primary D&Os and the Other D&Os together are referred to as the "D&Os" in this Complaint.

16.    CCC Diagnostics, LLC ("CCCD") is a Delaware limited liability company with its principal place of business in the Canton Research Center, located at 3918 Vero Road, Suite B, Baltimore, Maryland 21227.  CCCD may be served with process through its registered agent, The Corporation Trust Incorporated, 351 West Camden Street, Baltimore, Maryland 21201, or such other location or address where it can be found.

17.    2100 Grand LLC ("2100 Grand") is a California limited liability company with its principal place of business located at 2100 East Grand Avenue, El Segundo, California 90245. 2100 Grand may be served with process through its registered agent, Hughes, at 3534 Purdue Avenue, Los Angeles, California 90066, or such other location or address where he can be found.

18.    Rhythm & Hues Sdn. Bhd ("RHM") is a Malaysian corporation with its principal place of business located in Malaysia. RHM is owned by Hughes, Ts'o and Goldfarb. It may be served with process through its registered agent, Hughes, at 3534 Purdue Avenue, Los Angeles, California 90066, or such other location or address where he can be found.

## JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction over this action, pursuant to 28 U.S.C. §§ 157(a) and 1334(b), in that the Complaint asserts causes of action arising in, arising under and/or relating to the above-captioned bankruptcy case.

20.    The Court has personal jurisdiction over the Defendants. First, many of the Defendants have filed proofs of claim in the above-captioned bankruptcy case, thereby submitting themselves to the jurisdiction of this Court. Second, the Defendants—nearly all of whom reside in California, are organized under California law and/or are headquartered in California—have the requisite contacts to support personal jurisdiction in this Court. Third, the Defendants have purposefully directed their activities toward R&H, which was organized under California law and headquartered in California, and those activities are the subject of this action.

21.    Venue for the action is proper in this Court under 28 U.S.C. § 1409(a), as the action is commenced in the district in which the above-captioned bankruptcy case is pending.

## BACKGROUND

22.    R&H was one of the world's leading producers of visual effects ("VFX") and computer-generated ("CG") animation for the entertainment industry. Since its founding in 1987, R&H grew to become the largest VFX and CG studio in Los Angeles (and among the top eight VFX and CG studios globally) with more than 700 employees at its headquarters in El Segundo, California. R&H also employed over 600 additional employees abroad through its subsidiaries and/or affiliates located in Canada, India, Malaysia and Taiwan.

23.    R&H provided top-quality VFX and CG animation services for some of Hollywood's highest-grossing feature films, including *Django Unchained*, *The Hunger Games* and *The Lord of the Rings*. In total, R&H contributed its services to more than 150 feature films

and worked closely with certain major film studios (the "Studios"). For example, R&H's three largest customers were Warner Brothers, Twentieth Century Fox, and Universal Studios.

24.     Not only did it attract significant work from the Studios, R&H received numerous industry awards and accolades for its work. R&H earned Academy Awards (Best Visual Effects) for *Babe* (1995), *The Golden Compass* (2007) and *Life of Pi* (2012). It also received an Academy Award nomination for *The Chronicles of Narnia* (2005). R&H, moreover, won Scientific and Technical Achievement Awards from the Academy of Motion Picture Arts and Sciences in 1994, 1998, 2008 and 2010.

25.     Unfortunately, starting in 2007, R&H's artistic and technical success was overshadowed by its financial troubles. This was caused by a number of factors. R&H added hundreds of employees to its U.S. operations, and these additions were without planning or foresight. Even though R&H opened two international offices in India and intended to outsource large portions of its work there, the D&Os caused the number of employees in R&H's Los Angeles office to nearly double from approximately 375 employees in 2005 to more than 700 employees in 2007 and 2008. Eager to promote a "culture," rather than sustain a business, the D&Os basked in the breadth of human resources. R&H, in turn, was crushed by the weight of excessive labor costs and accompanying benefit programs.

26.     By 2007, R&H's business was beginning to take a turn for the worse. In addition to the costs of an underutilized and irrationally expensive labor force, certain of R&H's "assets," including substantial loans made to related companies or insiders, appeared to have little value, yet they were still being recorded at their face amount. R&H also used the percentage-of-completion method of accounting while work in progress had an ever-more tenuous value as extreme project delays and cost overruns mounted, and the Studios refused to make payments to R&H until the project was completed. The level of completion could therefore never be accurately predicted, thereby resulting in an overstatement as to the value of R&H's work in progress.

27.     Even accepting R&H's financial reporting, which showed that it had production revenue of about $82 million and $99 million in 2006 and 2007 respectively, its ratio of total

expenses to production revenue (*i.e.*, the percentage of revenue used to pay for expenses) was beginning to increase.    From year 2007 to 2010, this percentage increased rapidly and substantially (from 75.7% in 2007 to 96.1% in 2008 to 97.2% in 2009 to 106.9% in 2010 [net loss]), and this dangerously thin net revenue was insufficient to secure R&H's financial stability in light of its other escalating expenses.

28.    R&H's financial problems were further reflected in an internal 2008 audit, which pointed out to the Primary D&Os that R&H was a "company of 850 people that competes in a global market, however, we still run ourselves almost identically to how R&H ran in 1999 when it was 1/3 the size . . . we need to fix what's broken and fix it now."    The D&Os did not fix what was broken.    And as a result, R&H had more than $6.7 million in annual net losses in 2010.

29.    By 2012, after years of financial distress, R&H's situation was dire, and its efforts to seek financing to salvage the company were too late.    R&H suffered losses of $22.5 million that year.    Further, paid time-off ("<u>PTO</u>") and sabbatical accruals continued to mount, and R&H's recognition and recording of these problems in earlier years was questionable.    R&H had accrued over $10 million in PTO and sabbatical leave liabilities by 2012.    It was thus no surprise when R&H sought bankruptcy protection in early 2013.

## The CCCD Notes

30.    Starting in 2007, the Primary D&Os began funneling R&H's precious cash resources to CCCD, a start-up biotechnology company founded by Dr. Paul Ts'o, the father of Ts'o and the father-in-law of Hughes.    CCCD had no revenues.    Its business was wholly unrelated to R&H's business, and the two companies had absolutely no corporate synergies.    Nonetheless, the Primary D&Os caused R&H to make $1.89 million in unsecured advances to CCCD, pursuant to five convertible notes (the "<u>CCCD Notes</u>") that Hughes negotiated on behalf of both CCCD and R&H.    Later, seeking to relieve CCCD of its obligations and to deprive R&H of its investment, Hughes agreed to pay $1.00 to purchase the $1,890,000 in Convertible Notes from R&H.

31.    R&H initially advanced $300,000 to CCCD.    On or about July 5, 2007, CCCD and R&H entered into an Unsecured Convertible Note Agreement (the "<u>CCCD Note Agreement</u>") and

8

an Unsecured Convertible Note for $300,000, which was due by November 2008 (the "First CCCD Note"). This debt was convertible into a 3% membership interest in CCCD. Notably, the CCCD Note Agreement and the First CCCD Note, which were negotiated by Hughes, failed to set performance milestones, to impose other financial requirements and to provide for adjustments to the conversion ratio based upon performance. These protections would have been typical of an investment in a start-up venture, and their absence increased R&H's risks in the investment.

32.    A few months later, in October 2007, R&H advanced another $700,000 to CCCD. On or about October 31, 2007, CCCD and R&H entered into an Unsecured Convertible Note for $700,000, which was due by November 2009 (the "Second CCCD Note"). This debt was convertible into a 7% membership interest in CCCD. The Second CCCD Note, which was negotiated by Hughes, again failed to set performance milestones, to impose other financial requirements and to provide for adjustments to the conversion ratio based upon performance. The Second CCCD Note also was not approved or ratified by R&H's board of directors.

33.    During the year after these advances, CCCD seemed to make little progress as a start-up venture. It still generated no revenues. And promised reports on its performance were delayed or not delivered at all to R&H. Nonetheless, CCCD continued to rely on R&H as its piggy bank, while taking little, if any, action to raise funding from alternative sources. The Primary D&Os, in turn, continued to finance CCCD.

34.    Starting in June 2008, R&H advanced another $650,000 to CCCD. On or about June 20, 2008, CCCD and R&H entered into (a) an Unsecured Convertible Note for $500,000, which was due by June 2010 (the "Third CCCD Note"); and (b) an Unsecured Convertible Note for $150,000, which was due by June 2010 (the "Fourth CCCD Note"). These debts, together with the prior debts owed to R&H, were convertible into a 16.5% membership interest in CCCD. The Third CCCD Note and the Fourth CCCD Note, which were negotiated by Hughes, again failed to set performance milestones, to impose other financial requirements and to provide for adjustments to the conversion ratio based upon performance. Neither the Third CCCD Note nor the Fourth CCCD Note were approved or ratified by R&H's board of directors.

35.    By late 2009, CCCD had not made a single payment of principal or interest on any of the CCCD Notes.  CCCD still generated no revenues and had limited remaining funds.  Hughes acknowledged that the Primary D&Os "were always concerned about CCCD's financial status."  Echoing this concern, Weinberg sent an email to Dr. Ts'o in late 2009, urging CCCD to take actions to generate necessary cash flow to support its operations as "[t]he funding from R&H will only last so long."

36.    CCCD desperately needed a cash infusion.  It had failed to secure debt financing.  In an attempt to attract equity financing, Dr. Ts'o formed CCC Diagnostics, Inc. ("CCCD Inc.") and transferred a 100% membership interest in CCCD to that entity.  Hughes not only received stock in CCCD Inc., but was appointed to be its President and a member of its board of directors.

37.    In November and December 2009, CCCD began to explore the possibility of yet another advance from R&H and the conversion of its notes to equity in CCCD Inc.  In email negotiations regarding the conversion issue, Weinberg and R&H's outside counsel emphasized that R&H was effectively one of CCCD's founders, "keeping [that company] afloat," and acting as a "lifeline" for that company, "without which, [CCCD] could not continue."  As a result, they argued that R&H should be entitled to preferred shares and/or a substantially discounted share price (at $0.50 per share) in converting to equity in CCCD Inc.

38.    Weinberg also pointed out deficiencies in the CCCD Notes, which had been negotiated by Hughes.  In an email to Hughes, Weinberg complained:

> Furthermore, companies that invest in fledgling companies often establish milestones that need to be hit. For instance, if the company doesn't reach certain revenue levels by a predetermined date, the investor would either then own a greater percentage of the company or they would take over operating control of the company. When R&H made its original investments, it appeared to me that you were reluctant to negotiate with the president of CCCD, as he was your father-in-law . . . .

Hughes not only had diverted R&H's funds into a risky and ill-advised investment, but had failed to negotiate adequate protections for R&H based on his personal conflict of interest.

39.    Even after Weinberg noted this conflict, Hughes still refused to protect R&H's interest.  Hughes, for example, rejected the $0.50 share price, insisting that R&H should pay a

higher share price for equity in CCCD Inc. Hughes also argued that if the CCCD Notes were converted to equity, R&H should receive only a 16.5% equity interest in CCCD Inc. R&H's outside counsel disagreed with Hughes, stating that R&H should receive at least a 40% equity interest after repeatedly sustaining the floundering start-up enterprise. R&H's counsel also advised Hughes to negotiate a permanent board seat for R&H to protect its interests. Hughes, however, rejected these recommendations from R&H's outside counsel. Ultimately, Hughes and the other Primary D&Os declined to convert the CCCD Notes to equity.

40. Instead, they discussed advancing even more money to CCCD. In December 2009, given that R&H was struggling with its own liquidity issues, Hughes proposed that R&H provide an early cash out of his PTO benefits, so that the proceeds could be used to fund R&H's latest advance to CCCD. In an email to Hughes, Weinberg warned that this proposal would have negative financial consequences for R&H, stating that the company would be forced: (a) to use needed liquidity to fund the advance to CCCD, even though R&H had no incentive or obligation to provide an early cash out of his PTO; and (b) to pay unnecessary taxes on that income in the event that the advance were ever repaid.

41. This exchange prompted further discussions between Weinberg and Hughes about converting the CCCD Notes to equity. On December 31, 2009, Weinberg urged Hughes to take his fiduciary duties more seriously, stating:

> [Y]ou mentioned that the shares that R&H ought to receive for its recent investment should be on par with all other recent investments, including Dr. Ts'o's investments. I disagree. Any money that Dr. Ts'o chose to invest in his own company would not be considered in the same light as investments being made by outside investors in a private placement. I do not think it is fair, nor appropriate to commingle Dr. Ts'o's investments with R&H's . . . investments.

> Based upon your new responsibilities as interim CEO of CCCD, I think that you are in a position whereby there is a conflict of interest. It would appear to me that you may not be able to be objective in your assessment of what percentage R&H should receive for its investment in CCCD given that you are deeply involved in both companies.

> Furthermore, I would presume that Pauline, and perhaps your children, are among the heirs to Dr. and Mrs. Ts'o estate. As such, your family stands to

> gain personally by keeping a greater percentage of the money with the family. By funneling money away from R&H and into CCCD, you are taking money away from Keith [Goldfarb] and giving it to Pauline's family.

As Weinberg noted, Hughes had a clear conflict of interest.

42.    Nonetheless, to use Weinberg's words, the Primary D&Os continued "funneling money away from R&H and into CCCD."  On or about December 9, 2009, CCCD and R&H entered into an Unsecured Convertible Note for $240,000, which was due by December 2010 (the "Fifth CCCD Note," and all of the transfers from R&H to CCCD in connection with the First CCCD Note, Second CCCD Note, Third CCCD Note, Fourth CCCD Note, and Fifth CCCD Note, the "CCCD Transfers").  This debt, together with the prior debts owed to R&H, was convertible into an 18.9% membership interest in CCCD.  The Fifth CCCD Note, which was negotiated by Hughes, again failed to set performance milestones, to impose other financial requirements and to provide for adjustments to the conversion ratio based upon performance.  Nor was the Fifth CCCD Note approved or ratified by R&H's board of directors.

43.    In early 2010, CCCD finally commercialized its product after many years of research and preparation.  Hughes believed this product had "tremendous" value once commercialized and marketed.  Indeed, in a private placement memorandum dated August 2012, Hughes and other CCCD officers valued the company at $10 million.

44.    Shortly after this $10 million valuation, Hughes robbed R&H of its investment in CCCD.  Specifically, in November 2012, Hughes agreed to purchase the $1.89 million in CCCD Notes from R&H for "the sum of $1."  Given that these notes were convertible into an 18.9% membership interest, this $1.00 purchase price equated to a $5.29 valuation for CCCD.  In the end, Hughes obtained the CCCD Notes without paying anything—not even a dollar—to R&H (the "CCCD Note Sale").  This sale was not approved or ratified by R&H's board of directors; nor was it accompanied by a fairness opinion or determination, presumably because the transaction was so inherently unfair, one could not have been issued.

45.    The D&Os breached their fiduciary duties in connection with the CCCD Notes. The Primary D&Os caused R&H to make these ill-advised and risky investments, despite their clear conflicts of interest.  Then, when it appeared that R&H might salvage something from these investments, the Primary D&Os simply transferred R&H's interests to Hughes.  The Other D&Os knew about these problems surrounding the CCCD Notes, but did nothing to stop the Primary D&Os from funding and later selling the CCCD Notes.  Weinberg explicitly noted the underlying conflicts and breaches of duty by the Primary D&Os, but likewise did nothing to stop them.

**Other CCCD Transactions**

46.    In addition to advances under the CCCD Notes, the Primary D&Os found other ways to divert funds from R&H to CCCD.  In March 2010, for example, Hughes volunteered R&H's employees to re-design the CCCD website.  As a result, R&H incurred more than $20,000 in expenses, plus significantly more in unpaid fees, related to this work.  R&H never billed, or received payment from, CCCD for these fees and expenses (the "Unpaid CCCD Services").

47.    In 2012, as R&H faced significant cash-flow problems, Hughes reached out to a number of potential investors about providing liquidity to R&H.  Yet, when investors showed interest, Hughes tried to divert their investments to CCCD (the "Diverted CCCD Financing"). One Chinese investor, for example, had scheduled a meeting with Hughes after receiving information about R&H.  Before that meeting and apparently unprompted, Hughes sent a follow-up email to the investor attaching an executive summary of CCCD and stating that "even $500,000 would be wonderful."

48.    The D&Os breached their fiduciary duties in connection with the Unpaid CCCD Services and the Diverted CCCD Financing.  The Primary D&Os diverted services and financing from R&H to CCCD, despite their clear conflicts of interest.  The Other D&Os knew or should have known about these actions, given their obligation to exercise corporate oversight and monitoring, particularly in light of their awareness of existing conflicts and breaches of duty by the Primary D&Os related to CCCD.  Nonetheless, the Other D&Os did nothing to stop these harmful actions.

**The RHM Software Rights Transfer**

49.    The Primary D&Os also engaged in self-interested transactions with entities other than CCCD.  In late 2012, the Primary D&Os caused R&H to transfer valuable assets for no consideration whatsoever to RHM, a Malaysian company owned by the Primary D&Os.

50.    On November 1, 2008, the Primary D&Os caused R&H to enter into a Memorandum of Understanding (the "MOU") with RHM for a fixed term that was automatically renewable.  Under the MOU, RHM was to provide computer-graphic and animation services, as well as software development services, to R&H.  The MOU was executed by Hughes on RHM's behalf and by Buyyala on R&H's behalf.

51.    RHM later filed a proof of claim in R&H's bankruptcy case, seeking payment of more than $1.6 million under the MOU and attaching a purported copy of the MOU.  This copy of the MOU, unlike the executed version in R&H's files, includes an Addendum B that is not referenced anywhere in the MOU itself.  Strangely, Addendum B also has a typographical font that differs from the rest of the MOU.  Addendum B provides:

> [R&H] grants [RHM] i. access to all source code written, developed, maintained, modified or otherwise owned or under the control of CLIENT at any time during the term of the MOU (Software), ii. the right to enhance and modify that Software, iii. the right to use the Software in perpetuity, and iv. the right to commercialize the Software after good faith negotiations with any of the original shareholders John Hughes, Pauline Ts'o or Keith Goldfarb.

Thus, R&H transferred all rights to its software to RHM in perpetuity (the "RHM Software Rights Transfer").

52.    Hughes testified in R&H's bankruptcy case that the Primary D&Os made the RHM Software Rights Transfer in late 2012, when R&H's "financial status was shaky."  Hughes, moreover, testified that R&H received no consideration in exchange for the RHM Software Rights Transfer.  Nor was this transfer approved or ratified by R&H's board of directors.

53.    Hughes further testified that RHM now employs many of R&H's former employees, including Hughes himself.  He also explained that Ts'o, who initially worked for the entity that purchased R&H's assets in the bankruptcy case, was "fired" because of her

connections to RHM, which it deemed to be a competitor. Apparently, the Primary D&Os were oblivious to this conflict of interest when they made the RHM Software Rights Transfer.

54.    The D&Os breached their fiduciary duties in connection with the RHM Software Rights Transfer. With R&H sinking deeper into insolvency and preparing to liquidate its assets in bankruptcy, the Primary D&Os transferred all of R&H's software rights—which had been developed over decades and used to win multiple awards in the film industry—to a company owned by the Primary D&Os in exchange for no consideration. The Other D&Os knew or should have known about the RHM Software Rights Transfer, given their obligation to exercise corporate oversight and monitoring, particularly in light of their awareness of existing conflicts and other breaches of duty by the Primary D&Os. Nonetheless, like the CCCD Notes, establishing a pattern of unexcused inattention, the Other D&Os did nothing to stop the RHM Software Rights Transfer.

**The 2100 Grand Transaction**

55.    Starting in early 2009, the Primary D&Os caused R&H to enter into a multi-step real estate acquisition that personally benefitted them at R&H's expense. Through this transaction, the Primary D&Os drained more than $14 million in cash from R&H, seized the significant upside potential of the investment for themselves and shifted the significant downside risk of the investment to R&H. The net result was that R&H surrendered liquidity at a critical time, entered into a lease that provided no benefit to the company and suffered more than $9 million in losses.

56.    On March 9, 2009, R&H entered into an agreement to pay $27.4 million in order to purchase its new headquarters, a six-story office building located at 2100 East Grand Avenue in El Segundo, California (the "2100 Grand Property"). Shortly thereafter, R&H assigned its rights under that agreement to 2100 Grand, an entity owned by the Primary D&Os.

57.    After taking this assignment, the Primary D&Os obtained three loans to finance their purchase of the 2100 Grand Property. First, they obtained a $19.95 million loan from Bank of America to 2100 Grand, which loan was secured by the 2100 Grand Property. Second, they obtained a $2.1 million construction loan from Bank of America to 2100 Grand, which loan was

also secured by the 2100 Grand Property.  Third, they caused R&H to advance $7.25 million to the Primary D&Os.  Specifically, R&H advanced $4,640,000 to Hughes, $1,305,000 to Ts'o and $1,305,000 to Goldfarb ("Original Transfers"), pursuant to three promissory notes executed by the Primary D&Os (the "2100 Grand Notes").

58.    The 2100 Grand Notes were not secured by the 2100 Grand Property itself or by any other personal assets of the Primary D&Os.  Instead, the notes were secured only by their individual membership interests in 2100 Grand.  The 2100 Grand Notes also did not provide for periodic repayment of principal.  Rather, the notes provided for a balloon payment in 10 years with only a 4% annual interest rate payable in arrears.  Most importantly, the 2100 Grand Notes were non-recourse notes, meaning that the Primary D&Os were not personally obligated to repay the 2100 Grand Notes to R&H.  Thus, with the Primary D&Os insulated by the non-recourse provisions, R&H assumed the risk not only of non-payment as to the 2100 Grand Notes, but also of depreciation in value as to the 2100 Grand Property.  The Primary D&Os, on the other hand, stood to benefit from any appreciation in value.

59.    To finance their payments on the Bank of America loans (as well as their interest payments on the 2100 Grand Notes), the Primary D&Os caused R&H to lease the 2100 Grand Property, pursuant to a master lease agreement dated May 19, 2009.  This lease required R&H to pay $214,000 in base monthly rent to 2100 Grand, plus all insurance, taxes, and maintenance related to the 2100 Grand Property.  In total, R&H was required to pay approximately $264,000 per month under this lease.  Hughes testified in the bankruptcy case that this was a full market-rate lease, thus providing no special benefits to R&H.  Indeed, because it provided no special benefits, R&H rejected this lease in the bankruptcy case.

60.    Despite financing their loan payments through R&H's lease, the Primary D&Os violated a financial covenant on the Bank of America loans in early 2010.  Ironically, it was their self-dealing activities related to CCCD—loaning $240,000 under the Fifth CCCD Note—that triggered this covenant violation.  Due to this violation, 2100 Grand refinanced the Bank of America loans with a new third-party lender in December 2010.  This nearly $21 million

refinancing was secured by: (a) the 2100 Grand Property; (b) personal guarantees by the Primary D&Os; and (c) subordination of the 2100 Grand Notes to payment of those personal guarantees.

61.    As part of this refinancing, the Primary D&Os amended the 2100 Grand Notes and caused R&H to make $7 million in additional advances to them. Specifically, R&H advanced $4,480,000 to Hughes, $1,260,000 to Ts'o and $1,260,000 to Goldfarb ("Additional Transfers" together with the Original Transfers, the "2100 Grand Transfers"). The 2100 Grand Notes remained subject to the same terms as before—non-recourse terms with no meaningful collateral and a balloon payment due in 10 years. Thus, with the Primary D&Os still insulated by the non-recourse provisions, R&H assumed the risk of non-payment as to more than $14 million in total advances under the 2100 Grand Notes, plus the risk of depreciation in value as to the 2100 Grand Property. The Primary D&Os, on the other hand, still stood to benefit from any appreciation in value as to the 2100 Grand Property.

62.    In the end, R&H lost nearly $9.4 million related to the 2100 Grand Property and the 2100 Grand Notes (collectively, the "2100 Grand Transaction"). In early 2013, during the bankruptcy case, the Primary D&Os sold the 2100 Grand Property, thereby repaying the first-lien lender and eliminating their liability on the personal guarantees. R&H received the remaining sale proceeds, but incurred a loss of $9,393,646 which was never paid on the 2100 Grand Notes.

63.    The D&Os breached their fiduciary duties in connection with the 2100 Grand Transaction, a transaction that was inherently unfair to R&H. The Primary D&Os seized all upside potential of this investment for themselves, while shifting all downside risk to R&H. Perhaps more importantly, the Primary D&Os drained over $14 million from R&H at a time when the company was already suffering from serious liquidity issues, thereby leaving it unable to operate as a viable and healthy company. The Other D&Os knew about the 2100 Grand Transaction, but did nothing to stop the transaction or even to reasonably inform themselves about the transaction, including its inherent unfairness and significant risks to R&H. Nor did they seek a fairness opinion or determination regarding the 2100 Grand Transaction. They simply abdicated their role as R&H officers and/or directors.

## **Studio Contracts and Related Expenses**

64.    In addition to entering into self-interested transactions, the Primary D&Os and the Other D&Os grossly mismanaged R&H's business operations, which caused large, repeated and unmanageable losses and other financial overhang.  As an initial matter, the D&Os caused R&H to become increasingly dependent on only three powerful and often recalcitrant Studios—Warner Brothers, Twentieth Century Fox, and Universal Studios—for its work.  From 2010 through 2012, R&H relied on these three Studios to provide approximately 97% of the company's gross revenues.  Knowing that without a more diversified customer base, R&H would be forced to accept harmful contract terms dictated to them by this handful of Studios, the D&Os failed to widen R&H's customer base.  This failure put a chokehold on R&H's business ("Customer Diversification Failures").

65.    The D&Os also caused R&H to focus almost entirely on VFX and CG animation for feature films, which are notoriously low-margin projects.  Such projects provide only a 3% to 5% profit margin, at best, for a VFX and CG animation studio like R&H ("Low Profit Margin Work").  Because of this, if the project was substantially changed, delayed, or cancelled, the razor-thin profit margins would be eliminated, and the project would result in a loss to R&H.  As described below, even after R&H was hurt by numerous project changes, delays, or cancellations, the D&Os continued to carelessly pursue this business strategy, rather than delving into more commercially profitable business sectors, such as video games, television programs, commercials, and cinematics for special venues and theme parks.  In addition, as an alternative to the fixed-price Low Profit Margin Work, R&H should have focused more on negotiating for equity in films or co-producing films, like it did with *Yogi Bear,* a film which achieved worldwide box office sales of $200 million ("Neglect of Profitable Ventures").

66.    The D&Os, moreover, caused R&H either intentionally or recklessly to severely underbid potential VFX and CG animation feature film contracts with the Studios.  In certain instances, the D&Os knowingly caused R&H to make fixed bids that were lower than the calculated out of pocket estimates to deliver the requested services.  In other instances, the D&Os failed to obtain enough information from the Studios to submit an informed bid on the potential

project.  As a result, the D&Os submitted bids on behalf of R&H that often failed to clearly spell out the work that was included or not included in the fixed price, the milestones that needed to be satisfied to obtain payment and the assumptions that R&H was making.  These reckless and/or ignorant bidding practices ultimately led to R&H entering into numerous toxic contracts.  Whether done purposely or carelessly, according to Buyyala, the bidding process was "flawed" because the bids did not accurately account for the work to be completed by R&H.  By underbidding projects with the Studios, the D&Os severely damaged R&H as it caused the company to forgo potential profits and lose leverage with the Studios ("Underbidding Practices").

67.    In addition to the Underbidding Practices, the D&Os failed to negotiate for provisions protecting R&H against Studio-caused additional work and delays ("Lack of Contract Provision Protection").  The Studio contract provisions did not provide R&H with adequate means to financially account for changes and delays, such as increasing the overall bid, minimizing the degree of change required for submission of a change order, providing financial penalties for delays and/or requiring a non-refundable hold fee in the event the project stopped completely.  Further, Hughes admitted that, starting a few years before R&H's bankruptcy filing, he saw the delays as an increasing problem for R&H and other VFX studios.  As a result of their actions, the D&Os forced R&H into a defenseless position whereby it was unable to financially protect itself in the event that the Studios made changes to the project or pushed out the timeline.

68.    Likewise, even when R&H was contractually permitted to seek payment for change orders, the D&Os failed to monitor and obtain payment from the Studios for these change orders ("Inadequate Change Order Administration").  In many instances, the Studio demanded that additional work be completed outside of the contractually agreed upon work.  To obtain payment for such work, the Studio contracts typically required R&H to submit a "change order" form before the extra work was completed and to gain Studio approval.  However, the D&Os intentionally declined to pursue such change orders.  Instead, R&H's management felt that: "unless we can prove to the studio that there were additional shots or that there was in fact a very clear change of direction on the part of the director, you know, we just don't get much in the way of overages" and "[i]f shots change, if they were lengthened, if they're shortened, if you add

characters, you can't ask for an overage." As a result, the D&Os forced R&H to incur millions of additional work expenses while abandoning the contractual collection mechanisms for such work.

69.     Further, the D&Os subjected R&H to massive payroll liabilities and when faced with a liquidity crisis, adamantly refused to reduce those excessive costs by cutting staff and superfluous costs (the "Cost-Cutting Failures"). In fact, R&H had hundreds of idle staff members who continued to collect salaries and benefits during R&H's financial crisis. In an interview regarding R&H, Hughes acknowledged that the D&Os were aware that they desperately needed to "cut people's salaries or to lay off a significant number of people or to work people overtime without paying them for overtime by restructuring their contracts" but explicitly chose not to make such changes in order to maintain the R&H "culture." Instead of altering the culture to save the company financially, Hughes acknowledged that the D&Os drove R&H into bankruptcy and "destroyed" the company by failing to take such action.

70.     Finally, even though they were aware that they were "destroying" the company, the D&Os continued to engage in wasteful practices such as maintaining a reckless PTO policy, an excessive sabbatical policy, and a preferential benefit payout policy ("Wasteful Benefit Policies"). In fact, prior to 2011, the D&Os authorized a PTO and sabbatical policy that gave most of the company's 700+ employees at least six weeks of vacation per year and paid sabbaticals of eight weeks every five years, both of which freely rolled over into the next calendar year. As a result, by early April 2011, the D&Os had caused R&H to accumulate over 2,877 weeks of unpaid PTO totaling almost $7 million in liabilities and over 1,312 weeks of unpaid sabbatical pay representing over $3 million in liabilities. In addition, the D&Os created a preferential benefit payout policy which permitted executives and supervisors to cash out their accrued PTO and sabbatical leave by adding payments to their yearly salaries.

71.     Likewise, to facilitate a cash out of benefits sooner for certain executives, the D&Os permitted those employees to resign from their position and immediately be re-hired as a consultant to R&H. For example, in May 2012, Weinberg resigned as Chief Financial Officer and subsequently received cash payments for his accrued PTO and sabbatical leave which, as of April 13, 2012, totaled 18.99 weeks of PTO and 8 weeks of paid sabbatical leave (the "Weinberg

PTO Payments"). Immediately following his resignation, Weinberg was re-hired as a consultant but appeared to resume all the responsibilities of Chief Financial Officer. As a result of these irresponsible and deleterious policies, the D&Os drained R&H of its liquidity at a time when the company's financials were unsustainable.

72. Through these exceedingly wasteful and reckless practices, the D&Os "destroyed" R&H. As Berger admitted in a *Wall Street Journal* article, "[w]e made some bad investment choices that cost us a lot of capital and we did not book enough work to sustain the size of the company." The Customer Diversification Failures, Low Profit Margin Work, Neglect of Profitable Ventures, Underbidding Practices, Lack of Contract Provisional Protection, Inadequate Change Order Administration, Cost-Cutting Failures, Wasteful Benefit Policies, and Weinberg PTO Payments are collectively referred to as the "Reckless Operational Acts" in this Complaint.

73. The Other D&Os knew or should have known about the Reckless Operational Acts. Yet they did nothing to change the situation or to prevent the harm done to R&H. Manifesting a consistent pattern of inattentiveness, the Other D&Os relinquished their role as R&H officers and/or directors and ignored these problems.

**Loss of NOLs**

74. Consistent with their irresponsible manner of addressing the economic realities of R&H's operations, in 2011, the Primary D&Os and Weinberg made an illogical and reckless NOL tax election that had a severe impact on R&H's liquidity.

75. More specifically, on R&H's 2010 Federal corporate income tax return, the Primary D&Os and Weinberg elected to carry its 2010 net operating losses ("NOLs") forward to 2011, rather than back to 2008 and 2009. NOLs can be carried back and used to recover income taxes paid in the prior two years or carried forward to offset taxes due in future years (up to 20 years). NOLs are carried back to recover taxes already paid unless an election is made to carry them forward. Companies never make an election to carry an NOL forward to cover speculative future income when they have enough prior income to fully utilize the NOL; yet this is precisely what the Primary D&Os and Weinberg did.

76.    R&H filed its tax return for the 2010 calendar year on September 15, 2011. Despite the fact that R&H was in need of cash and had gains that it needed to cover from previous years (for which it had paid taxes that would have been refunded), the Primary D&Os filed a tax return that elected to carry the 2010 NOL *forward* to 2011 (the "Loss of NOLs").   Oddly, notwithstanding the Reckless Operational Acts and liquidity challenges that R&H faced, the Primary D&Os and Weinberg inexplicably acted as if they would have future and plentiful gains to cover these NOLs.  When Hughes was asked under oath about this valuable NOL, which might have provided a lifeline to R&H, he explained that issues like this were never presented to him, and that no board meeting addressed this issue.  Despite the supervisory role the Primary D&Os were obligated to fulfill, they simply failed to notice or address this important issue.

77.    By so doing, the Primary D&Os and Weinberg caused R&H to make a decision no director or officer could ever responsibly make.  R&H forwent a non-speculative utilization of the NOLs and a needed source of cash in the form of a tax refund, in return for the risk that the NOL might be lost altogether.  Instead of taking this foolish risk, the Primary D&Os should have caused R&H to file the 2010 tax return at the earliest possible time, in January of 2011, documenting the losses experienced in 2010 as well as a carry back claim that requested a refund of taxes paid in 2008 and 2009.  No such responsible and rational action was taken.

78.    Such a cash refund, moreover, would have been made available promptly.  Since the IRS routinely processes such claims within 90 days of filing, R&H would likely have received the refund in the first or second quarter of 2011.  Instead, R&H chose to gamble with the NOL, and carry it forward to be used against profits in 2011 and/or 2012, profits that were yet to be earned and highly speculative.

79.    The probable consequence of this reckless election did, in fact, come to pass. While R&H experienced some profit in 2011 for which the NOL was used, these profits could have nevertheless been covered by a very large loss sustained in 2012, representing an NOL that when carried back to 2011 offset all the profits earned in 2011.  Thus, no taxes were saved by the carry forward of the NOL.  By senselessly refusing to do the obvious—carry the NOL back to

2008 or 2009 and assuming that it could be (and would be) used in the uncharted future, the Primary D&Os and Weinberg cost R&H well over $900,000.

80.    Weinberg displayed a reckless disregard for his duties, and the Primary D&Os knew or should have known of the Loss of NOLs and the harm that could be done to R&H.  The Other D&Os, following their pattern of inattentiveness, either failed to inform themselves of the issue or act to prevent the Loss of NOLs.

## DAMAGES

81.    Prior to the harmful actions of the D&Os, R&H had a present value well in excess of $100 million based on average revenue and other factors, and pursuant to a number of reliable valuation techniques.  Sadly, following its collapse into bankruptcy, R&H's assets sold for only about $30 million (after deduction for assumed liabilities).  All of the actions described above caused the destruction of over $70 million of value.

82.    The actions of the D&Os also caused more specific categories of damages, including damages associated with:  (a) the CCCD Transfers and the CCCD Note Sale; (b) the Unpaid CCCD Services; (c) the Diverted CCCD Financing; (d) the RHM Software Rights Transfer; (e) the 2100 Grand Transaction and 2100 Grand Transfers; (f) the Reckless Operational Acts; and (g) the Loss of NOLs.

## COUNT 1

## BREACH OF FIDUCIARY DUTIES OF LOYALTY, CARE AND

## GOOD FAITH AGAINST HUGHES, TS'O AND GOLDFARB

### California Corporate Code §§ 309, 310 and Common Law

83.    The Trustee repeats and re-alleges the allegations set forth above.

84.    The Primary D&Os, in their roles as officers and/or directors, each owed fiduciary duties of loyalty, care and good faith to R&H.

85.    The Primary D&Os each were grossly negligent and reckless, did not act in the best interest of R&H and its creditors and/or did not exercise an informed business judgment with the due care and consideration that an ordinarily prudent person in a like position would use under similar circumstances with respect to the CCCD Transfers, the CCCD Note Sale, the Unpaid

23

CCCD Services, the Diverted CCCD Financing, the RHM Software Rights Transfer, the 2100 Grand Transaction, the 2100 Grand Transfers, the Reckless Operational Acts and the Loss of NOLs.

86.     The Primary D&Os each breached their fiduciary duties to R&H by simultaneously acting as officers, directors and/or shareholders of R&H, CCCD, RHM and 2100 Grand, and authorizing the CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD Services, the Diverted CCCD Financing, the RHM Software Rights Transfer, the 2100 Grand Transaction and the 2100 Grand Transfers that failed to protect the interest of R&H and benefitted CCCD, RHM and 2100 Grand to the detriment of R&H.

87.     The Primary D&Os each acted without reasonable inquiry, with improper motives and/or as a result of conflicts of interest with respect to the CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD Services, the Diverted CCCD Financing, the RHM Software Rights Transfer, the 2100 Grand Transaction, the 2100 Grand Transfers, the Reckless Operational Acts and Loss of NOLs.

88.     The Primary D&Os committed acts or omissions that (a) the Primary D&Os believed to be contrary to the best interests of R&H or that involved the absence of good faith on the part of the Primary D&Os; (b) showed a reckless disregard for the Primary D&Os' duty to R&H in circumstances in which the Primary D&Os were aware or should have been aware, in the ordinary course of performing the Primary D&Os' duties, of a risk of serious injury to R&H; (c) constituted an unexcused pattern of inattention that amounted to an abdication of the Primary D&Os' duty to R&H.

89.     Each of these breaches of fiduciary duty harmed R&H by proximately causing damages relating to the specified act and by destroying its business.  As a result, the Primary D&Os are liable to the Trustee for damages in an amount to be determined at trial.

**<u>COUNT 2</u>**

**BREACH OF FIDUCIARY DUTIES OF LOYALTY, CARE AND**

**GOOD FAITH AGAINST BERGER, BUYYALA, FEENEY AND WEINBERG**

**California Corporate Code §§ 309, 310 and Common Law**

90.     The Trustee repeats and re-alleges the allegations set forth above.

91.     The Other D&Os, in their roles as officers and/or directors, each owed fiduciary duties of loyalty, care and good faith to R&H and were required to use their utmost ability to control, monitor and supervise the affairs of R&H.

92.     The Other D&Os each had the power to control, influence and regulate the acts of R&H and the Primary D&Os.

93.     The Other D&Os each were grossly negligent and reckless, did not act in the best interest of R&H and its creditors and/or did not exercise an informed business judgment with the due care and consideration that an ordinarily prudent person in a like position would use under similar circumstances with respect to the CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD Services, the Diverted CCCD Financing, the RHM Software Rights Transfer, the 2100 Grand Transaction, the 2100 Grand Transfers, the Reckless Operational Acts and the Loss of NOLs of which they were aware or should have been aware.

94.     The Other D&Os each acted without reasonable inquiry, with improper motives and/or as a result of conflicts of interest with respect to the CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD Services, the Diverted CCCD Financing, the RHM Software Rights Transfer, the 2100 Grand Transaction, the 2100 Grand Transfers, the Reckless Operational Acts and Loss of NOLs.

95.     The Other D&Os each breached their fiduciary duties by being derelict in their duties and failing to act in the best interest of R&H and by failing to exercise due care, including making a reasonably inquiry, as an ordinarily prudent person in a like position would do under similar circumstances, into the actions of the Primary D&Os.

96.     By failing to supervise and prevent CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD Services, the Diverted CCCD Financing, the RHM Software Rights Transfer, the

2100 Grand Transaction, the 2100 Grand Transfers, the Reckless Operational Acts, and the Loss of NOLs, the Other D&Os each engaged in a sustained and systematic failure to exercise oversight and to establish a reasonable information and reporting system.

97.    The Other D&Os committed acts and omissions that (a) the Other D&Os believed to be contrary to the best interests of R&H or that involved the absence of good faith on the part of the Other D&Os; (b) showed a reckless disregard for the Other D&Os' duty to R&H in circumstances in which the Other D&Os were aware or should have been aware, in the ordinary course of performing the Other D&Os' duties, of a risk of serious injury to R&H; and (c) constituted an unexcused pattern of inattention that amounted to an abdication of the Other D&Os' duty to R&H.

98.    Each of these breaches of fiduciary duty harmed R&H by proximately causing damages relating to the specified act and by destroying its business.  As a result, the Other D&Os are liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 3

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

### AGAINST CCCD

99.    The Trustee repeats and re-alleges the allegations set forth above.

100.    As a result of the familial relationship between CCCD's founder and two of the Primary D&Os, the roles that Hughes played within CCCD, as well as CCCD's participation in the CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD Services and the Diverted CCCD Financing, CCCD had actual knowledge that the Primary D&Os were engaged in conduct that constituted a breach of their fiduciary duties to R&H.  CCCD also had actual knowledge that the Other D&Os were derelict in their fiduciary duties to R&H.

101.    In accepting the CCCD Transfers, allowing the CCCD Note Sale, accepting the Unpaid CCCD Services and permitting the Diverted CCCD Financing, CCCD substantially assisted and encouraged the Primary D&Os and the Other D&Os to breach their fiduciary duties to R&H.

102.    CCCD aided and abetted the breach of fiduciary duties by the Primary D&Os and the Other D&Os in connection with the CCCD Transfers, CCCD Note Sale, the Unpaid CCCD Services and the Diverted CCCD Financing, thereby proximately causing damage to R&H. As a result, CCCD is liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 4

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

### AGAINST RHM

103.    The Trustee repeats and re-alleges the allegations set forth above.

104.    As a result of the overlapping roles and ownership interests of the Primary D&Os in R&H and RHM and the fiduciary duties owed to each company, RHM had actual knowledge that the Primary D&Os were engaged in conduct that constituted a breach of their fiduciary duties to R&H.  RHM also had actual knowledge that the Other D&Os were derelict in their fiduciary duties to R&H.

105.    In entering into and receiving the RHM Software Rights Transfer, RHM substantially assisted and encouraged the Primary D&Os and the Other D&Os to breach their fiduciary duties to R&H.

106.    RHM aided and abetted the breach of fiduciary duties by the Primary D&Os and the Other D&Os in connection with the RHM Software Rights Transfer, thereby proximately causing damage to R&H.  As a result, RHM is liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 5

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES

### AGAINST 2100 GRAND

107.    The Trustee repeats and re-alleges the allegations set forth above.

108.    As a result of the overlapping roles and ownership interests of the Primary D&Os in R&H and 2100 Grand and the fiduciary duties owed to each company, 2100 Grand had actual knowledge that the Primary D&Os were engaged in conduct that constituted a breach of their

fiduciary duties to R&H.  2100 Grand also had actual knowledge that the Other D&Os were derelict in their fiduciary duties to R&H.

109.    In entering into and receiving the 2100 Grand Transfers, 2100 Grand substantially assisted and encouraged the Primary D&Os and the Other D&Os to breach their fiduciary duties to R&H.

110.    2100 Grand aided and abetted the breach of fiduciary duties by the Primary D&Os and the Other D&Os in connection with the 2100 Grand Transfers, thereby proximately causing damage to R&H.  As a result, 2100 Grand is liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 6

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO RHM SOFTWARE RIGHTS TRANSFER

### 11 U.S.C. § 544 and California Civil Code § 3439.04(a)(1)

111.    The Trustee repeats and re-alleges the allegations set forth above.

112.    R&H made the RHM Software Rights Transfer, which constituted a transfer of R&H's interest in property to RHM.

113.    The RHM Software Rights Transfer was made with actual intent to hinder, delay or defraud R&H's then-existing or future creditors.  The Primary D&Os knew that (a) R&H was insolvent and doomed to fail, and (b) making the RHM Software Rights Transfer would reduce the amount of assets available for distribution to R&H's creditors in the imminent bankruptcy. As such, they knew to a substantial certainty that the inevitable consequence of making the RHM Software Rights Transfer was to hinder, delay or defraud R&H's creditors.  Further, the RHM Software Rights Transfer was made to or for the benefit of the Primary D&Os.

114.    R&H did not receive reasonably equivalent value in exchange for the RHM Software Rights Transfer.

115.    At the time of the RHM Software Rights Transfer, R&H (a) was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to that business or transaction, (b) intended to incur, or believed or reasonably should have believed that

1    it would incur, debts beyond its ability to pay as they came due, and/or (c) was insolvent in that,

2    at a fair valuation, the sum of R&H's debts were greater than the sum of R&H's assets.

3        116.    At the time of the RHM Software Rights Transfer, there was at least one creditor

4    of R&H that held an allowable unsecured claim as of the Petition Date and could have avoided

5    the RHM Software Rights Transfer under applicable state law, including California Civil Code

6    § 3439.04(a)(1) and California common law.  Further, there exists at least one creditor who could

7    not have reasonably discovered the fraudulent nature of the RHM Software Rights Transfer until

8    within one year of the Petition Date.

9        117.    Accordingly, the RHM Software Rights Transfer should be avoided as a fraudulent

10    transfer under 11 U.S.C. § 544(b)(1) and applicable state law, including California Civil Code

11    § 3439.04(a)(1) and California common law.

12    ### COUNT 7

13    ### AVOIDANCE OF FRAUDULENT TRANSFER

14    ### RELATED TO RHM SOFTWARE RIGHTS TRANSFER

15    ### 11  U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05

16        118.    The Trustee repeats and re-alleges the allegations set forth above.

17        119.    R&H made the RHM Software Rights Transfer, which constituted a transfer of

18    R&H's interest in property to RHM.

19        120.    R&H did not receive reasonably equivalent value in exchange for the RHM

20    Software Rights Transfer.

21        121.    At the time of the RHM Software Rights Transfer, R&H (a) was engaged in a

22    business or a transaction for which its remaining assets were unreasonably small in relation to that

23    business or transaction, (b) intended to incur, or believed or reasonably should have believed that

24    it would incur, debts beyond its ability to pay as they came due, and/or (c) was insolvent in that,

25    at a fair valuation, the sum of R&H's debts were greater than the sum of R&H's assets.

26        122.    At the time of the RHM Software Rights Transfer, there was at least one creditor

27    of R&H that held an allowable unsecured claim as of the Petition Date and could have avoided

28

RHM Software Rights Transfer under applicable state law, including California Civil Code §§ 3439.04(a)(2), 3439.05, and California common law.

123.    Accordingly, the RHM Software Rights Transfer should be avoided as a fraudulent transfer under 11 U.S.C. § 544(b)(1) and applicable state law, including California Civil Code §§ 3439.04(a)(2), 3439.05, and California common law.

**COUNT 8**

**AVOIDANCE OF FRAUDULENT TRANSFER**

**RELATED TO RHM SOFTWARE RIGHTS TRANSFER**

**11 U.S.C. § 548(a)(1)(A)**

124.    The Trustee repeats and re-alleges the allegations set forth above.

125.    R&H made the RHM Software Rights Transfer, which constituted a transfer of R&H's interest in property to RHM.

126.    The RHM Software Rights Transfer was made with actual intent to hinder, delay or defraud R&H's then-existing or future creditors.  The Primary D&Os knew that (a) R&H was insolvent and doomed to fail, and (b) making the RHM Software Rights Transfer would reduce the amount of assets available for distribution to R&H's creditors in the imminent bankruptcy. As such, they knew to a substantial certainty that the inevitable consequence of making the RHM Software Rights Transfer was to hinder, delay or defraud R&H's creditors.  Further, the RHM Software Rights Transfer was made to or for the benefit of the Primary D&Os.

127.    R&H did not receive reasonably equivalent value in exchange for the RHM Software Rights Transfer.

128.    R&H was (a) insolvent on the date of the RHM Software Rights Transfer or rendered insolvent as a result of the RHM Software Rights Transfer, (b) engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small, or (c) intending to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to repay as a result of the RHM Software Rights Transfer.

129.    Accordingly, the RHM Software Rights Transfer should be avoided as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(A).

## COUNT 9

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO RHM SOFTWARE RIGHTS TRANSFER

### 11 U.S.C. § 548(a)(1)(B)

130.     The Trustee repeats and re-alleges the allegations set forth above.

131.     R&H made the RHM Software Rights Transfer, which constituted a transfer of R&H's interest in property to RHM.

132.     R&H did not receive reasonably equivalent value in exchange for the RHM Software Rights Transfer.

133.     R&H was (a) insolvent on the date of the RHM Software Rights Transfer or rendered insolvent as a result of the RHM Software Rights Transfer, (b) engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small, or (c) intending to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to repay as a result of the RHM Software Rights Transfer.

134.     Accordingly, the RHM Software Rights Transfer should be avoided as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

## COUNT 10

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO CCCD NOTE SALE

### 11 U.S.C. § 544 and California Civil Code § 3439.04(a)(1)

135.     The Trustee repeats and re-alleges the allegations set forth above.

136.     R&H engaged in the CCCD Note Sale, which constituted a transfer of R&H's interest in property to Hughes.

137.     The CCCD Note Sale was made with actual intent to hinder, delay or defraud R&H's then-existing or future creditors.  The Primary D&Os knew that (a) R&H was insolvent and doomed to fail, and (b) making the CCCD Note Sale would reduce the amount of assets available for distribution to R&H's creditors in the imminent bankruptcy.  As such, they knew to a substantial certainty that the inevitable consequence of making the CCCD Note Sale was to

hinder, delay or defraud R&H's creditors.  Further, the CCCD Note Sale was made to or for the benefit of Hughes.

138.    R&H did not receive reasonably equivalent value in exchange for the CCCD Note Sale.

139.    At the time of the CCCD Note Sale, R&H (a) was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to that business or transaction, (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due, and/or (c) was insolvent in that, at a fair valuation, the sum of R&H's debts were greater than the sum of R&H's assets.

140.    At the time of the CCCD Note Sale, there was at least one creditor of R&H that held an allowable unsecured claim as of the Petition Date and could have avoided the CCCD Note Sale under applicable state law, including California Civil Code § 3439.04(a)(1) and California common law.  Further, there exists at least one creditor who could not have reasonably discovered the fraudulent nature of the CCCD Note Sale until within one year of the Petition Date.

141.    Accordingly, the CCCD Note Sale should be avoided as a fraudulent transfer under 11 U.S.C. § 544(b)(1) and applicable state law, including California Civil Code § 3439.04(a)(1) and California common law.

## COUNT 11

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO CCCD NOTE SALE

### 11  U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05

142.    The Trustee repeats and re-alleges the allegations set forth above.

143.    R&H engaged in the CCCD Note Sale, which constituted a transfer of R&H's interest in property to Hughes.

144.    R&H did not receive reasonably equivalent value in exchange for the CCCD Note Sale.

145.    At the time of the CCCD Note Sale, R&H (a) was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to that business or

transaction, (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due, and/or (c) was insolvent in that, at a fair valuation, the sum of R&H's debts were greater than the sum of R&H's assets.

146.    At the time of the CCCD Note Sale, there was at least one creditor of R&H that held an allowable unsecured claim as of the Petition Date and could have avoided CCCD Note Sale under applicable state law, including California Civil Code §§ 3439.04(a)(2), 3439.05, and California common law.

147.    Accordingly, the CCCD Note Sale should be avoided as a fraudulent transfer under 11 U.S.C. § 544(b)(1) and applicable state law, including California Civil Code §§ 3439.04(a)(2), 3439.05 and California common law.

## COUNT 12

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO CCCD NOTE SALE

### 11  U.S.C. § 548(a)(1)(A)

148.    The Trustee repeats and re-alleges the allegations set forth above.

149.    R&H engaged in the CCCD Note Sale, which constituted a transfer of R&H's interest in property to Hughes.

150.    The CCCD Note Sale was made with actual intent to hinder, delay or defraud R&H's then-existing or future creditors.  The Primary D&Os knew that (a) R&H was insolvent and doomed to fail, and (b) making the CCCD Note Sale would reduce the amount of assets available for distribution to R&H's creditors in the imminent bankruptcy.  As such, they knew to a substantial certainty that the inevitable consequence of making the CCCD Note Sale was to hinder, delay or defraud R&H's creditors.  Further, the CCCD Note Sale was made to or for the benefit of Hughes.

151.    R&H did not receive reasonably equivalent value in exchange for the CCCD Note Sale.

152.    R&H was (a) insolvent on the date of the CCCD Note Sale or rendered insolvent as a result of the CCCD Note Sale, (b) engaged or was about to engage in a business or

transaction for which its remaining assets were unreasonably small, or (c) intending to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to repay as a result of the CCCD Note Sale.

153.    Accordingly, the CCCD Note Sale should be avoided as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(A).

## COUNT 13

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO CCCD NOTE SALE

### 11  U.S.C. § 548(a)(1)(B)

154.    The Trustee repeats and re-alleges the allegations set forth above.

155.    R&H engaged in the CCCD Note Sale, which constituted a transfer of R&H's interest in property to Hughes.

156.    R&H did not receive reasonably equivalent value in exchange for the CCCD Note Sale.

157.    R&H was (a) insolvent on the date of the CCCD Note Sale or rendered insolvent as a result of the CCCD Note Sale, (b) engaged or was about to engage in a business or transaction for which its remaining assets were unreasonably small, or (c) intending to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to repay as a result of the CCCD Note Sale.

158.    Accordingly, the CCCD Note Sale should be avoided as a fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

## COUNT 14

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO CCCD TRANSFERS

### 11  U.S.C. § 544 and California Civil Code § 3439.04(a)(1)

159.    The Trustee repeats and re-alleges the allegations set forth above.

160.    R&H made the CCCD Transfers, which each constituted a transfer of R&H's interest in property to CCCD.

161.    The CCCD Transfers were made with actual intent to hinder, delay or defraud R&H's then-existing or future creditors.  The Primary D&Os knew that (a) R&H was insolvent and doomed to fail, and (b) making the CCCD Transfers would reduce the amount of assets available for distribution to R&H's creditors in the imminent bankruptcy.  As such, they knew to a substantial certainty that the inevitable consequence of making the CCCD Transfers was to hinder, delay or defraud R&H's creditors.  Further, the CCCD Transfers were made to or for the benefit of CCCD, an entity founded by a family member of two of the Primary D&Os.

162.    R&H did not receive reasonably equivalent value in exchange for the CCCD Transfers.  At the time of the CCCD Transfers, R&H (a) was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to that business or transaction, (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due, and/or (c) was insolvent in that, at a fair valuation, the sum of R&H's debts were greater than the sum of R&H's assets.

163.    At the time of the CCCD Transfers, there was at least one creditor of R&H that held an allowable unsecured claim as of the Petition Date and could have avoided the CCCD Transfers under applicable state law, including California Civil Code § 3439.04(a)(1) and California common law.  Further, there exists at least one creditor who could not have reasonably discovered the fraudulent nature of the CCCD Transfers until within one year of the Petition Date.

164.    Accordingly, the CCCD Transfers should be avoided as fraudulent transfers under 11 U.S.C. § 544(b)(1) and applicable state law, including California Civil Code § 3439.04(a)(1) and California common law.

## COUNT 15

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO CCCD TRANSFERS

### 11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05

165.    The Trustee repeats and re-alleges the allegations set forth above.

166.    R&H made the CCCD Transfers, which each constituted a transfer of R&H's interest in property to CCCD.

167.    R&H did not receive reasonably equivalent value in exchange for the CCCD Transfers.

168.    At the time of the CCCD Transfers, R&H (a) was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to that business or transaction, (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due, and/or (c) was insolvent in that, at a fair valuation, the sum of R&H's debts were greater than the sum of R&H's assets.

169.    At the time of the CCCD Transfers, there was at least one creditor of R&H that held an allowable unsecured claim as of the Petition Date and could have avoided CCCD Transfers under applicable state law, including California Civil Code §§ 3439.04(a)(2), 3439.05 and California common law.

170.    Accordingly, the CCCD Transfers should be avoided as fraudulent transfers under 11 U.S.C. § 544(b)(1) and applicable state law, including California Civil Code §§ 3439.04(a)(2), 3439.05 and California common law.

## COUNT 16

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO 2100 GRAND TRANSFERS

### 11 U.S.C. § 544 and California Civil Code § 3439.04(a)(1)

171.    The Trustee repeats and re-alleges the allegations set forth above.

172.    R&H made the 2100 Grand Transfers, which each constituted a transfer of R&H's interest in property to or for the benefit of the Primary D&Os.

173.    The 2100 Grand Transfers were made with actual intent to hinder, delay or defraud R&H's then-existing or future creditors.  The Primary D&Os knew that (a) R&H was insolvent and doomed to fail, and (b) making the 2100 Grand Transfers would reduce the amount of assets available for distribution to R&H's creditors in the imminent bankruptcy.  As such, they knew to a substantial certainty that the inevitable consequence of making the 2100 Grand Transfers was to hinder, delay or defraud R&H's creditors.  Further, the 2100 Grand Transfers were made to or for the benefit of the Primary D&Os.

174.   R&H did not receive reasonably equivalent value in exchange for the 2100 Grand Transfers.

175.   At the time of the 2100 Grand Transfers, R&H (a) was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to that business or transaction, (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due, and/or (c) was insolvent in that, at a fair valuation, the sum of R&H's debts were greater than the sum of R&H's assets.

176.   At the time of the 2100 Grand Transfers, there was at least one creditor of R&H that held an allowable unsecured claim as of the Petition Date and could have avoided the 2100 Grand Transfers under applicable state law, including California Civil Code § 3439.04(a)(1) and California common law.  Further, there exists at least one creditor who could not have reasonably discovered the fraudulent nature of the 2100 Grand Transfers until within one year of the Petition Date.

177.   Accordingly, the 2100 Grand Transfers should be avoided as fraudulent transfers under 11 U.S.C. § 544(b)(1) and applicable state law, including California Civil Code § 3439.04(a)(1) and California common law.

## **COUNT 17**

### **AVOIDANCE OF FRAUDULENT TRANSFER**

### **RELATED TO 2100 GRAND TRANSFERS**

### **11 U.S.C. § 544 and California Civil Code §§ 3439.04(a)(2) and 3439.05**

178.   The Trustee repeats and re-alleges the allegations set forth above.

179.   R&H made the 2100 Grand Transfers, which each constituted a transfer of R&H's interest in property to or for the benefit of the Primary D&Os.

180.   R&H did not receive reasonably equivalent value in exchange for the 2100 Grand Transfers.

181.   At the time of the 2100 Grand Transfers, R&H (a) was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to that business or transaction, (b) intended to incur, or believed or reasonably should have believed that it would

incur, debts beyond its ability to pay as they came due, and/or (c) was insolvent in that, at a fair

valuation, the sum of R&H's debts were greater than the sum of R&H's assets.

182.    At the time of the 2100 Grand Transfers, there was at least one creditor of R&H

that held an allowable unsecured claim as of the Petition Date and could have avoided 2100

Grand Transfers under applicable state law, including California Civil Code §§ 3439.04(a)(2),

3439.05 and California common law.

183.    Accordingly, the 2100 Grand Transfers should be avoided as fraudulent transfers

under 11 U.S.C. § 544(b)(1) and applicable state law, including California Civil Code

§§ 3439.04(a)(2), 3439.05 and California common law.

## COUNT 18

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO 2100 GRAND TRANSFERS

### 11 U.S.C. § 548(a)(1)(A)

184.    The Trustee repeats and re-alleges the allegations set forth above.

185.    R&H made the 2100 Grand Transfers, which each constituted a transfer of R&H's

interest in property to or for the benefit of the Primary D&Os.

186.    The 2100 Grand Transfers were made with actual intent to hinder, delay or defraud

R&H's then-existing or future creditors.  The Primary D&Os knew that (a) R&H was insolvent

and doomed to fail, and (b) making the 2100 Grand Transfers would reduce the amount of assets

available for distribution to R&H's creditors in the imminent bankruptcy.  As such, they knew to

a substantial certainty that the inevitable consequence of making the 2100 Grand Transfers was to

hinder, delay or defraud R&H's creditors.  Further, the 2100 Grand Transfers made to or for the

benefit of the Primary D&Os.

187.    R&H did not receive reasonably equivalent value in exchange for the 2100 Grand

Transfers.

188.    R&H was (a) insolvent on the date of the 2100 Grand Transfers or rendered

insolvent as a result of the 2100 Grand Transfers, (b) engaged or was about to engage in a

business or transaction for which its remaining assets were unreasonably small, or (c) intending to

1  incur, or believed or reasonably should have believed that it would incur, debts beyond its ability
2  to repay as a result of the 2100 Grand Transfers.

3       189.    Accordingly, the 2100 Grand Transfers should be avoided as fraudulent transfers
4  under 11 U.S.C. § 548(a)(1)(A).

## COUNT 19

### AVOIDANCE OF FRAUDULENT TRANSFER

### RELATED TO 2100 GRAND TRANSFERS

### 11 U.S.C. § 548(a)(1)(B)

9       190.    The Trustee repeats and re-alleges the allegations set forth above.

10      191.    R&H engaged in the 2100 Grand Transfers, which each constituted a transfer of
11  R&H's interest in property to or for the benefit of the Primary D&Os.

12      192.    R&H did not receive reasonably equivalent value in exchange for the 2100 Grand
13  Transfers.

14      193.    R&H was (a) insolvent on the date of the 2100 Grand Transfers or rendered
15  insolvent as a result of the 2100 Grand Transfers, (b) engaged or was about to engage in a
16  business or transaction for which its remaining assets were unreasonably small, or (c) intending to
17  incur, or believed or reasonably should have believed that it would incur, debts beyond its ability
18  to repay as a result of the 2100 Grand Transfers.

19      194.    Accordingly, the 2100 Grand Transfers should be avoided as fraudulent transfers
20  under 11 U.S.C. § 548(a)(1)(B).

## COUNT 20

### AVOIDANCE OF PREFERENTIAL TRANSFER

### RELATED TO WEINBERG PTO PAYMENTS

### 11 U.S.C. § 547(b)

25      195.    The Trustee repeats and re-alleges the allegations set forth above.

26      196.    Following his resignation on May 14, 2012, Weinberg received the Weinberg PTO
27  Payments for his accrued paid time off and sabbatical leave.

197.   The Weinberg PTO Payments were transfers of money by R&H, and thus each constitute a transfer of an interest in R&H's property.

198.   The Weinberg PTO Payments were made for the benefit of Weinberg on account of an antecedent debt owed by R&H before the transfers were made.   The Weinberg PTO Payments became due and owing upon Weinberg's resignation on May 14, 2012.

199.   At the time of the Weinberg PTO Payments, R&H was insolvent in that, at a fair valuation, the sum of R&H's debts were greater than the sum of R&H's assets..

200.   Weinberg was an insider of R&H, and the Weinberg PTO Payments were made less than one year before the Petition Date.

201.   The Weinberg PTO Payments enabled Weinberg to receive more than he would have received if (a) R&H's bankruptcy case were a case under chapter 7 of the Bankruptcy Code; (b) the respective transfers had not been made; and (c) Weinberg received payment of such debt to the extent provided by the Bankruptcy Code.

202.   Interest on the Weinberg PTO Payments has accrued and continues to accrue from the date that a demand for each of the Weinberg PTO Payments was made.

203.   Accordingly, the Weinberg PTO Payments should be avoided as preferential transfers under 11 U.S.C. § 547(b).

## COUNT 21

### RECOVERY OF AVOIDED TRANSFERS FROM

### HUGHES, TS'O GOLDFARB, WEINBERG, RHM, CCCD, AND 2100 GRAND

### 11 U.S.C. § 550

204.   The Trustee repeats and re-alleges the allegations set forth above.

205.   The RHM Software Rights Transfer, the CCCD Note Sale, the CCCD Transfers, and the 2100 Grand Transfers are avoidable under (a) 11 U.S.C. § 544 and applicable state law, including California Civil Code §§ 3439.04(a)(1), 3439.04(a)(2), 3439.05 and California common law; and/or (b) 11 U.S.C. § 548.

206.   RHM received the RHM Software Rights Transfer as the initial transferee.   The Primary D&Os received the RHM Software Rights Transfer as subsequent transferees and/or

40

persons for whose benefit the initial transfer was made.  Accordingly, the RHM Software Rights Transfer (or the value thereof) should be recovered by the Trustee from RHM and the Primary D&Os under 11 U.S.C. § 550.

207.    Hughes received the CCCD Note Sale as the initial transferee.  Accordingly, the CCCD Note Sale (or the value thereof) should be recovered by the Trustee from Hughes under 11 U.S.C. § 550.

208.    CCCD received the CCCD Transfers as the initial transferee.  Accordingly, the CCCD Transfers (or the value thereof) should be recovered by the Trustee from CCCD under 11 U.S.C. § 550.

209.    The Primary D&Os received the 2100 Grand Transfers as the initial transferees. 2100 Grand received the 2100 Grand Transfers as the subsequent transferee and/or person for whose benefit the initial transfer was made.  Accordingly, the 2100 Grand Transfers (or the value thereof) should be recovered by the Trustee from the Primary D&Os and 2100 Grand under 11 U.S.C. § 550.

210.    Weinberg received the Weinberg PTO Payments as the initial transferee. Accordingly, the Weinberg PTO Payments (or the value thereof) should be recovered by the Trustee from Weinberg under 11 U.S.C. § 550.

## COUNT 22

### CORPORATE WASTE AGAINST HUGHES, TS'O GOLDFARB,

### BERGER, BUYYALA, FEENEY AND WEINBERG

211.    The Trustee repeats and re-alleges the allegations set forth above.

212.    In connection with the CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD Services, the Diverted CCCD Financing, the 2100 Grand Transaction, the 2100 Grand Transfers, the RHM Software Rights Transfer, Reckless Operational Acts and Loss of NOLs, the Primary D&Os and the Other D&Os failed to properly consider the interests of R&H.  The Primary D&Os caused R&H to waste valuable corporate assets due to these activities, and the Other D&Os failed to supervise the Primary D&Os in their misuse of those corporate assets.

213.    The CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD Services, the 2100 Grand Transaction, the 2100 Grand Transfers and the RHM Software Rights Transfer were so one-sided that no business person of ordinary, sound judgment could conclude that R&H received adequate consideration in connection with the transactions.  Rather, the transactions resulted in gifts to Hughes, CCCD, RHM and 2100 Grand.

214.    Each of these acts of corporate waste harmed R&H by proximately causing damage relating to the specified act and by destroying its business.  As a result, the Primary D&Os and Other D&Os are liable to the Trustee for damages in an amount to be determined at trial.

## COUNT 23

### UNJUST ENRICHMENT AGAINST HUGHES, TS'O, GOLDFARB, RHM, CCCD, AND 2100 GRAND

215.    The Trustee repeats and re-alleges the allegations set forth above.

216.    R&H conferred a benefit on Hughes, Ts'o, Goldfarb, RHM, CCCD, and 2100 Grand in making the CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD Services, the 2100 Grand Transaction, the 2100 Grand Transfers and the RHM Software Rights Transfer to the extent each such transfer was received by and/or made for the benefit of Hughes, Ts'o, Goldfarb, RHM, CCCD, and/or 2100 Grand, respectively.

217.    Hughes, Ts'o, Goldfarb, RHM, CCCD, and 2100 Grand appreciated the benefit of the transfers that they each received.  In addition, they appreciated the benefit that they each received indirectly from the transfers made for their ultimate, personal benefit.

218.    Hughes, Ts'o, Goldfarb, RHM, CCCD, and 2100 Grand accepted and retained the benefit of the transfers that they each received.  In addition, they accepted and retained the benefit that they received indirectly from the transfers made for their ultimate, personal benefit.

219.    It would be inequitable and unjust for Hughes, Ts'o, Goldfarb, RHM, CCCD and 2100 Grand to retain the respective benefits that they each received in connection with the CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD Services, the 2100 Grand Transaction, the 2100 Grand Transfers and the RHM Software Rights Transfer.  Specifically, the Primary D&Os

1   caused each of these transfers to be made for little or no consideration at a time when R&H was

2   insolvent, under-capitalized, and/or would be unable to pay its debts as they became due.  Further,

3   the Primary D&Os breached their fiduciary duties of loyalty, care, and good faith in causing R&H

4   to make these transfers.

5       220.    Accordingly, the CCCD Transfers, the CCCD Note Sale, the Unpaid CCCD

6   Services, the 2100 Grand Transaction, the 2100 Grand Transfers, and the RHM Software Rights

7   Transfer (or the value thereof) should be recovered by the Trustee from Hughes, Ts'o, Goldfarb,

8   RHM, CCCD and 2100 Grand.

9   

**COUNT 24**

10  **EQUITABLE SUBORDINATION OF CLAIMS AGAINST HUGHES, TS'O, GOLDFARB,**

11  **BERGER, BUYYALA, FEENEY, WEINBERG AND RHM**

12  **11 U.S.C. § 510(c)**

13      221.    The Trustee repeats and re-alleges the allegations set forth above.

14      222.    Claims have been filed or scheduled on behalf the Defendants in R&H's

15  bankruptcy case, including the following claims (collectively, the "Claims"):

16

| Claimant | Filed/Scheduled | Claim Amount |
|---|---|---|
| Hughes | Filed as Claim No. 156 | Unliquidated |
| Hughes | Scheduled [Dkt. 135] | $105,488.23 |
| Ts'o | Filed as Claim No. 157-1 | Unliquidated |
| Ts'o | Filed as Claim No. 157-2 | $46,002.86 |
| Ts'o | Filed as Claim No. 208 | $90.65 |
| Ts'o | Scheduled [Dkt. 135] | $46,488.76 |
| Goldfarb | Filed as Claim No. 154 | Unliquidated |
| Goldfarb | Scheduled [Dkt. 135] | $76,707.84 |
| Berger | Filed as Claim No. 159 | Unliquidated |
| Berger | Scheduled [Dkt. 135] | $218,770.15 |
| Buyyala | Filed as Claim No. 158 | Unliquidated |
| Buyyala | Scheduled [Dkt. 135] | $459,469.93 |
| Feeney | Filed as Claim No. 155 | Unliquidated |
| Weinberg | Filed as Claim No. 161 | Unliquidated |
| RHM | Filed as Claim No. 171 | $1,600,425.47 |

    223.    Defendants engaged in inequitable conduct as described in detail above.  The

inequitable conduct by Defendants not only injured R&H and its creditors, but also conferred an

1   unfair advantage on Defendants.    Equitable subordination of the Claims, moreover, is not

2   inconsistent with the Bankruptcy Code.

3         224.    Accordingly, the Trustee requests that the Claims be equitably subordinated to the

4   claims of all other creditors pursuant to 11 U.S.C. § 510(c)(1).

5                            **COUNT 25**

6                  **OBJECTION TO CLAIMS BY HUGHES**

7         225.    The Trustee repeats and re-alleges the allegations set forth above.

8         226.    Claims have been filed and/or scheduled on behalf of Hughes in R&H's

9   bankruptcy case, including Claim No. 156 (collectively, the "Hughes Claim").

10        227.    The Trustee hereby objects to the Hughes Claim because:  (a) the Hughes Claim

11   should be disallowed as an indemnity claim or other claim under 11 U.S.C. § 502(b)(1); (b) the

12   Hughes Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the Hughes

13   Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of

14   action asserted against Hughes in this action; and (d) the Hughes Claim should be disallowed

15   under 11 U.S.C. § 502(d) based upon the causes of action under 11 U.S.C. §§ 544, 548 and 550

16   asserted against Hughes in this action.

17                            **COUNT 26**

18                  **OBJECTION TO CLAIMS BY TS'O**

19         228.    The Trustee repeats and re-alleges the allegations set forth above.

20         229.    Claims have been filed and/or scheduled on behalf of Ts'o in R&H's bankruptcy

21   case, including Claim Nos. 157-1, 157-2, and 208 (collectively, the "Ts'o Claim").

22        230.    The Trustee hereby objects to the Ts'o Claim because:  (a) the Ts'o Claim should

23   be disallowed as an indemnity claim or other claim under 11 U.S.C. § 502(b)(1); (b) the Ts'o

24   Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the Ts'o Claim is subject

25   to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted

26   against Ts'o in this action; and (d) the Ts'o Claim should be disallowed under 11 U.S.C. § 502(d)

27   based upon the causes of action under 11 U.S.C. §§ 544, 548 and 550 asserted against Ts'o in this

28   action.

## COUNT 27

### OBJECTION TO CLAIMS BY GOLDFARB

231.    The Trustee repeats and re-alleges the allegations set forth above.

232.    Claims have been filed and/or scheduled on behalf of Goldfarb in R&H's bankruptcy case, including Claim No. 154 (collectively, the "Goldfarb Claim").

233.    The Trustee hereby objects to the Goldfarb Claim because:  (a) the Goldfarb Claim should be disallowed as an indemnity claim or other claim under 11 U.S.C. § 502(b)(1); (b) the Goldfarb Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the Goldfarb Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against Goldfarb in this action; and (d) the Goldfarb Claim should be disallowed under 11 U.S.C. § 502(d) based upon the causes of action under 11 U.S.C. §§ 544, 548 and 550 asserted against Goldfarb in this action.

## COUNT 28

### OBJECTION TO CLAIMS BY BERGER

234.    The Trustee repeats and re-alleges the allegations set forth above.

235.    Claims have been filed and/or scheduled on behalf of Berger in R&H's bankruptcy case, including Claim No. 159 (collectively, the "Berger Claim").

236.    The Trustee hereby objects to the Berger Claim because:  (a) the Berger Claim should be disallowed as an indemnity claim or other claim under 11 U.S.C. § 502(b)(1); (b) the Berger Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); and (c) the Berger Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against Berger in this action.

## COUNT 29

### OBJECTION TO CLAIMS BY BUYYALA

237.    The Trustee repeats and re-alleges the allegations set forth above.

238.    Claims have been filed and/or scheduled on behalf of Buyyala in R&H's bankruptcy case, including Claim No. 158 (collectively, the "Buyyala Claim").

239.    The Trustee hereby objects to the Buyyala Claim because:  (a) the Buyyala Claim should be disallowed as an indemnity claim or other claim under 11 U.S.C. § 502(b)(1); (b) the Buyyala Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); and (c) the Buyyala Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against Buyyala in this action.

## COUNT 30

### OBJECTION TO CLAIMS BY FEENEY

240.    The Trustee repeats and re-alleges the allegations set forth above.

241.    Claims have been filed and/or scheduled on behalf of Feeney in R&H's bankruptcy case, including Claim No. 155 (collectively, the "Feeney Claim").

242.    The Trustee hereby objects to the Feeney Claim because:  (a) the Feeney Claim should be disallowed as an indemnity claim under 11 U.S.C. § 502(b)(1); (b) the Feeney Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); and (c) the Feeney Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against Feeney in this action.

## COUNT 31

### OBJECTION TO CLAIMS BY WEINBERG

243.    The Trustee repeats and re-alleges the allegations set forth above.

244.    Claims have been filed and/or scheduled on behalf of Weinberg in R&H's bankruptcy case, including Claim No. 161 (collectively, the "Weinberg Claim").

245.    The Trustee hereby objects to the Weinberg Claim because:  (a) the Weinberg Claim should be disallowed as an indemnity claim under 11 U.S.C. § 502(b)(1); (b) the Weinberg Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the Weinberg Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against Weinberg in this action; and (d) the Weinberg Claim should be disallowed under 11 U.S.C. § 502(d) based upon the causes of action under 11 U.S.C. §§ 547 and 550 asserted against Weinberg in this action.

## COUNT 32

### OBJECTION TO CLAIMS BY RHM

246.   The Trustee repeats and re-alleges the allegations set forth above.

247.   Claims have been filed and/or scheduled on behalf of RHM in R&H's bankruptcy case, including Claim No. 171 (collectively, the "RHM Claim").

248.   The Trustee hereby objects to the RHM Claim because:  (a) the RHM Claim should be disallowed under 11 U.S.C. § 502(b)(1); (b) the RHM Claim should be equitably subordinated under 11 U.S.C. § 510(c)(1); (c) the RHM Claim is subject to set off, recoupment, and/or withholding based upon the affirmative causes of action asserted against RHM in this action; and (d) the RHM Claim should be disallowed under 11 U.S.C. § 502(d) based upon the causes of action under 11 U.S.C. §§ 544, 548 and 550 asserted against RHM in this action.

### TOLLING OF LIMITATIONS

249.   All statutes of limitations applicable to the Trustee's claims were tolled for two years after the filing of R&H's bankruptcy case on February 13, 2013.

250.   Prior to February 13, 2013, the statutes of limitations for the Trustee's claims were tolled, and their accrual was delayed, by the fact that the acts and/or injuries to R&H caused by the D&Os could not have been discovered.  The D&Os maintained full control over R&H's affairs and its expenditure of funds which prevented such discovery by a person exercising reasonable diligence.

### PRAYER

WHEREFORE, the Trustee requests judgment against the Defendants as follows:

- awarding monetary damages in an amount to be proven at trial;

- avoiding the RHM Software Rights Transfers, the CCCD Note Sale, the CCCD Transfers, and the 2100 Grand Transfers as fraudulent transfers under: (a) 11 U.S.C. § 544 and applicable state law, including California Civil Code §§ 3439.04(a)(1), 3439.04(a)(2), and 3439.05 and California common law; and/or (b) 11 U.S.C. § 548;

- avoiding the Weinberg PTO Payments as preferential transfers under 11 U.S.C. § 547(b);

- awarding a monetary judgment for or otherwise ordering recovery of the value of the RHM Software Rights Transfer, the CCCD Note Sale, the CCCD Transfers, the 2100 Grand Transfers, and the Weinberg PTO Payments under 11 U.S.C. § 550;

- equitably subordinating the Claims under 11 U.S.C. § 510(c)(1);

- authorizing set off, recoupment, and/or withholding against the Claims;

- disallowing the Claims under 11 U.S.C. § 502(d);

- awarding pre-judgment interest at the maximum rate allowable by law and/or equity;

- awarding reasonable attorney's fees and costs to the extent permissible by applicable law; and

- granting such other and further relief as the Court deems just and proper.

Dated: February 13, 2015                    LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.


                                            _/s/ Gary E. Klausner_____
                                            Gary E. Klausner, Esq.

                                            -and-

                                            REID COLLINS & TSAI LLP
                                            Eric D. Madden (*pro hac vice* application to be filed)
                                            Angela J. Somers (*pro hac vice* application to be filed)
                                            Anne M. Bahr (*pro hac vice* application to be filed)

                                            *Counsel for Solution Trust, as Trustee of the*
                                            *AWTR Liquidation Trust*