1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



FILED & ENTERED

MAR 11 2016

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY sumlin    DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**LOS ANGELES DIVISION**

| | |
|---|---|
| In re:<br><br>AWTR Liquidation Inc.,<br><br>        Debtor | CHAPTER 11<br><br>Case No.: 2:13-bk-13775-NB<br>Adv No: 2:15-ap-01095-NB<br><br>**OPINION ON DIRECTORS' AND OFFICERS'<br>DUTIES UPON INSOLVENCY, AND<br>RELATED ISSUES**<br><br>Argued:<br>Date:       September 1, 2015<br>Time:      2:00 p.m.<br>Courtroom: 1545 |
| SOLUTION TRUST, as Trustee of the<br>AWTR LIQUIDATION TRUST,<br><br>        Plaintiff,<br>   v.<br><br>2100 Grand LLC, Lee Berger, Prashant<br>Buyyala, CCC Diagnostics LLC,<br>Raymond Feeney, Keith Goldfarb, John<br>Patrick Hughes, Rhythm & Hues Sdn.<br>Bhd, Pauline Ts'o, David Weinberg,<br><br>        Defendants. | |

1

## I. INTRODUCTION[1]

The individual defendants were all directors of the debtor corporation, then known as Rhythm & Hues, Inc. ("Debtor"), before it filed its bankruptcy petition on February 13, 2013 (the "Petition Date").  Some defendants also served as Debtor's officers.  The plaintiff, which is the liquidating trustee under Debtor's confirmed chapter 11 plan, alleges that while Debtor was insolvent these defendants (the "Directors") diverted its assets to themselves, or dissipated or unduly risked those assets.  The plaintiff seeks to recover damages for the benefit of Debtor's creditors.

The Directors argue that there is no duty to creditors even upon insolvency – that their duties run solely to stockholders – and alternatively that the plaintiff has not adequately alleged insolvency.  This opinion rejects those arguments.  In so doing this opinion interprets what measures of insolvency apply and what it means for directors (and officers) to "unduly risk" a corporation's assets under the leading California decisions.

Some issues of California law are not settled, so this opinion must predict how the Supreme Court of California would interpret directors' and officers' duties.  The prediction is that it would do so consistent with what appears to be the emerging trend in other Federal and State court decisions.

Specifically, the most relevant duty of directors and officers remains the same regardless of insolvency: the duty to exercise their business judgment in an informed, good faith effort to preserve and grow the corporation's value.  That duty must be exercised for the benefit of the whole corporate enterprise, encompassing all of its constituent groups, without undue preference to any.  What principally changes upon

---

[1] For brevity, filed documents are referred to by docket number rather than their full title ("dkt. __" for documents filed in this Adversary Proceeding, No. 2:15-ap-01095-NB, or "Case dkt. __" for documents filed in the main case, No. 2:13-bk-13775-NB).  Many arguments are repeated in numerous briefs, and this opinion will not always refer to every location where the argument was made.  Unless the context suggests otherwise, references to a "chapter" or "section" ("§") refer to the United States Bankruptcy Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"), and other terms have the meanings provided in the Bankruptcy Code, the Rules, and the parties' briefs.  This opinion supersedes the memorandum decision on the same issues (dkt. 101).

insolvency is who can sue.  For acts or omissions occurring outside of insolvency, the creditors cannot sue because they have no cognizable harm.  But when the corporation is insolvent or is rendered insolvent by any standard measure – balance sheet, cash flow, or inadequate capitalization – then creditors join stockholders in being able to sue derivatively for breaches of fiduciary duties to the corporation that divert, dissipate, or unduly risk corporate assets.

As a practical matter, the alternative to such essentially unchanging duties would be for directors' and officers' duties to change substantially once the corporation crossed some invisible line that is later determined to constitute insolvency.  Such a rule would be unfair to directors and officers, and it would harm all constituent groups by creating conflicting incentives and unclear directions for risk management.  This Bankruptcy Court does not anticipate that the California Supreme Court would interpret directors' and officers' duties in that way.

This opinion also rejects most of the other arguments in the defendants' motions to dismiss or for a more definite statement, including most of their assertions that the plaintiff's claims are barred as a matter of law by the business judgment rule.  That is not to say that the business judgment rule lacks teeth; to the contrary it is a very powerful defense, but on the facts alleged in the complaint it is not possible to conclude as a matter of law that it applies.  In addition, the defendants have established some statute of limitation defenses.

## II.  BACKGROUND

### A.  Factual Allegations

Debtor was one of the premiere producers of visual effects and computer-generated animation for the entertainment industry.  It blames its financial troubles on a variety of factors, including thin margins, projects that have inherently unpredictable costs, and international competition.  *See, e.g.,* Case dkt. 9.  The plaintiff, however, places much of the blame on alleged self-dealing, fraudulent transfers, and other asserted acts and omissions by Debtor's Directors.

The complaint defines the "Primary" Directors as John Patrick Hughes (a director, president, treasurer, and, at times, its chief financial officer), his wife Pauline Ts'O (also a director and officer), and Keith Goldfarb (a director).  The "Other" Directors are Lee Berger (a director and officer), Prashant Buyyala (same), Raymond Feeney (a director), and David Weinberg (a director and, at relevant times, chief financial officer or "CFO").  Complaint (dkt. 1) ¶¶ 7-15.

The following summary includes some pejorative descriptions of the Directors' alleged acts and omissions because, as always in the context of motions to dismiss, all well pled and plausible allegations are assumed to be true, and all reasonable inferences are drawn in the non-moving party's favor.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The facts might (or might not) turn out to be very different after discovery or after trial.

### 1. The CCCD Transactions: risky, self-dealing advances, mostly without board approval; and then $1 buyout by Hughes after the gamble paid off

From July 2007 through December 2009 the Primary Directors used $1.89 million of Debtor's scarce capital to fund CCC Diagnostics, LLC ("CCCD"), which was founded by Ts'O's father (Hughes' father-in-law).  CCCD had no revenues, was in a business "wholly unrelated" to Debtor's line of business, and "had absolutely no corporate synergies" with Debtor.  Complaint (dkt. 1) ¶ 30.  In exchange for these investments (the "CCCD Transfers") Debtor received five unsecured convertible promissory notes, all of which lacked "performance milestones," "adjustments to the conversion ratio based upon performance," and "other financial requirements" which "would have been typical of an investment in a start-up venture."  *Id.* ¶¶ 30-42.

Hughes was on both sides: he negotiated the notes on behalf of both Debtor and CCCD.  Before the fifth investment, 100% of the membership interest in CCCD was transferred to a newly formed entity, CCC Diagnostics, Inc. ("CCCD, Inc."), of which Hughes was President, a board member, and a stockholder.  Weinberg (Debtor's CFO and a board member) pointed out Hughes' conflicts of interest in email correspondence.

-4-

Nevertheless, only the first of the CCCD notes was approved or ratified by Debtor's board. *Id.*

Eventually the gamble paid off; but not for Debtor. CCCD was able to commercialize its product and, in a private placement memorandum dated August 2012, Hughes and other officers of CCCD valued that company at $10 million. Just a few months later, though, in November 2012, Hughes arranged to purchase the entire $1.89 million series of convertible notes for $1. "Given that these notes were convertible into an 18.9% membership interest, this $1.00 purchase price equated to a $5.29 valuation for CCCD." *Id.* ¶ 44. This sale (the "CCCD Note Sale") was not approved or ratified by Debtor's board, nor was it accompanied by any fairness opinion or determination.

In addition, the complaint alleges, the Primary Directors caused Debtor to provide services to CCCD at no charge, and Hughes attempted to divert investors from Debtor to CCCD. The remaining Directors allegedly knew or should have known of these things and did nothing to stop them. *Id.* ¶¶ 46-48.

### 2. The RHM Software Rights Transfer: giving key software rights to the Primary Directors' overseas corporation for no consideration

On November 1, 2008, the Primary Directors caused Debtor to enter into a Memorandum of Understanding ("MOU") for computer graphic and animation services with a Malaysian business known as Rhythm & Hues Sdn. Bhd (the "RHM"). The Primary Directors owned RHM, and they were on both sides of the transaction. The MOU was executed by Buyyala on behalf of Debtor and Hughes on behalf of RHM. Complaint (dkt. 1) ¶¶ 49-50.

RHM filed a proof of claim in the underlying bankruptcy, attaching a copy of the MOU that, unlike the copy in Debtor's files, included an "Addendum B" which purports to transfer to RHM in perpetuity all of Debtor's rights in certain software "which had been developed over decades and used to win multiple awards in the film industry." *Id.* ¶ 54. Hughes testified that this addendum was created in late 2012, shortly before the Petition Date. RHM now employs many of Debtor's former employees, including Hughes. *Id.*

¶¶ 51-53.

Debtor received no consideration for this software transfer (the "RHM Software Rights Transfer").  It was not approved or ratified by Debtor's board of directors.  *Id.* ¶ 52.

### 3. The 2100 Grand Transaction: non-recourse advances to the Primary Directors to buy the business premises, then leasing back the premises at full market rates – leaving Debtor with all of the risks and none of the upside

In early 2009 the Primary Directors caused Debtor to advance millions of dollars to them, on a non-recourse basis, without taking back any of their assets as collateral, and at a 4% interest rate, to buy a six-story office building located at 2100 East Grand Avenue, El Segundo, California, through an entity they created and owned, known as 2100 Grand LLC ("2100 Grand").  Debtor then leased back the property at full market rates, at a cost of $264,000 per month.  In December of 2010, due to breaches in the Primary Directors' financial covenants caused by the fifth CCCD note, they had to refinance the 2100 Grand mortgage, and once again Debtor advanced the funds to do so, on similar terms.  These transactions (collectively, the "2100 Grand Transaction") shifted all of the upside to the Primary Directors, while leaving Debtor with all risks of the purchase and draining it of $14 million of scarce capital, of which it eventually lost nearly $9.4 million.  The Other Directors allegedly knew about this transaction but did nothing to stop it, reasonably inform themselves about it, or seek a fairness opinion. Complaint (dkt. 1) ¶¶ 55-63.

### 4. Operational Issues: unfavorable studio contracts, cost-cutting failures, etc.

The complaint alleges that the Directors recklessly caused Debtor to become increasingly dependent on just three studios, underbid and forego potential profits, engage in low profit margin and high risk work, neglect profitable ventures, engage in ill-informed and flawed bidding practices, fail to negotiate for key protections such as reimbursement in the event that the studio delayed or stopped projects, fail to monitor and obtain payment for change orders that were not Debtor's fault, incur massive payroll

liabilities, refuse to cut excessive costs, establish wasteful benefit policies that resulted

in enormous accrued liabilities for paid time off and sabbaticals, and permit certain

executives including Weinberg to resign and cash out those benefits and immediately

be re-hired as consultants (collectively, the "Reckless Operational Acts" and, as to

Weinberg, the "Weinberg PTO Payments").  The complaint alleges that, to the extent

the Other Directors were not personally involved in these matters, they knew or should

have known about them but did nothing to stop them and, "[m]anifesting a consistent

pattern of inattentiveness, the Other [Directors] relinquished their role as [Debtor's]

officers and/or directors and ignored these problems." *Id.* ¶¶ 64-73.

### 5.  Loss of tax benefits: net operating losses

The Primary Directors and Weinberg elected to carry forward, rather than back,

Debtor's 2010 net operating losses ("NOLs"), thereby sacrificing certain and substantial

tax refunds for 2008 and 2009 in exchange for speculative and insubstantial future tax

offsets for 2011 and 2012, at a cost of well over $900,000 (the "Loss of NOLs").  *Id.*

¶¶ 75 & 79.  The complaint alleges that companies "never" make such an election

"when they have enough prior income to fully utilize the NOL," yet this is "precisely"

what the Primary Directors and Weinberg did.  *Id.* ¶ 75.  "When Hughes was asked

under oath about this valuable NOL, which might have provided a lifeline to [Debtor], he

explained that issues like this were never presented to him, and that no board meeting

addressed this issue."  *Id.* ¶ 76.  The complaint alleges that "Weinberg displayed a

reckless disregard for his duties," the "Primary [Directors] knew or should have known

of the Loss of NOLs and the harm that could be done to [Debtor]," and the Other

Directors, "following their pattern of inattentiveness, either failed to inform themselves of

the issue or act to prevent the Loss of NOLs."  *Id.* ¶ 80.

### B.  Procedural History

On February 13, 2015, the plaintiff filed the complaint on behalf of Debtor's

liquidating trust.  A plan of reorganization (Case dkt. 352) confirmed by this court (Case

dkt. 488) expressly reserves all causes of action belonging to Debtor and/or its

1   bankruptcy estate for post-confirmation enforcement by the trust.  According to the

2   complaint, the Directors' conduct caused the destruction of over $70 million of Debtor's

3   value, which the plaintiff seeks to recover from the Directors or D&O insurance.

4         The defendants have each filed motions to dismiss, or in some instances for a

5   more definite statement (dkt. 36, 37, 41, 42, 43, 50).  The plaintiff filed its consolidated

6   opposition (dkt. 57), the defendants filed replies (dkt. 61-66), and some supplemental

7   papers were filed (dkt. 97, 98).  The matter was heard on September 1, 2015 and,

8   briefly, on October 6, 2015 and February 23, 2016.

9         The complaint's 32 separate counts fall into three broad categories: (1) alleged

10  breaches of fiduciary duties or similar claims (including aiding and abetting, corporate

11  waste, and unjust enrichment) (Counts 1-5, 22, 23), (2) alleged avoidable transfers

12  (fraudulent transfers under both federal and California law, and a preferential transfer

13  under § 547) (Counts 6-21), and (3) objections to claims (including equitable

14  subordination) (Counts 24-32).  The defendants principally argue that (1) they owed no

15  duties to creditors, even when Debtor was insolvent (*e.g.,* dkt. 37, pp. 16:1-19:9); (2) the

16  complaint does not adequately plead insolvency (*e.g.*, dkt. 37, pp. 23:14–24:15; dkt. 42,.

17  pp. 6:21–8:3; dkt. 50, pp. 6:21–8:3); (3) they are protected by the business judgment

18  rule or stockholder ratification (*e.g.,* dkt. 42, pp. 5:3–6:20; dkt. 50, pp. 5:3–6:20); and

19  (4) certain transactions, particularly some of the 2100 Grand note transactions, did not

20  occur within the applicable statute of limitations (*e.g.*, dkt. 42, pp. 13:5–14:11; dkt. 50,

21  pp. 13:5–14:11).

22  **III.    JURISDICTION AND AUTHORITY**

23        For the reasons set forth in a concurrently issued opinion, this Bankruptcy Court

24  concludes that it has subject matter jurisdiction over all the claims, and has the authority

25  to issue final judgments or orders on pretrial matters that do not involve factual findings,

26  such as the present motions.  To the extent that this Bankruptcy Court does not have

27  the authority to issue a final judgment or order, the discussion below should be deemed

28  to be proposed findings of fact and conclusions of law for *de novo* review by an

1  Article III Court.

2  **IV.  LEGAL STANDARDS**

3      **A.  Motion to Dismiss**

4        A motion to dismiss for failure to state a claim upon which relief can be granted is

5  governed by Rule 12(b)(6) (incorporated by Rule 7012(b)).  Rule 8(a)(2) (incorporated

6  by Rule 7008), requires the plaintiff to provide a "short and plain statement of the claim

7  showing that the pleader is entitled to relief, in order to give the defendant fair notice of

8  what the claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550

9  U.S. 544, 555 (2007) (citations and internal quotation marks omitted).  The standards

10  under these rules are well known to the parties, and need only be summarized here.

11  *See generally* Motions to Dismiss (dkt. 36, pp. 3:21–4:16; dkt. 37, pp. 7:4–9:10; dkt. 42,

12  pp. 3:12–4:11; dkt. 43, pp. 6:10–7:15; dkt. 50, pp. 3:11–4:11); Opposition (dkt. 57, pp.

13  2:9–3:13).

14        "To survive a motion to dismiss, a complaint must contain sufficient factual

15  matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

16  *v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. 544, 570).  "A claim has

17  facial plausibility when the plaintiff pleads factual content that allows the court to draw

18  the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*,

19  556 U.S. 662, 678 (citation omitted).  "While a complaint attacked by a Rule 12(b)(6)

20  motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation

21  to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

22  conclusions, and a formulaic recitation of a cause of action's elements will not do."

23  *Twombly*, 550 U.S. 544, 546.  "Determining whether a complaint states a plausible

24  claim for relief is a context-specific task that requires the reviewing court to draw on its

25  judicial experience and common sense."  *In re JMC Telecom, LLC*, 416 B.R. 738, 742

26  (C.D. Cal. 2009) (citation omitted).

27        Stated otherwise, a motion to dismiss "under Rule 12(b)(6) challenges the <u>legal</u>

28  <u>sufficiency of a complaint</u>, considered with the assumption that the facts alleged are

1  true." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009) (emphasis added,

2  citations omitted).  Thus, "dismissal for failure to state a claim is proper only where there

3  is no cognizable legal theory or an absence of sufficient facts alleged to support a

4  cognizable legal theory."  *Shroyer v. New Cingular Wireless Servs.*, Inc., 622 F.3d 1035,

5  1041 (9th Cir. 2010) (citation omitted).

6       The Ninth Circuit has recently summarized this standard:

7          In sum, for a complaint to survive a motion to dismiss, the non-
conclusory "factual content," and reasonable inferences from that
8          content, must be plausibly suggestive of a claim entitling the
plaintiff to relief.  [*Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th
9          Cir. 2009) (citation omitted)].

10       Rule 9(b) adds an additional requirement.  A party alleging fraud must "state with

11  particularity" the circumstances constituting fraud.  The paragraphs of the complaint that

12  appear to sound in fraud are those alleging transfers in actual fraud of creditors (as

13  opposed to constructively fraudulent transfers) and those alleging actual intent by the

14  Primary Directors to transfer assets to themselves at the expense of Debtor and its

15  creditors.  As to those claims Rule 9(b) applies, but it does not apply to the remaining

16  claims, such as alleged reckless breaches of fiduciary duties or alleged failure over

17  oversight by the Other Directors.  *See Am. Apparel, Inc. Shareholder Deriv. Litig.*, 2012

18  U.S. Dist. Lexis 146970 at *38-39 (C.D. Cal.) (Rule 9(b) did not apply to claims for

19  breach of fiduciary duty because those claims did not sound in fraud).  *See* dkt. 97, 98.

20       Rule 9(b) requires that the "circumstances constituting the alleged fraud be

21  specific enough to give defendants notice of the particular misconduct so that they can

22  defend against the charge and not just deny that they have done anything wrong."

23  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (citation and

24  internal quotation marks omitted).  The rule is satisfied if the complaint identifies the

25  "who, what, when, where, and how" of the alleged misconduct.  *Id.* (same)

26  **B.  Motion for a More Definite Statement**

27       "A party may move for a more definite statement of a pleading to which a

28  responsive pleading is allowed but which is so vague or ambiguous that the party

cannot reasonably prepare a response."  Rule 12(e) (incorporated by Rule 7012(b)).

But when the issues involve "highly fact-sensitive inquiry, the better practice is to

resolve [the issues] on summary judgment, after full discovery[,]" rather than attempting

to do so on a motion for a more definite statement.  *One Indus., LLC v. Jim O'Neal*

*Distrib., Inc.*, 578 F.3d 1154, 1160 (9th Cir. 2009).

## V.    DISCUSSION

### A. Governing Law

The parties' chief disputes involve insolvency and fiduciary duties.  Different laws

apply to each.

Insolvency is defined by the Bankruptcy Code for purposes of federal avoidance

claims under §§ 547 and 548.  Insolvency is defined by California law for purposes of

State avoidance claims incorporated by § 544.  There is no statutory definition of

insolvency for purposes of the fiduciary duty claims.

Corporate fiduciary duties are governed by California law, because Debtor was

organized under California law.  Complaint (dkt. 1) ¶ 20.  California courts often look to

decisions from Delaware and other States.  *See, e.g., Swingless Golf Club Corp. v.*

*Taylor*, 679 F.Supp.2d 1060, 1070 (N.D. Cal. 2009) ("Claims of corporate waste in

California are based upon Delaware state law."); *Oakland Raiders v. Nat'l Football*

*League*, 93 Cal.App.4th 572, 586 (Cal. Ct. App. 2001), *as modified on denial of reh'g*

(reviewing both Delaware and Maryland decisions regarding stockholder demands).

*See also* Tr. 9/01/15 (dkt. 83, p. 20:17–18) (defendants' counsel: "We are embracing

Delaware in this case.").

When the California Supreme Court has not decided a state law issue, the

federal courts must predict how it would decide the issue by looking to other sources,

such as "intermediate appellate court decisions, decisions from other jurisdictions,

statutes, treatises, and restatements."  *Vestar Development II v. General Dynamics*

*Corp.,* 249 F. 3d 958, 960 (9th Cir. 2001) (citation and internal quotation marks omitted).

When there is "relevant precedent from the state's intermediate appellate court, the

1  federal court must follow [that precedent] unless the federal court finds convincing

2  evidence that the state's supreme court likely would not follow it." *Ryman v. Sears,*

3  *Roebuck & Co.*, 505 F.3d 993, 994 (9th Cir. 2007).

4  **B. The Avoidance Statutes, And Their Definitions Of Insolvency**

5      Section 548(a) provides in relevant part:

6  (1) The trustee may avoid any transfer … of an interest of the debtor in property,
       or any obligation … incurred by the debtor, that was made or incurred on or
7      within 2 years before the date of the filing of the petition, if the debtor
       voluntarily or involuntarily –
8
9      (A) made such transfer or incurred such obligation with actual intent to hinder,
           delay, or defraud any entity to which the debtor was or became, on or after
10         the date that such transfer was made or such obligation was incurred,
           indebted; or
11
       (B)(i) received less than a reasonably equivalent value in exchange for such
12         transfer or obligation; and

13         (ii) (I) [balance sheet insolvency] was insolvent on the date that such
               transfer was made or obligation was incurred [meaning that the debtor
14             had a "financial condition such that the sum of [its] debts is greater
               than all of [its] property, at a fair valuation, exclusive of … property
15             transferred, concealed, or removed with intent to hinder, delay, or
               defraud [its] creditors …" (§ 101(32))], or became insolvent [under the
16             same definition] as a result of such transfer or obligation;

17         (II) [inadequate capitalization] was engaged in business or a transaction,
               or was about to engage in business or a transaction, for which any
18             property remaining with the debtor was an unreasonably small capital;
               [or]
19
           (III) [cash flow or equitable insolvency] intended to incur, or believed that
20             [it] would incur, debts that would be beyond [its] ability to pay as such
               debts matured.

21      An avoidable preference under § 547 includes balance sheet insolvency as one

22  of its elements.  11 U.S.C. § 547(b)(3).  The relevant California statutes have similar

23  tests of balance sheet insolvency, cash flow insolvency, and inadequate capitalization.[2]

24  ────────────────────────
    [2] The California statutes incorporate all three standard tests of insolvency, though in slightly different
25  ways from § 548.  California's codification of the Uniform Fraudulent Transfer Act is at California Civil
    Code §§ 3439.04(a)(1)&(2) and 3439.05 (the applicable versions of these statutes, quoted below, are the
26  ones in effect prior to 2015 amendments, because those amendments only affect transfers made, or
    obligations incurred, after Jan. 1, 2016, per Civ. C. § 3439.14(a)).

27  California Civil Code section 3439.04(a) provides, in relevant part:

28      (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the
        creditor's claim arose before or after the transfer was made or the obligation was incurred, if the

The second and third insolvency tests described above – inadequate capital and cash flow/equitable insolvency – may be seen as different iterations of the same test: inability to pay debts either in the reasonably foreseeable future or more immediately. The Third Circuit has observed, "some courts have equated a finding of equitable insolvency [aka cash flow insolvency] with that of unreasonably small capital," but "[w]e believe the better view" is that "unreasonably small capital denotes a financial condition short of equitable insolvency," and "we hold the test for unreasonably small capital is reasonable foreseeability" that lack of capital would lead to an "inability to generate enough cash flow to sustain operations." *Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d 1056, 1070,1073 (3rd Cir. 1992) (footnotes omitted).

Insolvency for purposes of the complaint's claims for breach of fiduciary duty will be reviewed after an examination of what those duties are.

---

debtor made the transfer or incurred the obligation as follows:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(A) [inadequate capitalization] Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(B) [cash flow] Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

(b) In determining actual intent under paragraph (1) of subdivision (a), consideration may be given, among other factors, to any or all of the following:

* * *

(9) [balance sheet or presumptive cash flow insolvency] Whether the debtor was insolvent [meaning, in relevant part, "if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets," without including property that has been "transferred, concealed, or removed with intent to hinder, delay, or defraud creditors" or was otherwise fraudulently transferred, and with the further caveat that a debtor "who is generally not paying his or her debts as they become due is presumed to be insolvent" (Cal. Civ. C. § 3439.02)] or became insolvent [under the same definition] shortly after the transfer was made or the obligation was incurred.

The last of the avoidance statutes, California Civil Code section 3439.05 provides, in relevant part:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent [under the balance sheet test quoted above (Cal. Civ. C. § 3439.02)] at that time or the debtor became insolvent as a result of the transfer or obligation.

### C.  Corporate Fiduciary Duties

Corporate fiduciary duties typically are divided into three categories (although the last of these may be a sub-category):

Duty of care – This is the duty to exercise reasonable prudence in making business judgments for the corporation, including gathering adequate information and undertaking due consideration of the relevant issues. *See, e.g.*, *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.*, 21 Cal.4th 249, 258 (1999) ("A director shall perform the duties of a director ... with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.").

Duty of loyalty – This is the duty to give primacy to the interest of the corporation, most typically contrasted with acting in self-interest.  *See, e.g., Remillard Brick Co. v. Remillard-Dandini Co.*, 109 Cal.App.2d 405, 419 (1952) ("It is a cardinal principle of corporate law that a director cannot, at the expense of the corporation, make an unfair profit from his position. He is precluded from receiving any personal advantage without fullest disclosure to and consent of all those affected.").

Duty of good faith – This duty of good faith is generally considered part of the duty of loyalty, because directors or officers cannot act loyally towards the corporation unless they act in the good faith belief that their actions are in the corporation's best interest, and this has been held to include a duty of oversight.  *See Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006); *see also Mueller v. Macban*, 62 Cal.App.3d 258, 274, 132 (1976) ("Directors owe a duty of highest good faith to the corporation and its stockholders, and this same duty is demanded of officers of the corporation.") (citations omitted).

It is not entirely clear whether there is any difference between the duties for directors and officers.  Delaware decisions have held that these basic duties are the same.  *Gantler v. Stephens*, 965 A.2d 695, 708 (Del. 2009) ("[C]orporate officers owe

fiduciary duties that are identical to those owed by corporate directors.").  For now this discussion focuses on directors.

As part of exercising the foregoing duties, directors must monitor for others' wrongdoing.  This is often referred to as "*Caremark*" duties.  *In re Caremark Int'l Derivative Lit.*, 698 A.2d 959 (Del. Ch. 1996).  *See also Stone*, 911 A.2d 362, 370 (expressly approving *Caremark* standard).

The overall goal, in exercising each of these duties, is to preserve and grow corporate value.  *See, e.g., Paramount Communications, Inc. v. Time, Inc.*, 571 A.2d 1140, 1150 (Del. 1990) (duty to manage corporation attempt to "enhance corporate profitability"); *N. Am. Catholic Educ. Programming Fdn., Inc. v. Gheewalla*, 930 A.2d 92, 103 (Del. 2007) (duty to attempt to "maximize" corporate value).

The elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary relationship (in this case, a duty to the corporation or to creditors), (2) the breach of that relationship, and (3) damages proximately caused by the breach.   *In re GSM Wireless, Inc.,* 2013 Bankr. Lexis 3298, at *128 (Bankr. C.D. Cal.).  Remedies include damages for all harm proximately caused to the corporation, as well as rescission and restitution.  *Id.*

### 1.  The business judgment rule

Normally one who breaches a duty through ordinary negligence is liable for the damages that are proximately caused, but directors are protected by the business judgment rule.  *Caremark*, 698 A.2d 959, 967-68.  That rule is "a judicial policy of deference to the business judgment of corporate directors in the exercise of their broad discretion in making corporate decisions."  *Everest Investors 8 v. McNeil Partners*, 114 Cal.App.4th 411, 429 (2003); *Burt v. Irvine Co.*, 237 Cal.App.2d 828, 852 (1965).  *See also Gantler*, 965 A.2d 695, 705-06 (business judgment rule is "a <u>presumption</u> that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company") (citation and quotation marks omitted, emphasis added).

The effect of the business judgment rule is to raise the burden of proof from ordinary negligence to gross negligence – "*i.e.,* failure to exercise even slight care." Friedman et al., Cal. Prac. Guide: Corps. (The Rutter Group 2015) Ch. 6-C (citation omitted).  *See also Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985) ("gross negligence" standard applies under Delaware law), *overruled on other grounds by Gantler*, 965 A.2d 695.

Put differently:

> [Corporate directors] will not be held liable for a negligent judgment (*i.e.,* one a reasonably prudent person would not have made) so long as the <u>process</u> leading to the judgment meets business judgment rule requirements.  In other words, courts will not "second-guess" the decisions of disinterested directors made with reasonable diligence in ascertaining the facts and believed to be in the corporation's best interests.  (This is so even if the directors make a bad or "stupid" decision.)  [Cal. Prac. Guide: Corps. (The Rutter Group 2015) Ch. 6-C (emphasis added)]

But the <u>process</u> is critical.  The business judgment rule "presuppose[s] that judgment – reasonable diligence – has in fact been exercised" and "[a] director cannot close his eyes to what is going on about him in the conduct of the business of the corporation and have it said that he is exercising business judgment."  *Burt*, 237 Cal.App.2d 828, 852-53.  *See also In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 569 (Bankr. D. Del. 2008) (holding, under Delaware law, that "if the 'directors individually and the board collectively' fail to inform themselves 'fully and in a deliberate manner,' then they 'lose the protection of the business judgment rule' …..") (citation omitted).[3]

---

[3] The business judgment rule has been <u>partially</u> codified in California Corporations Code section 309. That statute at first appears to apply a simple negligence standard, but the parties do not dispute that a gross negligence standard applies under the business judgment rule (apparently because, although directors are required to act under a reasonableness standard, the business judgment rule <u>presumes</u> that they have done so unless that presumption can be overcome by a showing of gross negligence). Cal. Prac. Guide: Corps. (The Rutter Group 2015) Ch. 6-C ("Disinterested directors are *rebuttably presumed* to have acted in good faith (*i.e.,* to have believed their decision was in the corporation's best interests).");  *see Biren v. Equal. Emergency Med. Grp., Inc.*, 102 Cal.App.4th 125, 136 (2002) ("A director is not liable for a mistake in business judgment which is made in good faith and in what he or she believes to be the best interests of the corporation[.] The business judgment rule sets up a presumption that directors' decisions are made in good faith[.]") (citations omitted); *see also Katz v. Chevron Corp.*, 22 Cal.App.4th 1352, 1366 (1994) ("The business judgment rule is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. … Under the business judgment rule, director liability is predicated upon concepts of gross negligence.") (citations and punctuation omitted) (applying Delaware law); *Fed. Deposit Ins. Co. v. Faigin*, 2013 WL 3389490 at *14 n. 1 (C.D. Cal.).

The process that directors must implement is explained in greater detail in *Caremark*. Although no reported decision under California corporate law has expressly followed *Caremark*, is has been widely accepted and this Bankruptcy Court knows of no reason why the California Supreme Court would not apply the same reasoning.

> [Directors must] assur[e] themselves that information and reporting systems exist in the organization that are <u>reasonably</u> designed to provide to senior management and to the board itself timely, accurate information sufficient to allow management and the board, each within its scope, to reach informed judgments concerning both the corporation's compliance with law and its business performance.
>
> <u>Obviously the level of detail that is appropriate for such an information system is a question of business judgment</u>. And obviously too, no rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations, or that senior officers or directors may nevertheless sometimes be misled or otherwise fail reasonably to detect acts material to the corporation's compliance with the law. But it is important that the board exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the board that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility.
>
> Thus, … a director's obligation includes a <u>duty to attempt in good faith</u> to <u>assure that a corporate information and reporting system, which the board concludes is adequate, exists</u>, and that failure to do so … [may] render a director liable for losses caused by non-compliance with applicable legal standards.
>
> * * *

---

California Corporations Code § 309 provides:

(a) A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances.

(b) In performing the duties of a director, a director shall be entitled to rely on information, opinions, reports or statements, including financial statements and other financial data, in each case prepared or presented by any of the following:

(1) One or more officers or employees of the corporation whom the director believes to be reliable and competent in the matters presented.

(2) Counsel, independent accountants or other persons as to matters which the director believes to be within such person's professional or expert competence.

(3) A committee of the board upon which the director does not serve, as to matters within its designated authority, which committee the director believes to merit confidence, so long as, in any such case, the director acts in good faith, after reasonable inquiry when the need therefor is indicated by the circumstances and without knowledge that would cause such reliance to be unwarranted.

(c) A person who performs the duties of a director in accordance with subdivisions (a) and (b) shall have no liability based upon any alleged failure to discharge the person's obligations as a director. In addition, the liability of a director for monetary damages may be eliminated or limited in a corporation's articles to the extent provided in paragraph (10) of subdivision (a) of Section 204.

> <u>Generally</u> where a claim of directorial liability for corporate loss is predicated upon ignorance of liability[-]creating activities within the corporation … only a <u>sustained or systematic failure of the board to exercise oversight</u> – <u>such as</u> an <u>utter</u> failure to attempt to assure a reasonable information and reporting system exits – will establish the lack of good faith that is a necessary condition to liability.

> [*Caremark*, 698 A.2d 959, 970-71 (footnote omitted); *see Stone*, 911 A.2d 362, 369-70 (expressly approving *Caremark* standard).]

### 2. The Directors appear to over-interpret the exculpatory effect of the business judgment rule

The Directors argue that the complaint is required to, and does not, allege "utter" and "conscious" failures, or "abdications" of duties; and they point to authority that a breach of *Caremark* duties requires more than gross negligence.  Dkt. 41, pp. 13:1–15:17; dkt. 42, pp. 9:20–26; dkt. 43, pp. 9:20–26.   The Directors are correct that some cases use the words and express those concepts; but the Directors appear to take those words and concepts out of context and read too much into them.

*Caremark* articulated directors' duty to attempt "in good faith" to assure the adequacy of information and reporting systems, and the Delaware Supreme Court has held that liability for lack of "oversight" requires a lack of such good faith in that "(a) the directors <u>utterly</u> failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, <u>consciously</u> failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Stone*, 911 A.2d 362, 370 (italics in original, underlining added).  The Delaware Supreme Court has also described *Caremark* as addressing situations in which the fiduciary "intentionally fails to act in the face of a known duty to act [*i.e.*, the duty to attempt to establish adequate information and reporting systems], demonstrating a conscious disregard for his duties" which is "qualitatively different from, and more culpable than, the conduct giving rise to a violation of the fiduciary duty of care (*i.e.*, gross negligence)."  *Stone*, 911 A.2d 362, 369 (citation omitted, footnote omitted).  Similarly, *Berg* states that the "business judgment rule does not immunize directors for <u>abdication</u> of duty by closing their eyes to what is going on in the conduct of the business."  *See Berg & Berg Enterprises, LLC v. Boyle*,

178 Cal.App.4th 1020, 1047 (2009) (emphasis added) (citation omitted).

The emphasized words do not change the *Caremark* standards.

### a. If directors do not attempt in good faith to <u>establish</u> a system that is reasonably designed to provide timely, accurate, and sufficient information, then they have utterly failed to <u>implement</u> such a system

As explained in *Caremark* (which was expressly adopted by *Stone*), the first step in "implement[ing]" a reporting or information system is that corporate directors have a "duty to attempt in good faith" to <u>establish</u> an "adequate" one, meaning one "reasonably" designed to provide "timely," "accurate," and "sufficient" information. *Caremark*, 698 A.2d 959, 970 (emphasis added).  If the allegations in the complaint, accepted as true, establish a *prima facie* showing that no such system exists, then by definition the directors have "utterly" failed to "implement" it and have "intentionally" failed to act in the face of the known duty to attempt to establish such a system.  The burden then would be on the directors either to rebut that *prima facie* showing or to show that, despite the absence of such a system, they nevertheless made an "<u>attempt</u> in good faith" to do so.  *Id.* (emphasis added).

Circumstantial evidence can establish such a *prima facie* showing that there is no system, such as the complaint's allegations of repeated transactions occurring without any board approval or ratification, when normally such transactions would require such approval.  *See, e.g.,* Complaint (dkt. 1) ¶¶ 32, 34, 42, 44, 52 (no approval or ratification for four of the five CCCD Notes or the other CCCD Transactions, nor for the RHM Software Rights Transfer).  That shifts the burden to the corporation's directors to show either that the complaint's *prima facie* showing is unfounded or that they did in fact attempt in good faith to establish an "adequate" system.  *Compare, e.g., In re Polycom, Inc.*, 78 F.Supp.3d 1006, 1016 (N.D. Cal. 2015) ("Plaintiffs do not identify a single instance where internal controls were disregarded or red flags were ignored").

**b. Alternatively, if a system exists but the directors do not exercise "business judgment" in concluding that the system is "adequate," then they have utterly failed to implement a system sufficient to invoke the "business judgment" rule**

Although there is great deference as to the nature of such a system ("the level of detail" is itself "a question of business judgment" (*Caremark*, 698 A.2d 959, 970)) the directors must have actually exercised "judgment" in establishing such a system before the business judgment rule applies.  For example, if one board member's "system" is simply to assume that other board members will handle his or her responsibilities – without attempting to confirm that by some reasonable method, such as appropriate delegation to a subcommittee that reports back to the board – then there would not have been any exercise of business judgment.  That is another form of utterly failing to implement a *Caremark* system.  *See Burt*, 237 Cal.App.2d 828, 852-53 (business judgment rule "presuppose[s] that judgment – reasonable diligence – has in fact been exercised").

Again, circumstantial evidence, such as the allegations in the complaint, can establish a *prima facie* showing that directors of a corporation have not exercised business judgment.  That shifts the burden to those directors to rebut that *prima facie* showing and show that they did in fact exercise their business judgment in attempting in good faith to establish a system that was "reasonably" designed to provide them with "timely," "accurate," and "sufficient" information.  *Caremark*, 698 A.2d 959, 970.

**c. If directors do not use the system, or ignore its clear flaws, then they have "consciously" failed to monitor or oversee the corporation's operations**

Once having set up such a system, directors are entitled to rely on it.  But if they fail to use that system, or choose to ignore its clear flaws, then they have "<u>consciously</u> failed to monitor or oversee [the corporation's] operations thus disabling themselves from being informed of risks or problems requiring their attention."  *Stone*, 911 A.2d 362, 370 (emphasis added).  This, too, can be shown by circumstantial evidence such as the allegations in the complaint.

Any one of the foregoing examples illustrate what would constitute, in the words of *Caremark*, a "sustained <u>or</u> systematic failure of the board to exercise oversight – <u>such as</u> an utter failure to attempt to assure a reasonable information and reporting system exits …," or, as *Berg* put it, an "abdication" of duties.  *Caremark*, 698 A.2d 959, 971 (emphasis added); *Berg*, 178 Cal.App.4th 1020, 1047.  Nothing in *Stone*'s brief summary of *Caremark* appears intended to change these things.  To the contrary, *Stone* expressly approves the *Caremark* standard.  *Stone*, 911 A.2d 362, 369-70.  *See also Fed. Deposit Ins. Co. v. Faigin*, 2013 WL 3389490 at *14 n. 3 (C.D. Cal.) (rejecting overbroad interpretation of *Berg*).

In sum, the business judgment rule provides the Directors with a very substantial amount of deference, but not an unlimited amount.  The complaint, including reasonable inferences thereunder, adequately alleges facts from which the plaintiff can plausibly assert that the requirements of the business judgment rule were not met.

Alternatively, assuming for the sake of discussion that the predicates to the business judgment rule existed, the plaintiff has argued that there are exceptions to it.

### 3. Conflicts of interest, including self-dealing, are exceptions to the business judgment rule

The business judgment rule does not apply "in circumstances which inherently raise an inference of conflict of interest" nor to actions taken "with improper motives, or as a result of a conflict of interest."  *Everest*, 114 Cal.App.4th 411, 430.

When self-dealing is involved the transaction will be scrutinized for fairness:

> Any transaction between the corporation and a director or a dominant or controlling stockholder, or group of stockholders, is subject to the following test: "Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the <u>good faith</u> of the transaction but also to show its <u>inherent fairness</u> from the viewpoint of the corporation and those interested therein. … The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain.  If it does not, equity will set it aside."  [*Burt*, 237 Cal.App.2d 828, 850-51 (1965) (quoting *Pepper v. Litton*, 308 U.S. 295, 306 (1939) (other citations omitted).]

Delaware law is to the same effect.  The Delaware Supreme Court scrutinizes

self-dealing transactions under the "entire fairness" standard, which it has described as follows (when examining a proposed merger):

> The concept of fairness has two basic aspects: fair dealing and fair price. The former embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The latter aspect of fairness relates to the economic and financial considerations of the [transaction], including all relevant factors …. However, the test for fairness is not a bifurcated one as between fair dealing and price.  All aspects of the issue must be examined as a whole since the question is one of entire fairness.  [*Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162-63 (Del. 1995) (citation omitted)]

At the pleading stage, plaintiff must allege sufficient facts to support a reasonable inference that material self-interest of one or more Directors could have infected or affected the board's deliberative process, and thereby change the standard of review from business judgment to entire fairness.  *See Cinerama,* 663 A.2d 1156 (extensive analysis of self-dealing and entire fairness issues).

These principles have also been partially codified in California Corporations Code section 310 (California § 310), which provides in relevant part:

> (a) No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any corporation, firm or association in which one or more of its directors has a material financial interest, is either void or voidable because such director or directors or such other corporation, firm or association are parties or because such director or directors are present at the meeting of the board or a committee thereof which authorizes, approves or ratifies the contract or transaction, if
>
> (1) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the shareholders and such contract or transaction is approved by the shareholders (Section 153) in good faith, with the shares owned by the interested director or directors not being entitled to vote thereon, or
>
> (2) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the board or committee, and the board or committee authorizes, approves or ratifies the contract or transaction in good faith by a vote sufficient without counting the vote of the interested director or directors and the contract or transaction is just and reasonable as to the corporation at the time it is authorized, approved or ratified, or
>
> (3) As to contracts or transactions not approved as provided in paragraph (1) or (2) of this subdivision, the person asserting the validity of the contract or transaction sustains the burden of <u>proving that the contract or transaction was just and reasonable</u> as to the corporation at the time

it was authorized, approved or ratified.

A mere common directorship does not constitute a material financial interest within the meaning of this subdivision. A director is not interested within the meaning of this subdivision in a resolution fixing the compensation of another director as a director, officer or employee of the corporation, notwithstanding the fact that the first director is also receiving compensation from the corporation. [Emphasis added.]

The complaint includes a number of allegations of self-dealing. *See, e.g.,* Complaint (dkt. 1) ¶¶ 2, 3, 49, 60, 64. Those allegations, if proven, would establish exceptions to the business judgment rule.

### 4. Officers apparently are not protected by the business judgment rule in California; but that issue is not decided in this opinion because the complaint does not adequately distinguish between the defendants' alleged acts or omissions as officers and as directors

At least in California, the business judgment rule apparently does not protect officers. *See* Cal. Corp. Code § 309(a)–(c); *F.D.I.C. v. Perry*, 2012 WL 589569, at *4 (C.D. Cal.) (under both California common law and the California Corporations Code, the business judgment rule "does not protect officers' corporate decisions"); *FDIC v. Van Dellen*, 2012 WL 4815159, at *6 & *14 n. 13 (C.D. Cal.) ("California courts have not extended the rule to officers and this Court declines to do so.") (footnote omitted). *Cf. Biren v. Equality Emergency Medical Group*, 102 Cal.App.4th 125, 138 (2002) (although CFO acted without board approval, she was also director responsible for billing matters, and she was protected by the business judgment rule because the "trial court could reasonably infer that she mistakenly believed it was in the best interest of the corporation that she act with alacrity because the other directors could not").

That issue need not be decided in this opinion because, as argued by at least some of the Directors, the complaint does not sufficiently distinguish between their alleged acts and omissions as <u>officers</u>, as distinguished from their capacity as <u>directors</u>. *See* dkt. 43, pp. 17:1-18:11, *and* dkt. 50, pp. 14:12-15:17 (both citing *Brown v. Brewer*, 2010 WL 2472182, at *3 (C.D. Cal.)). Accordingly, the plaintiff cannot rely on this exception to defeat the motions to dismiss. (But the plaintiff might be able to amend the complaint to make that distinction more clear, or might be able to establish at later

1    stages of this litigation that a given defendant was acting as an officer and therefore

2    cannot use the business judgment rule as a defense.)  *See generally Gaillard v.*

3    *Natomas Co.*, 208 Cal.App.3d 1250, 1265 (1989) (because directors "did not vote on

4    the approval of the golden parachutes or consulting agreement … they were not

5    'perform[ing] the duties of a director,' as specified in section 309, but were acting as

6    officer employees of the corporation [and] [t]he judicial deference afforded under the

7    business judgment rule therefore should not apply.").

8                   **5.  Exculpatory provisions do not necessarily protect the Directors**

9           A corporation's governing documents generally can excuse directors from the

10    duty of care but not the duty of loyalty or good faith.  *See, e.g., Malpiede v. Townson*,

11    780 A.2d 1075, 1095 (Del.  2001).  That is particularly significant for *Caremark* duties

12    because those have been held to be part of the duty of good faith so, at least in

13    Delaware, exculpatory provisions cannot exonerate directors for violations of their

14    *Caremark* duties.  *See Stone*, 911 A.2d 362, 367-70 (Del. 2006).[4]

15           That is hardly surprising: the whole point of having a board of directors is to

16    oversee the corporation, so it would make no sense to permit them to be exculpated in

17    advance for completely failing to oversee the corporation – *i.e.*, if they have "utterly

18    failed to implement any reporting or information system or controls" or have

19    "consciously failed to monitor or oversee" such a system or controls "thus disabling

20    themselves from being informed of risks or problems requiring their attention."  *Stone*,

21    911 A.2d 362, 370.  This Bankruptcy Court anticipates that the California Supreme

22    Court would reach the same conclusion: directors cannot be exculpated in the articles of

23    incorporation from breaches of their *Caremark* duties.

24           In California the applicable statute is Corporations Code section 204(a)(10),

25    which states that the articles of incorporation may set forth:

26     

27    [4] Notwithstanding the general rule that duty of care claims must be dismissed in the face of an
exculpatory provision, "[w]hen a duty of care breach is not the *exclusive* claim" and is accompanied by a
duty of loyalty claim that is not dismissed, there is authority that "the due care claim is not defeated by

28    [10 Del. C.] § 102(b)(7)."  *Cf. In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 566-72 (Bankr. D. Del. 2008)
(citation omitted, emphasis in original).  This opinion expresses no view on that issue.

Provisions eliminating or limiting the personal liability of a director for monetary damages in an action brought by or in the right of the corporation for breach of a director's duties to the corporation and its shareholders, as set forth in Section 309, provided, however, that (A) such a provision may not eliminate or limit the liability of directors (i) for acts or omissions that involve <u>intentional misconduct or a knowing and culpable violation of law</u>, (ii) for acts or omissions that a director <u>believes to be contrary to the best interests of the corporation or its shareholders or that involve the absence of good faith</u> on the part of the director, (iii) for any transaction from which a director derived an <u>improper personal benefit</u>, (iv) for acts or omissions that show a <u>reckless disregard</u> for the director's duty to the corporation or its shareholders in circumstances in which the director was aware, or should have been aware, in the ordinary course of performing a director's duties, of a risk of serious injury to the corporation or its shareholders, (v) for acts or omissions that constitute an <u>unexcused pattern of inattention that amounts to an abdication of the director's duty to the corporation</u> or its shareholders, (vi) under Section 310, or (vii) under Section 316, (B) no such provision shall eliminate or limit the liability of a director for any act or omission occurring prior to the date when the provision becomes effective, and (C) no such provision shall eliminate or limit the liability of an officer for any act or omission as an officer, notwithstanding that the officer is also a director or that his or her actions, if negligent or improper, have been ratified by the directors.  [Cal. Corp. Code § 204 (West) (emphasis added)]

Debtor's articles of incorporation do include an exculpation provision:

The liability of the directors of the corporation for monetary damages shall be eliminated to the fullest extent permissible under California law.  [*See* dkt. 41-5, exhibit A to Foust Declaration.]

The plaintiff argues that the Directors are not protected by this clause.  The plaintiff is not persuasive on every issue, as noted in brackets below, but it has established that this exculpatory provision does not entirely protect the Directors from liability:

First, exculpation does not apply to <u>corporate officers</u>.  [As noted above, the complaint does not sufficiently distinguish between the defendants' alleged acts and omissions as <u>officers</u>, as distinguished from their capacity as <u>directors</u>, so the plaintiff's argument on this issue is insufficient.]

Second, exculpation does not apply to <u>self-dealing</u> transactions [which the complaint alleges as against some Directors, but not as to others].

Third, exculpation does not apply to "acts or missions that show a <u>reckless disregard</u> for the director's duty to the corporation or its shareholders in circumstances where the director was aware, or should have been aware ..., of a risk of serious injury to the corporation or its shareholders."  [The complaint (dkt. 1), at ¶¶ 85 & 93, alleges a reckless disregard as against all of the Directors.]

Fourth, exculpation does not apply to "acts or omissions that constitute ... an <u>abdication</u> of the director's duty to the corporation or its shareholders."

> [As explained above, in discussing *Caremark* duties, the complaint does allege such "abdication" of duties.]  [Dkt. 57, p. 18:3-12, emphasis added].

In sum, neither the business judgment rule nor the exculpatory clause in Debtor's articles of incorporation entirely protects the Directors from liability under the general corporate law of California (or the parallel laws of Delaware and other States).  The next issue is what effect insolvency has.

### D. Insolvency's Effect On Fiduciary Duties

What principally changes upon insolvency is who can sue for breaches of fiduciary duties.  Normally the fiduciary duties of care, loyalty, and good faith run not only to stockholders but also to the corporation itself, under the California Corporations Code section 309,[5] and decisions under that law,[6] as well as analogous decisions from Delaware[7] and other jurisdictions.[8]  This is an unremarkable proposition.  The defendants' assertions to the contrary – that directors' duties essentially run only to the stockholders – are belied by the plain words of the statute and the overwhelming weight

---

[5] "A director shall perform the duties of a director, including duties as a member of any committee of the board upon which the director may serve, in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders and with such care, including reasonable inquiry, as an ordinarily prudent person in a like position would use under similar circumstances." Cal. Corp. Code § 309(a) (emphasis added). Likewise, California Corporations Code section 204(a)(10) provides that directors cannot be exculpated for breaching certain fiduciary duties to "the corporation or its shareholders."  (Emphasis added.)

[6] *Berg & Berg Enterprises, LLC v. Boyle*, 178 Cal.App.4th 1020, 1037 (2009) ("It is without dispute that in California, corporate directors owe a fiduciary duty to the corporation and its shareholders and now as set out by statute, must serve 'in good faith, in a manner such director believes to be in the best interests of the corporation and its shareholders.'" (quoting Cal. Corp. Code § 309(a)) (emphasis added)).

[7] *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("It is well settled that directors owe fiduciary duties to the corporation.") (emphasis added); *Crescent/Mach I Partners, L.P. v. Turner*, 846 A.2d 963, 979 (Del. Ch. 2000) ("Directors have an unyielding fiduciary duty to protect the interests of the corporation and the stockholders alike.") (discussing fiduciary duties in the context of a merger, and recognizing the separate interests of the corporation and the shareholders) (emphasis added).

[8] N.Y. Bus. Corp. Law § 717 (McKinney) (directors and officers should consider, inter alia, "both the long-term and the short-term interests of the corporation and its shareholders[.]") (emphasis added); *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 224 (S.D.N.Y. 2005) ("A corporate officer or director generally owes a fiduciary duty only to the corporation over which he exercises management authority, and any breach of fiduciary duty claims arising out of injuries to the corporation in most cases may only be brought by the corporation itself or derivatively on its behalf.") (emphasis added) (citing *Abrams v. Donati*, 66 N.Y.2d 951, 953 (1985)); *Somers ex rel. EGL, Inc. v. Crane*, 295 S.W.3d 5, 11 (Tex. Ct. App. 2009) ("A director's fiduciary duty runs only to the corporation, not to individual shareholders or even to a majority of the shareholders." (applying Texas law) (emphasis added)).

1    of other authority.

2    Insolvency changes the situation, but the reported decisions struggle to explain

3    how.  The leading case in California is *Berg & Berg Enterprises, LLC v. Boyle*, 178

4    Cal.App.4th 1020 (2009).

5    As *Berg* notes, traditionally in California and elsewhere "all of the assets of a

6    corporation, immediately on its becoming insolvent, become a <u>trust fund</u> for the benefit

7    of all of its creditors."  *Berg*, 178 Cal.App.4th 1020, 1040 (citations and internal

8    quotation marks omitted, emphasis added).  This raises the question of what it means

9    for the corporation's assets to become a "trust fund" or, more generally, what are the

10   directors' and officers' duties upon insolvency.  For example, must the directors

11   immediately liquidate the corporation and pay creditors?

12   **1.  Upon insolvency, duties to creditors do not supersede or dilute
13        duties to stockholders; rather, creditors join stockholders in
             being able to sue directors derivatively for breaches of fiduciary
14        duties to the corporation that divert, dissipate, or unduly risk
             corporate assets**

15   *Berg* concluded that "the scope of any extracontractual duty owed by corporate

16   directors to the insolvent corporation's creditors is limited in California, consistent with

17   the trust fund doctrine, *to the avoidance of actions that divert, dissipate, or unduly risk*

18   *corporate assets that might otherwise be used to pay creditors['] claims*."  *Berg*, 178

19   Cal.App.4th 1020, 1041 (emphasis in original).  As this phrase is interpreted below, this

20   Bankruptcy Court is not persuaded that the California Supreme Court would reach any

21   different conclusion.

22   **a.  The duty to avoid actions that "unduly risk"
23        corporate assets is essentially the same as the duty
             outside of insolvency: to exercise business judgment
24        in an informed and good faith effort to preserve and
             grow the corporation's value**

25   *Berg* started by summarizing "modern" federal and "out-of-state" decisions

26   (without necessarily following all of their holdings or dicta):

27   [Those decisions] have underscored that when managing a corporation
     that is insolvent, directors must consider the best interests of the <u>whole</u>
28   "<u>corporate enterprise, encompassing all its constituent groups, without
     preference to any</u>.  That duty, therefore, requires directors to <u>take creditor</u>

-27-

interests into account, but not necessarily to give those interests priority. In particular, it is not a duty to liquidate and pay creditors when the corporation is near insolvency, provided that in the directors' informed, good faith judgment there is an alternative. Rather, the scope of that duty to the corporate enterprise is 'to exercise judgment in an informed, good faith effort to maximize the corporation's long-term wealth creating capacity.'"  [*Berg*, 178 Cal.App.4th 1020, 1038 (emphasis added, citations omitted)]

*Berg* then explained the rationale of those decisions "for the general rule of no duty owed to creditors" outside of insolvency, and how the dynamics change upon insolvency:

In an economic sense, when a corporation is solvent, it is the shareholders who are the residual claimants of the corporation's assets and who are the residual risk bearers. As long as the corporation remains solvent, the business decisions made by management directly affect the shareholders' income; management accordingly owes fiduciary duties to those shareholders as well as to the corporation. The corporation's creditors, on the other hand, are free to protect their interests by contract. As long as the corporation is solvent, no matter how badly managed it might be, it is able to satisfy its contractual obligations to creditors who are therefore unaffected by management's business decisions. But when insolvency arises, the value of creditors' contract claims may be affected by management's business decisions in a way it was not before insolvency. [*Berg*, 178 Cal.App.4th 1020, 1038 ( citations omitted)]

Having reviewed these modern trends and rationales, *Berg* then returned to decisions applying the "trust fund" doctrine under California law. *Berg* observed that "generally" any recovery for breaching the fiduciary duties imposed under the trust fund doctrine in California involved "cases where the directors or officers of an insolvent corporation have diverted assets of the corporation for the benefit of insiders or preferred creditors." *Id.* at 1040-41 (internal quotations omitted). It interpreted California law not to create any "paramount fiduciary duty of due care or loyalty that directors of an insolvent corporation owe the corporation's creditors …" nor any duty in an amorphous "zone" or "vicinity" of insolvency. *Id.* at 1041 (emphasis added). *Berg* rejected the seminal *Credit Lyonnais* decision of the Delaware Court of Chancery to the extent it can be read to imply otherwise. *Id.* at 1041 & n.22 (citing *Credit Lyonnais Bank Nederland N.V. v. Pathe Communications Corp.*, 1991 WL 277613 (Del. Ch.)).

Rather, *Berg* held, under California law the duty to creditors only arises upon

insolvency and is limited "*to the avoidance[9] of actions that divert, dissipate, or <u>unduly risk</u> corporate assets that might otherwise be used to pay creditors['] claims.*"  *Berg*, 178 Cal.App.4th 1020, 1041 (italics in original, underlining added).  The italicized words echo *Berg*'s recognition (a few paragraphs earlier) that "when insolvency arises" the "risk bearers" include creditors, and "the value of creditors' contract claims" can be directly jeopardized "by management's business decisions." *Id.* at 1038 (citations omitted).  What *Berg* appears to mean by avoiding actions that "unduly risk" corporate assets is that directors must attempt to avoid asset depletion and instead "maximize the corporation's long term wealth creating capacity." *Id.* (summarizing modern federal and out-of-state decisions to that effect, citations omitted).  That is consistent with authority from the Delaware Supreme Court that directors have a duty to attempt "to maximize the value of the insolvent corporation for the benefit of all those having an interest in it." *Gheewalla*, 930 A.2d 92, 103.[10]

---

[9] For at least two reasons, *Berg* apparently intended the word "avoidance" to include not just recovery of "diverted" property but also recovery of damages.  First, assets that have been "dissipate[d]" cannot be recovered.  Similarly, once risks have been triggered it makes no sense to "avoid" the action that triggered the risk.  Second, *Berg* characterizes its holding as being "consistent with the trust fund doctrine" (*id.* at 1041) and the trust fund decisions that it cites include damage awards.  *See Berg*, 178 Cal.App.4th 1020, 1040; *and see, e.g., In re Jacks*, 266 B.R. 728, 732 & *passim* (9th Cir. BAP 2001) (action for nondischargeability of $116,882.25 contract and common count damages); *Commons v. Schine*, 35 Cal.App.3d 141, 145 (1973) (measure of damages was amount of unjust enrichment); *Saracco Tank & Welding Co. v. Platz*, 65 Cal.App.2d 306 (1944) (liability for dereliction imposed on directors for wrongful distribution of all assets of insolvent corporation for payment to preferred creditors).

[10] *See* William P. Weintraub (Updated by Debra Grassgreen), *Reorganizing High-Tech Businesses – "I Need Help, Find Me Some Lawyers Who Wear Suits"*, 2002 Ann. Surv. of Bankr.Law 9, at 220 (2002):

> Generally speaking, under recent cases in other jurisdictions addressing the expanded duties of directors upon insolvency, the duties of directors of insolvent companies have been identified as a duty not to divert, dissipate or unduly risk assets that are necessary to pay the claims of creditors. *See In re Ben Franklin Retail Stores, Inc.*, 225 B.R. 646 (Bankr. N.D. Ill. 1998), *aff'd in part*, 1999 WL 982963 (N.D. Ill. 1999), *opinion amended and superseded*, 43 Collier Bankr. Cas. 2d (MB) 9, 2000 WL 28266 (N.D. Ill. 2000); *Geyer v. Ingersoll Publications* Co., 621 A.2d 784 (Del. Ch. 1992); *and Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 17 Del. J. Corp. L. 1099, 1991 WL 277613 (Del. Ch. 1991). What does this mean? As a practical matter, the expanded duties upon insolvency mean that the board of directors cannot disregard the superior interests and rights of creditors to be paid ahead of shareholders. Thus, high-risk strategies, or strategies that are not supported by reasonable assumptions and realistic expectations may, with the benefit of hindsight, subject directors to personal liability for implementing an improvident strategy that unnecessarily dissipates the corporation's assets while seeking (perhaps blindly) the ever elusive new equity investor or asset

What stands out about this duty upon insolvency is that it is essentially, if not exactly, the same as the overall duty to stockholders and the corporation outside of insolvency: to exercise business judgment in an informed and good faith effort to preserve and grow the corporation's value.  *See, e.g., Paramount Communications, Inc. v. Time, Inc.*, 571 A.2d 1140, 1150 (Del. 1990) (duty, outside of insolvency, to manage corporation to attempt to "enhance corporate profitability").

What changes upon insolvency is the constituency: the creditors are now "risk bearers" so they now have the right, like stockholders, to bring a derivative action in the corporation's name against directors who "unduly risk" corporate assets.  *See Berg*, 178 Cal.App.4th 1020, 1027 & n.6, 1041 & n.22 (distinguishing creditor's lack of direct claim with their ability to bring derivative claims).  *See also, e.g., Gheewalla*, 930 A.2d 92, 103 (no "direct" claims by creditors, and no "zone" of insolvency, but directors can be sued derivatively for violation of duty to attempt "to maximize the value of the insolvent corporation for the benefit of all those having an interest in it") (cited favorably by *Berg*, 178 Cal.App.4th 1020, 1041 n.22); *Production Resources v. NCT Group*, 863 A.2d 772, 791 (Del. Ch. 2004) (upon insolvency directors "continue to have the task of attempting to maximize the economic value of the firm" and "[t]hat much of their job does not change" but what does change is "the constituency on whose behalf the directors are pursuing that end" which now includes creditors) (footnote omitted), *criticized on other grounds by, e.g., Berg*, 178 Cal.App.4th 1020, 1038 & 1039 n. 18 (rejecting any implicit adoption of zone of insolvency or creditors' direct claims, as opposed to derivative claims); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 115 A.3d 535, 546 (Del. Ch.) ("After a corporation becomes insolvent, creditors gain standing to assert claims

purchaser in an environment where neither option is realistically available to the corporation. In such circumstances, if the "cash burn" erodes what might otherwise have been a fair recovery for creditors, directors who have embarked upon a mistaken, ill conceived, or thoughtless strategy may be found to be liable to creditors for the erosion of asset value or diminution in cash. Similarly, the absence of any analysis or demonstrable awareness of how certain options affect certain constituencies may also be evidence of the breach of duty.

1  derivatively for breach of fiduciary duty.") (footnote omitted).[11]

2      **b.  *Berg*'s policy concerns are resolved by this**
3      **interpretation, *i.e.,* that directors' duties before and**
       **after insolvency are essentially, if not exactly, the**
4      **same: to attempt to preserve and grow corporate**
       **value**

5      *Berg* expressed two policy concerns.  First, *Berg* was concerned that any

6  "paramount" duty to creditors "would conflict with" and "dilute" duties that directors

7  already owe to shareholders and the corporation.  *Berg*, 178 Cal.App.4th 1020, 1041.

8  But no such conflict or dilution arises if the duty is always the same, both before and

9  after insolvency: to attempt to preserve and grow corporate value.

10     Second, *Berg* perceived "practical problems" with creating a paramount duty to

11 creditors, "among them a director's ability to <u>objectively and concretely determine when</u>

12 <u>a state of insolvency actually exists</u> such that his or her duties to creditors have been

13 triggered."  *Id.* (emphasis added).  That would be a very real concern if duties changed

14 radically upon insolvency, because it is so difficult to tell when the line of insolvency is

15 crossed.

16     For example, the balance sheet test is easy to state in theory, but in practice it

17 requires a "fair" valuation of assets.  This means that directors cannot rely on book

18 value, or value for accounting or tax purposes, or any other valuation that is likely to be

19 readily available.  *See, e.g., Quadrant Structured Products Co. v. Vertin*, 102 A.3d 155,

20 176-77 (Del. Ch. 2014) ("balance sheet" is a misnomer because the balance sheet is

21 only the starting point of the analysis); *Prod. Res. Grp. LLC v. NTC Grp. Inc.*, 863 A.2d

22 772, 775 (Del. Ch. 2004).

23     Similarly, as to cash flow insolvency or inadequate capitalization, a corporation

24 may have accounts receivable that have not yet been collected, causing some delays in

25

26 [11] For purposes of the analysis in this opinion, it does not matter whether directors' duties upon insolvency
   are duties to creditors *per se*, or instead duties to the corporation which in turn has a duty to pay
27 creditors.  Either way, the directors have to take into account the corporation's obligation to pay creditors.
   *See Quadrant*, 115 A.3d 535, 546-47 ("The directors of an insolvent firm do not owe any particular duties
28 to creditors.  They continue to owe fiduciary duties to the corporation for the benefit of all of its residual
   claimants, a category which now includes creditors.") (footnotes omitted).

payments, and it is ambiguous at what point such delays tip the balance into a general

inability to pay debts when due, either now or in the foreseeable future.  *See, e.g., In re*

*Dill*, 731 F.2d 629, 632 (9th Cir.1984) ("finding that a debtor is generally not paying his

debts requires a more general showing of the debtor's financial condition and debt

structure than merely establishing the existence of a few unpaid debts") (citations

omitted).  *See also* Cal. Civ. Code § 3439.01, Legislative Committee Comment 3 (court

should take into account proportion of debts not being paid, duration of nonpayment,

existence of bona fide disputes, etc.).

But these ambiguities in each type of "insolvency" are far less troublesome if no

new duties are "triggered" by insolvency.  Under the foregoing interpretation of *Berg* and

California law, no new duties are triggered.  Directors' duty remains essentially if not

entirely unchanged: to attempt to preserve and grow corporate value.

This interpretation is also consistent with the trend in decisions in Delaware (and

other States, as noted in *Berg*).  As one monograph states:

> [U]nder Delaware law, fiduciary duties of directors and officers of
> financially troubled companies run to the corporation itself, and not to the
> unique constituencies interested in the corporation.  Coupled with the
> protection afforded by the business judgment rule, Delaware law affords
> managers of troubled companies a broad discretion to act in the long-term
> interests of the corporation without worry that their actions will draw fire
> from either shareholders or creditors. … ["The] creditors of an insolvent
> firm have no greater right to challenge a disinterested, good faith business
> decision than the stockholders of a solvent firm.["]  [Christopher W. Frost,
> *Corporate Governance in Insolvency and Bankruptcy* (Collier Monograph,
> A. Resnick & H. Sommer Eds.) (2011) ("Frost, *Corp. Governance in
> Insolvency*") § 3[3], at pp. 33-34 (footnotes omitted).]

But there is a caveat.  In the next sentence that same monograph goes on to

note:

> The remaining problem, however is that this focus on the corporation
> obscures the conflicts between creditors and shareholders that lie at the
> heart of managerial decision-making.  <u>Most decisions of significance
> implicate conflicts between classes of investors</u>. … [*Id.*, emphasis added.]

This is another very real potential problem, but as the emphasized language

implies it is not unique to the insolvency situation: it applies to any conflicts between

different groups of "investors."  For example, directors often have to choose among

conflicting constituencies when a majority of stockholders favor a course of action that a

minority claims would violate their rights. *See, e.g., Paramount*, 571 A.2d 1140. *See*

*also Production Resources*, 863 A.2d 772, 797 (Del. Ch. 2004) (analogizing to conflicts

among groups of stockholders), *criticized on other grounds by, e.g.*, *Berg*, 178

Cal.App.4th 1020, 1038 & 1039 n. 18.

In each instance the solution, to which *Berg* alluded, is for directors to exercise

their business judgment in a good faith attempt to act in the best interests of the whole

corporate enterprise, encompassing all its constituent groups, without undue preference

to any, consistent with the goal of preserving and growing corporate value. This

concept is explored further below.

### 2. What it means to act in the best interests of the whole corporate enterprise, encompassing all its constituent groups, without undue preference to any

Stockholders and creditors are likely to have different approaches to risk,

especially upon insolvency. Creditors, "holding fixed claims, generally prefer corporate

decisions that minimize the risk of failure," whereas stockholders "generally prefer risky

strategies because they profit from the success of [those] decisions but share the losses

with creditors if the decisions fail." Frost, *Corp. Governance in Insolvency* § 2, at p. 6.

If directors acted solely at the direction of creditors they might take on too little

risk, from the standpoint of "maximiz[ing] the corporation's long-term wealth creating

capacity." *Berg*, 178 Cal.App.4th 1020, 1038 (citation and internal quotation marks

omitted). Conversely if they acted solely at the direction of stockholders they might take

on too much risk. *See generally* Laura Lin, *Shift of Fiduciary Duty Upon Corporate*

*Insolvency: Proper Scope of Directors' Duty to Creditors*, 46 Vand. L. Rev. 1485, 1489

(1993).

Only one rational approach to resolve those differences appears to have been

suggested in the reported decisions (or in the commentary that the parties have cited or

that this Bankruptcy Court has found). That approach is for the directors to exercise

their business judgment in a good faith attempt to weigh the likely value of each

proposed course of action, taking into account both the risks and the potential rewards, and then choose whichever has the best chance to preserve and increase value <u>of the corporation as a whole</u>, for the benefit of all constituent groups.  In other words, when faced with conflicting constituencies, directors are protected by the business judgment rule if they attempt in good faith to follow their overall duty to attempt to preserve and enhance corporate "profitability" or "value."  *Paramount*, 571 A.2d 1140, 1150; *Gheewalla*, 930 A.2d 92, 103.  *See also Credit Lyonnais*, 1991 WL 277613 at n.55 (Del. Ch. Dec. 30, 1991) (expressing same concept of maximizing value using a hypothetical discounted present value analysis to assess different courses of action), *criticized on other grounds by Berg*, 178 Cal.App.4th 1020, 1038, 1041 & n.22 (declining to follow *Credit Lyonnais* to the extent it stands for any duties to creditors in the "vicinity of insolvency," or any "paramount" duty to creditors upon insolvency).[12]

Corporate directors have enormous discretion in exercising their business judgment to weigh the alternative courses of action, within the "broad mandate" to attempt to preserve and enhance corporate profitability/value.  *Paramount*, 571 A.2d 1140, 1150; *Gheewalla*, 930 A.2d 92.  That includes not only <u>how</u> to enhance profitability/value but also <u>on what time frame</u> – short term or long term – because directors can "chart[] a course for a corporation which is in its best interests without regard to a fixed investment horizon."  *Paramount*, 571 A.2d 1140, 1150.  Corporate directors "do not have a duty to shut down the insolvent firm and marshal its assets for distribution to creditors, although they may make a business judgment that this is indeed the best route to maximize the firm's value."  *Quadrant Structured Products Co.,*

---

[12] *See* Robin E. Phelan, Tom D. Harris, Eric Terry, Eric D. Poole, *If Their Business Judgment Was So Good How Come They're in Bankruptcy and Other Perplexing Mysteries of the Business Judgment Rule: Corporate Governance Issues for the Financially Troubled Company*, 10 J. Bankr. L. & Prac. 471, 475–76 (2001) ("In insolvency, the directors' duties are to multiple constituencies. [citing *Credit Lyonnais*]. In *Credit Lyonnais*, Chancellor Allen noted that in insolvency the duty runs not directly to the creditors but to the "community of interest." Therefore, it appears that the duty does not necessarily place creditor interests ahead of the interests of stockholders, but requires the board to maximize the corporation's long-term wealth creating capacity. *Id.* In footnote 55, Chancellor Allen addressed the problem of directors' duties in insolvency by posing a complex numerical hypothetical. *Id.*").

*Ltd. v. Vertin*, 115 A.3d 535, 546-47 (Del. Ch. 2015) (footnotes omitted).  Conversely, "[e]ven when a firm is insolvent, its directors may, in the appropriate exercise of their business judgment, take action that might, if it does not pan out, result in the firm being painted in a deeper hue of red.  The fact that the residual claimants of the firm at that time are creditors does not mean that the directors cannot choose to continue the firm's operations in the hope that they can expand the inadequate pie …. "  *Trenwick Am. Litigation Trust v. Ernst & Young*, 906 A.2d 168, 174 (Del. Ch. 2006).  Within the broad scope of their exercise of business judgment, directors are protected from liability if these decisions are "second guessed" by either creditors or stockholders.

### 3. The alternative – duties that change substantially upon insolvency – would be unworkable because creditors' and stockholders' interests diverge near insolvency

The preceding sections of this discussion conclude that directors' duties remain essentially if not entirely unchanged upon insolvency – to attempt to preserve and grow corporate value – and what principally changes is that creditors join stockholders as constituents for whose benefit the corporate enterprise is managed.  The alternative to essentially unchanging duties would be for directors' duties to change substantially upon insolvency.  That would be unworkable, not only for the reasons stated in *Berg* but also because the closer to the line of insolvency, the more divergent the interests of stockholders and creditors are likely to be.  Consider three hypothetical situations: when the corporation is very solvent, very insolvent, or close to the line of insolvency.

### a.  Very solvent

Suppose that a corporation has $100 million of assets and $50 million of liabilities.  Stockholders have a financial incentive for the corporation not to take excessive risks, because they have $50 million of net equity to lose.  Creditors are protected both by the stockholders' self-interest and by the equity cushion.  Therefore, when a corporation is very solvent the interests of stockholders and creditors generally align (all other things being equal).

### b.  Very insolvent

Now suppose that the same corporation is very insolvent: it has $5 million of assets and $100 million of liabilities.  Stockholders, are woefully "out of the money" so they have nothing meaningful to lose and everything to gain if the corporation engages in a very high risk, high return strategy — to "bet the farm" or "swing for the fences." Creditors similarly have little to lose:  rather than split $5 million of assets among their $100 million in claims (a theoretical 5% distribution) they also have an incentive to try a high risk, high return strategy.  Therefore, when a corporation is very insolvent, the interests of stockholders and creditors once again may align (true, stockholders' risk tolerance still may be higher than that of creditors, but in general their interests are aligned).  *See* Frost, Corp. *Governance in Insolvency* ¶ 3[1] at p. 28, n.18.

### c.  Close to the line of insolvency

Next consider situations close to the line of insolvency.  Suppose that the corporation is slightly insolvent: say $95 million of assets and $100 million of liabilities. Stockholders are still out of the money so they still have a strong incentive to swing for the fences, but creditors have a strong incentive to cut their losses by having the corporation sell its assets at fair market value (for a theoretical 95% return), rather than engage in even moderately risky ventures. Creditors' interests have diverged sharply from those of stockholders.  *See generally* Lin, *Shift of Fiduciary Duty Upon Corporate Insolvency*, 46 Vand. L. Rev. 1485, 1489-93 (divergent interests in (1) level of risk, (2) distribution of dividends, (3) incentives to liquidate, and (4) new investments).

Now suppose that the corporation is slightly solvent: assets are worth $105 million and liabilities are still $100 million.  Now stockholders have something to lose ($5 million) but that may well be so little, when divided among all of them and compared to their investments in the corporation, that they still have a strong incentive to swing for the fences, whereas creditors still have a strong incentive to protect their thin equity margin (theoretically 5%, but more likely 0% or negative after costs of sale) and have the corporation avoid even moderately risky ventures.  Again, their interests

sharply diverge.

In sum, the closer to the line of insolvency, the more likely it is that stockholders will have nothing to lose and everything to gain by taking excessively large risks, and conversely the more likely that creditors will have the opposite incentive to take minimal if any risks.  If crossing some invisible line of insolvency switches directors' duties from stockholders to creditors, then directors would be in an impossible situation: their risk tolerance would have to switch suddenly from very high (for stockholders, prior to insolvency) to very low (for creditors after insolvency).  These policy considerations are additional reasons to interpret California law as described above, in keeping with the concerns expressed by *Berg* and numerous other decisions and commentators.

### 4. All three definitions of insolvency probably apply, and alternatively the balance sheet and cash flow tests apply

The foregoing discussion and hypotheticals largely focus on the balance sheet measure of insolvency.  It appears, however, that all three methods of determining insolvency probably apply under *Berg* and similar decisions in Delaware and other States.

The parties have not pointed to any governing statutory definition of insolvency for purposes of fiduciary duties, nor has this Bankruptcy Court's research revealed any.[13]  The reported decisions do not devote much attention to this issue, although there are some conclusory statements that the balance sheet and cash flow tests apply. *See, e.g., Pereira v. Farace*, 413 F.3d 330, 343 (2d Cir. 2005) (asserting that Delaware

---

[13] Some statutes apply in other contexts, but they are not very helpful to the analysis.  *See, e.g.,* Cal. Corp. Code § 501 (cash flow insolvency is applied for purposes of a rigid prohibition on shareholder distributions: "Neither a corporation nor any of its subsidiaries shall make any distribution to the corporation's shareholders (Section 166) if the corporation or the subsidiary making the distribution is, or as a result thereof would be, likely to be unable to meet its liabilities (except those whose payment is otherwise adequately provided for) as they mature.").  *Compare* 6 Del. Code § 1302 (fraudulent transfer statute, not fiduciary duty) ("A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation. A debtor who is generally not paying debts as they become due is presumed to be insolvent."); *and* 8 Del. Code § 291 (using the word "insolvent" without further definition in the context of court appointment of receiver(s) for an "insolvent" corporation); U.C.C. § 1-201(b)(23) ("'Insolvent' means: (A) having generally ceased to pay debts in the ordinary course of business other than as a result of bona fide dispute; (B) being unable to pay debts as they become due; or (C) being insolvent within the meaning of federal bankruptcy law.").

1  courts define insolvency using cash flow and balance sheet tests).  *Berg* noted that

2  there are "multiple definitions of insolvency" but it did not decide among them because

3  the plaintiff in that case "did not plead any facts establishing [the corporation's]

4  insolvency at any specific point in time under any test, only the conclusion that at all

5  relevant times, the corporation was insolvent or in the zone of insolvency."  *Berg*, 178

6  Cal.App.4th 1020, 1042 n.23.

7        As the Ninth Circuit has observed in attempting to define insolvency in an

8  analogous context, when there is "little legislative guidance" it is appropriate to consider

9  "underlying policies" of the law.  *In re Dill*, 731 F.2d 629, 632 (9th Cir. 1984) (evaluating

10  insolvency for purposes of an involuntary bankruptcy petition under § 303(h)(1)).  The

11  most relevant underlying policy is for directors to avoid actions that "unduly risk"

12  corporate assets that might otherwise be used to pay creditors' claims.  *Berg*, 178

13  Cal.App.4th 1020, 1041.  Guided by this policy, if a corporation is in recognizable

14  financial distress then its actions should be dictated by that financial reality, regardless

15  how that distress is manifested.  After all, that is why the different tests of insolvency

16  evolved.

17        For example, a corporation can have a positive balance sheet but be completely

18  unable to pay its debts as they come due – *e.g.*, it cannot make payroll.  In that situation

19  the corporation is clearly in financial distress and it would seem inappropriate for the

20  directors to ignore the corporation's financial distress simply because, looking only at

21  the balance sheet, its assets exceeded its liabilities.

22        Similarly, although a corporation may be currently paying its debts and have

23  assets that exceed present liabilities, nevertheless it can be doomed to fail – *e.g.,* after

24  an improvident leveraged buyout – and therefore be insolvent under the inadequate

25  capital test.  *See generally Moody v. Security Pacific Business Credit, Inc.,* 971 F.2d

26  1056, 1065-75 & n.22 (3rd Cir. 1992) (extensive analysis, in fraudulent transfer context,

27  of inadequate capital test of insolvency, recognizing its close relationship to cash flow

28  insolvency but distinguishing it as focusing on the "reasonable foreseeability" that lack

of capital would lead to an "inability to generate enough cash flow to sustain operations").

Accordingly, it seems likely that the California Supreme Court, if faced with the issue, would hold that all three tests of insolvency apply: balance sheet, cash flow, and inadequate capitalization. Alternatively, if only balance sheet insolvency and cash flow insolvency were to apply, that would not change the conclusions in this opinion except as noted below when discussing the adequacy of the complaint's allegations of insolvency.

### 5. Officers have not been shown to have different overall duties from directors, although they apparently do not have the protections of the business judgment rule

The foregoing analysis focuses on directors. As for officers, their apparent lack of protection by the business judgment rule has been discussed, but in other respects the parties have not pointed to any differences. They appear to have the same general duties of due care, loyalty and good faith, as well as the same overall duties to attempt to preserve and increase the corporation's value. *Gantler v. Stephens*, 965 A.2d 695, 708 (Del. 2009) ("[C]orporate officers owe fiduciary duties that are identical to those owed by corporate directors.").

### E. The Complaint Adequately Pleads Insolvency: It Need Not Allege Insolvency Under Every Test As To Every Claim

Under the foregoing analysis of fiduciary duties, the fact of insolvency might appear at first to be irrelevant because it does not change directors' and officers' duties in any material way, if at all. Nevertheless, insolvency is important for the plaintiff's standing. The plaintiff cannot sue on behalf of creditors except for breaches of fiduciary duties that occurred when the corporation was insolvent or was rendered insolvent (and, although theoretically the plaintiff could sue on behalf of other constituencies, he cannot sue on behalf of stockholders due to ratification, as discussed below). *See* Opposition (dkt. 57), p. 19:2-11. In any event, insolvency is important for purposes of the avoidance statutes.

The Directors argue that the complaint does not adequately plead insolvency. Their argument is unpersuasive.

As explained in more detail in the next two subsections of this discussion, the complaint expressly alleges – for almost all claims and at almost all times – that Debtor was insolvent under the balance sheet, cash flow, and inadequate capitalization tests. The complaint's allegations also include explanations and examples (the "Additional Insolvency Allegations") asserting that at all relevant times Debtor's assets lacked reliable value, its expenses were high and unsustainable, it faced liquidity challenges, and its net revenue was dangerously thin.  Those Additional Insolvency Allegations do double duty: they support the express allegations of insolvency and, standing on their own, they adequately assert insolvency under the inadequate capitalization test.

That is sufficient.  As described above, insolvency by any measure is sufficient for purposes of bringing derivative breach of fiduciary duty claims on creditors' behalf. In addition, insolvency by any measure is sufficient for purposes of one or another of the avoidance statutes.

### 1.  Specific articulation of all three tests

The complaint specifically alleges (except as to the claims for breach of fiduciary duty) that Debtor "(a) was engaged in a business or a transaction for which its remaining assets were unreasonably small in relation to that business or transaction [*i.e.*, inadequate capitalization], (b) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they came due [*i.e.*, cash flow insolvency], and/or (c) was insolvent in that, at a fair valuation, the sum of [Debtor's] debts were greater than the sum of [Debtor's] assets [*i.e.*, balance sheet insolvency]."  Complaint (dkt. 1) ¶ 115.  *See also id. at, e.g.,* ¶¶ 139, 145, 162, 168, 175, 181, 186, 188, 193.

These specific allegations of all three types of insolvency span the entire relevant period prior to the Petition Date, except for 2011:

July 5, 2007 (¶¶ 31, 42, 161, 162, 168, First CCCD Note)

October 31, 2007 (¶¶ 32, 42, 161, 162, 168, Second CCCD Note)
June 20, 2008 (¶¶ 33, 42, 161, 162, 168, Third and Fourth CCCD Notes)
March 9 through May of 2009 (and early 2010) ¶¶ 56, 61, 173, 175, 181, 186, 188,
 193, initial transactions regarding 2100 Grand Property)
December 9, 2009 (¶¶ 42, 161, 162, 168, Fifth CCCD Note)
2010 generally (¶ 27, alleging that expenses were 106.9% of revenue)
December of 2010 (¶¶ 60-61, 173, 175, 181, 186, 188, 193 Additional Transfers to
 Primary Directors related to refinance of the 2100 Grand Property)
May of 2012, approximately (¶¶ 71 & 199, Weinberg PTO Payments)
November of 2012 (¶¶ 44, 137, 139, 145, 150, 152, 157 CCCD Note Sale)
Late 2012 (¶¶ 50-52, 115, 121, 128, 133, RHM Software Rights Transfer)

Even in 2011, a year in which Debtor "experienced some profit" (Complaint
(dkt. 1) ¶ 79), the complaint alleges that the Directors "drained [Debtor] of its <u>liquidity</u> at
a time when <u>the company's financials were unsustainable</u>" (in connection with accruing
over $10 million in unpaid PTO and sabbatical leave as of April 2011, and permitting
executives and supervisors to cash out those benefits). *Id.* ¶¶ 70-71 (emphasis added).
In addition, the complaint alleges that in September of 2011, when Debtor filed its 2010
tax return that did not use the NOLs for a tax refund, Debtor had "<u>liquidity challenges</u>"
and was "<u>in need of cash</u>." *Id.* ¶ 76 (emphasis added).  These allegations adequately
state inadequate capitalization in 2011.

   All of these allegations of insolvency are also incorporated by reference into the
claims for corporate waste (¶ 211), unjust enrichment (¶ 215), equitable subordination
(¶ 221), and the objections to the Directors' claims (¶¶ 225, 228, 231, 234, 237, 240,
243).  Under a fair reading of the complaint, it alleges that Debtor was insolvent at all
relevant times under all three tests of insolvency, except that in 2011 it alleges only
inadequate capitalization.

   It is true that no <u>express</u> allegations of insolvency are made as to the claims for
breach of fiduciary duty. *Id.* ¶¶ 83-110.  But the plaintiff presumably could seek leave to
amend the complaint to add those allegations, because the alleged breaches of
fiduciary duty are based on, and were simultaneous with, the same underlying acts and
omissions as the other claims, as to which the complaint expressly alleges insolvency.
*Id.* ¶¶ 64-71, 76, 85-87, & 93-94.  Amending the complaint is not essential for the
breach of fiduciary duty claims, however, because as set forth below the complaint

adequately alleges inadequate capitalization even without any express allegation of insolvency.

### 2. The Additional Insolvency Allegations not only support the express allegations of all three types of insolvency; they also sufficient allege, standing on their own, inadequate capitalization

The complaint alleges that at all relevant times Debtor's assets lacked reliable value, its expenses were high and unsustainable, it faced liquidity challenges, and its net revenue was dangerously thin.  These are the Additional Insolvency Allegations referred to above.

The complaint alleges that from at least 2007, Debtor's valuation of its assets was unreliable.  As to its valuation of work in progress, it used a "percentage-of-completion" method of accounting but, given ever more "extreme project delays and cost overruns," its percentage of completion could "never be accurately predicted."  Complaint (dkt. 1) ¶ 26.  As for other assets, substantial loans to related companies and insiders "appeared to have little value, yet they were still being recorded at their face amount."  *Id.*

The complaint alleges that Debtor "was crushed by the weight of excessive labor costs and accompanying benefit programs" as it "added hundreds of employees to its U.S. operations" without "planning or foresight."  *Id.* ¶ 25.  Debtor's Los Angeles office had approximately 375 employees in 2005, which "nearly doubled to more than 700 employees in 2007 and 2008."  *Id.*  The Directors, "[e]ager to promote a 'culture,' rather than sustain a business," had "basked in the breadth of human resources" and fostered "an underutilized and irrationally expensive labor force."  *Id.* ¶ 26.  Other allegedly gross mismanagement throughout the relevant periods "caused large, repeated and unmanageable losses."  *Id.* ¶ 65.

According to the complaint, Debtor had "dangerously thin net revenue."  *Id.* ¶ 27.  Its ratio of total expenses to production revenue decreased from 75.7% in 2007 to 96.1% in 2008 to 97.2% in 2009 to 106.9% in 2010 (net loss).  *Id.*  In fact, Debtor's "dangerously thin" net revenue turned into actual losses of more than $6.7 million in

1 | 2010 and $22.5 million in 2012. *Id.* ¶¶ 28-29.

2 |      Even in 2011, as noted above, the complaint alleges that the Directors "drained

3 | [Debtor] of its liquidity at a time when the company's financials were unsustainable." *Id.*

4 | ¶¶ 70-71 (emphasis added).  In addition, the complaint alleges that in September of

5 | 2011, when Debtor filed its 2010 tax return that did not use the NOLs for a tax refund,

6 | Debtor had "liquidity challenges" and was "in need of cash." *Id.* ¶ 76 (emphasis added)

7 |      All of the foregoing allegations (*i.e.,* the Additional Insolvency Allegations) are

8 | incorporated by reference into every claim stated in the complaint.  *See, e.g., id.* ¶ 83.

9 | As noted above, these allegations support the express allegations of insolvency.

10 |      It is true that, standing on their own, these Additional Insolvency Allegations are

11 | insufficient to establish balance sheet insolvency.   "[U]ncertain" asset values and debts

12 | that eventually "crushed" Debtor do not <u>necessarily</u> mean that Debtor is balance sheet

13 | insolvent at a "fair" valuation as of every relevant time.  *See* § 548(a)(1)(B)(ii)(I)

14 | (requiring "fair" valuation"); Cal. Civ. C. § 3439.02 (same).  But these allegations are

15 | sufficient to <u>support</u> the express allegations of balance sheet insolvency as of all of the

16 | times listed in the preceding subsection of this discussion.  At the pleading stage, the

17 | Directors should not be able to hide behind their own (allegedly) unreliable books and

18 | records to assert that asset values have not sufficiently been shown to be less than

19 | liabilities.  It is not clear what more the defendants would require of the plaintiff at the

20 | pleading stage: a "fair" valuation of assets and liabilities almost certainly will require

21 | expert testimony, which is inappropriate to require on a motion to dismiss.

22 |      The same analysis applies to cash flow insolvency.  It is true that having

23 | "liquidity" problems, being "in need of cash" and similar allegations do not necessarily

24 | amount to cash flow insolvency.  But those allegations are sufficient to support the

25 | express allegations of cash flow insolvency.

26 |      Furthermore, the Additional Insolvency Allegations, standing on their own, are

27 | sufficient to allege inadequate capitalization.  To summarize those allegations: Debtor's

28 | assets lacked reliable value, its expenses were high and unsustainable, it faced liquidity

1  challenges, and its net revenue was dangerously thin.  Those things essentially define

2  what it means to lack adequate capitalization.  Therefore, even as to the claims for

3  breach of fiduciary duty that do not expressly allege insolvency (Complaint (dkt. 1)

4  ¶¶ 83-110), there are sufficient allegations of inadequate capitalization.

5          For all of these reasons, the complaint's allegations of insolvency are sufficient.

6  **F.  The Complaint States A Claim That The Directors Breached Their
   Fiduciary Duties; And The Directors Have Not Established As A Matter
7  Of Law The Adequacy Of Their Defenses**

8          The Directors had duties (both upon insolvency and at all times) of care, loyalty

9  and good faith, all in service of the ultimate duty not to "divert, dissipate, or unduly risk

10  corporate assets."  *Berg*, 178 Cal.App.4th 1020, 1041 (emphasis omitted).  *See also*

11  *Paramount*, 571 A.2d 1140, 1150 (duty to attempt to "enhance corporate profitability");

12  *Gheewalla*, 930 A.2d 92, 103 (duty to attempt to "maximize" corporate value).  The

13  complaint adequately alleges numerous acts and omissions that, if proven, appear to

14  establish a *prima facie* breach of those fiduciary duties.

15          For example, the CCCD Transactions allegedly involved self-dealing loans to

16  Hughes' and Ts'O's family business, with no legitimate business purpose, at high risk,

17  without board approval (except as to the first loan), and with a $1 buyout by Hughes

18  after the gamble had paid off, causing Debtor a loss of $1.89 million.  Likewise, the

19  RHM Software Rights Transfer allegedly involved self-dealing, a last minute transfer of

20  key software to the overseas affiliate owned by the Principal Directors, for no

21  consideration, and without board approval.  There are similarly troubling allegations

22  regarding the 2100 Grand Transactions and the Loss of NOLs.  Those alleged breaches

23  support claims of violations of the duty of loyalty and good faith, and the duty of care,

24  including both affirmative acts and failure of oversight – breach of *Caremark* duties.

25  The plaintiff, acting in its capacity as liquidating trustee under the plan, has standing to

26  bring claims for breaches of those fiduciary duties.

27          With one exception, the Directors have not established that either the exculpatory

28  provisions of the debtor's articles of incorporation or the business judgment rule

insulates them, as a matter of law, from the claims in the complaint.  That exception is

for the so-called Reckless Operational Acts, as to which the defendants' motions for a

more definite statement or, alternatively, motions to dismiss will be granted (subject to

the plaintiff's opportunity to seek leave to amend).  The directors' individual situations

are reviewed below.

### 1.  Hughes

For numerous alternative reasons, Hughes has not established that he is

protected either by the exculpatory provision of Debtor's articles of incorporation or

business judgment rule (except as to the Reckless Operational Acts).

#### a.  The complaint adequately alleges grounds on which the exculpatory provisions of Debtor's articles of incorporation may not apply, and also alleges more than ordinary negligence, as to which the business judgment rule is not a shield

The complaint allegations regarding Hughes' acts and omissions come within

one or more exceptions to the exculpatory provisions of Debtor's articles of

incorporation, such as for self-dealing, lack of good faith, intentional misconduct,

reckless disregard of duties, or "for acts or omissions that constitute an unexcused

pattern of inattention that amounts to an abdication of the director's duty to the

corporation."  Cal. Corp. C. § 204(a)(10)(i)-(v).  Likewise, the complaint's allegations are

that Hughes acted intentionally, recklessly, or with gross negligence, and those things

are sufficient to overcome the business judgment rule, which only shields directors as to

ordinary negligence.

Those allegations of ultimate fact are supported – except as to the Reckless

Operational Acts – with sufficiently specific subsidiary allegations to meet the

"plausibility" and other requirements in the context of a motion to dismiss.  *See, e.g.,*

Complaint (dkt. 1) ¶¶ 32, 34, 42, 44, 52 (no approval or ratification for four of the five

CCCD Notes or the other CCCD Transactions, nor for the RHM Software Rights

Transfer); *id.* at ¶¶ 3, 49, 53, 60, 64 (self-dealing as to numerous transactions); *and id.*

¶ 76 (regarding the Loss of NOLs, allegations that NOLs could have been fully used if

1   carried back and instead were wasted by being carried forward; that companies "never"

2   make such elections; and that Hughes testified that "issues like this were never

3   presented to him, and that no board meeting addressed this issue").

4           Hughes (and the remaining Directors) argue that they should be granted some

5   leeway because closely held corporations tend to operate informally.  "Larger

6   corporations often have formal board committees to recommend the approval of a

7   variety of corporate actions," but "small corporations like [Debtor] conduct much of their

8   official business informally," and "this is especially so where the members of the board

9   personally conduct the business of the corporation."  Dkt. 61, p.3 n. 2 (citations omitted).

10  Assuming without deciding that this informality gives the Directors some sort of greater

11  leeway in <u>how</u> they fulfill their duties, there is a difference between "informally"

12  reviewing and approving transactions and failing even minimally to review or approve

13  them.  The complaint alleges the latter.

14          In addition, any corporate informality cuts both ways at this pleading stage.

15  Hughes (and the remaining Directors) can hardly expect the plaintiff to be more specific

16  about exactly what role each one had in each transaction if they were too informal to

17  document their decisions.  *See generally In re MIPS Tech., Inc.*, 2008 WL 3823726 at

18  *8 (N.D. Cal.) (taking into consideration what information is or is not available to

19  plaintiff).

20          As to the Reckless Operational Acts, however, the complaint's allegations are

21  conclusory and are insufficient in view of the heavy burden that discovery and litigation

22  would impose on Hughes.  *See, e.g., Am. Apparel,* 2012 U.S. Dist. Lexis 146970 at *54

23  (C.D. Cal.) (to be entitled to presumption of truth, allegations in complaint (a) must not

24  simply recite elements of claim but must contain sufficient allegations of underlying facts

25  to give fair notice and enable opposing party to defend itself effectively and (b) must

26  plausibly suggest an entitlement to relief, "such that it is not unfair to require the

27  opposing party to be subjected to the expense of discovery and continued litigation")

28  (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

Gross negligence requires a showing of failure to exercise "even slight care." Cal. Prac. Guide: Corps., Ch. 6-C (citation omitted).  Although it is entirely possible that it was grossly negligent (or even reckless or willful misconduct) to adopt the PTO and sabbatical policies that the board is alleged to have done, it is also entirely possible that such policies were precisely what was needed to attempt to shore up morale, or retain key personnel, or for any other legitimate goal; or at least the Directors may have concluded as much, in the good faith exercise of their business judgment.  The complaint does not allege, for example, that the policies adopted by Debtor were contrary to practices that are universally or almost universally accepted in the circumstances presented (as the complaint does allege with the Loss of NOLs).

In sum, the complaint adequately alleges much more than ordinary negligence (except as to the Reckless Operational Acts).  Neither the exculpatory provisions of Debtor's organizing documents nor the business judgment rule acts as a shield for such conduct.  Therefore, except with respect to the Reckless Operational Acts, Hughes has not established as a matter of law that he is shielded from liability.

### b. Alternatively, the complaint's allegations shift the burden to Hughes to show that the board ever established a system to provide adequate information to the board

Alternatively, even if the complaint's assertions of more than ordinary negligence were not adequately alleged (which they are), Hughes could be liable for ordinary negligence in some circumstances.  As noted above, the exculpatory provisions of Debtor's articles of incorporation do not apply in some instances, such as for self-dealing or lack of good faith.  Cal. Corp. C. § 204(a)(10)(ii) & (iii).  The business judgment rule adds an additional layer of protection to shield Hughes, if it applied, but at this preliminary stage of the litigation Hughes cannot establish as a matter of law that it does apply.

The complaint's allegations are that repeated transactions occurred without any board approval or ratification, when normally such transactions would require such

approval.  *See, e.g.,* Complaint (dkt. 1) ¶¶ 32, 34, 42, 44, 52.  That establishes a *prima
facie* showing that no system was ever created by Debtor's board that was reasonably
designed to provide adequate information to the board.  *Caremark*, 698 A.2d 959, 970.
Alternatively and additionally, the complaint's allegations of unchecked self-dealing and
needless Loss of NOLs also establish a *prima facie* showing that no such system was
ever created.  *Id.* at ¶¶ 3, 49, 53, 60, 64, 74-80.  That shifts the burden to Hughes either
to rebut that *prima facie* showing or to prove that, despite the absence of an adequate
information and reporting system, the board made an "<u>attempt</u> in good faith" to establish
such a system.  *Caremark*, 698 A.2d 959, 970 (emphasis added).

In these circumstances a "ruling on the applicability of the business judgment rule
is peculiarly a question of fact, wholly inappropriate for consideration on a motion to
dismiss."  *Fed. Sav. and Loan Ins. Corp. v. Musacchio*, 695 F.Supp. 1053, 1064 (N.D.
Cal. 1998); *see Resolution Trust Corp. v. Heiserman*, 839 F.Supp. 1457, 1464, 1465 (D.
Colo. 1993) ("the business judgment rule is a fact bound affirmative defense which
provides no basis for dismissal under Rule 12(b)(6)") *impliedly overruled on other
grounds in* F.D.I.C. v. Schuchmann, 235 F.3d 1217 (10th Cir. 2000); *Gaillard*, 208
Cal.App.3d at 1267-68.

Hughes will have the opportunity to present evidence, either on summary
judgment or at trial.  He cannot establish at this preliminary stage of the litigation,
however, that as a matter of law the business judgment rule shields him from liability.

      **c.  The complaint's allegations shift the burden to
Hughes to show that the board ever exercised any
business "judgment" in attempting in good faith to
establish an adequate information or reporting
system**

If, for the sake of argument, it could be shown that an attempt actually was made
to establish an "adequate" information and reporting system, under the complaint's
allegations such attempt was so entirely unsuccessful as to constitute a *prima facie*
showing that the directors utterly failed to exercise their business <u>judgment</u> in
attempting in good faith to establish a system that was reasonably designed to provide

them with timely, accurate, and sufficient information.  *Caremark*, 698 A.2d 959, 970;

*Burt*, 237 Cal.App.2d 828, 852-53 (business judgment rule "presuppose[s] that

judgment – reasonable diligence – has in fact been exercised").  Again, that shifts the

burden to Hughes, so he cannot establish at this stage that as a matter of law the

business judgment rule shields him from liability.

### d. The complaint's allegations shift the burden to Hughes to show that the board actually used the information or reporting system, and did not ignore clear flaws in it

If, for the sake of argument, it could be shown that an adequate system actually

was established, under the complaint's allegations the Directors either chose not to use

that system at all, or chose to ignore its clear flaws.  This establishes a *prima facie*

showing that there was a "sustained or systematic failure of the board to exercise

oversight," an "abdication" of duties, or, put differently, a "conscious[] fail[ure] to monitor

or oversee [the corporation's] operations."  *Caremark*, 698 A.2d 959, 971; *Berg*, 178

Cal.App.4th 1020, 1047; *Stone*, 911 A.2d 362, 370.  This is an alternative reason why

Hughes cannot establish this defense as a matter of law.

### e. The business judgment rule does not protect Hughes as to self-interested transactions

If, for the sake of argument, it could be shown that an adequate system actually

was established and used, without ignoring obvious flaws, then Hughes still cannot use

the business judgment rule as a shield at this stage of the litigation as to any of the

transactions on which he is alleged to have been self-interested.  The complaint alleges,

for example, that he was self-interested in the CCCD Transfers and negotiated the

unsecured convertible promissory notes on behalf of both Debtor and CCCD.  *See*

Complaint ¶ 30-42.  Additionally, Hughes was a director and officer of Debtor and was a

director, officer, and stockholder of CCCD, Inc., which owned 100% of CCCD, at the

time of various CCCD Transactions as to which Hughes was on both sides.  Similar

arguments can be made as to Hughes and the RHM Software Transfer and the 2100

Grand Transaction.  This is an alternative reason why Hughes cannot establish this

defense, as a matter of law, as to every allegedly self-interested transaction.

### f.   Conclusion as to Hughes

Hughes has not established that he is shielded by either the exculpatory provisions of Debtor's articles of incorporation or the business judgment rule against the allegations in the complaint.  He will have the opportunity to rebut the allegations in the complaint, either on summary judgment or at trial, but he has not established that, as a matter of law, he is entirely shielded from liability at this preliminary stage of the litigation.

### 2.   Other Primary Directors: Ts'O and Goldfarb

Essentially the same analysis applies with respect to Ts'O and Goldfarb.  They are not alleged to have been quite as involved as Hughes in every purported self-dealing transaction, but in other respects the allegations against them are essentially the same, and the legal analysis and outcome is exactly the same.

### 3.   The Other Directors: Lee Berger, Prashant Buyyala, Raymond Feeney, and David Weinberg

With regard to the Other Directors, the complaint adequately alleges that they breached their fiduciary duties.  Each of the transactions (like the CCCD Note Sale (Complaint ¶ 44), the RHM Software Rights Transfer (Complaint ¶ 52), the NOL carry forward (Complaint ¶ 80), and the 2100 Grand Transactions (Complaint ¶ 63)) allegedly involved either (1) a complete failure of the board – intentionally, recklessly, or with gross negligence – to address issues that they knew about or as to which they were on notice or (2) was the result of an utter failure of *Caremark* supervision and an abdication of oversight duties.

For example, selling the entire, valuable $1.89 million series of series of CCCD convertible notes to Hughes for his promise of $1 (the CCCD Note Sale), without any board approval, appears on its face to be a complete failure of the board to act, and an abdication of any oversight duties.  Likewise, transferring Debtor's key software, "which had been developed over decades and used to win multiple awards in the film industry"

(Complaint (dkt. 1) ¶ 54), to the Primary Directors' overseas business, RHM, for no consideration and with no board approval, appears on its face to be another complete failure of the board to act and an abdication of any oversight duties.  The other alleged acts and omissions (except for the so called Reckless Operational Acts) similarly establish plausible claims for breaches of fiduciary duties by the Other Directors.

The allegations in the complaint, supported by subsidiary allegations, also sufficiently establish grounds to overcome the exculpatory provisions of Debtor's articles of incorporation and the business judgment rule.  The analysis is the same as for Hughes, with two exceptions.  First, the only specific allegations of self-dealing involving the Other Directors are with respect to the Weinberg PTO Payments.  Second, Weinberg allegedly had a direct role as CFO in the Loss of NOLs.

As for Feeney's status as an independent, outside, and disinterested director, it appears that, if the allegations in the complaint and reasonable inferences are accepted as true, there is a *prima facie* showing that he too failed to follow his obligations under *Caremark* and *Stone*.  Although he <u>might</u> be able to establish that there was an acceptable *Caremark* system established by the board pursuant to which he was only present to provide expertise and was entitled to rely on the remaining directors as to many types of board decisions, that is a highly factual issue.  *Cf.* Cal. Corp. C. § 309(a) & (b)(3).  Mr. Feeney also might benefit from the fact that, under California law at least, he will not be held to any sophisticated business standard but instead to the standard of an ordinary prudent person.  *See Frances T. v. Village Green Owners Assn.*, 42 Cal.3d 490, 526-28 (1986) (under a statute that imposes the "same standard that [Cal. Corp. Code § 309] imposes on directors of commercial corporations," the duty of care is that of "ordinarily prudent person," which emphasizes "long traditions of the common law, in contrast to standards that might call for some undefined degree of expertise, like 'ordinarily prudent businessman'") (quoting Assembly Select Committee Report, quoting ABA Committee Report).

### 4. Conclusion as to alleged breaches of fiduciary duties

For all of the foregoing reasons, the complaint states a claim that the Directors breached their fiduciary duties (except as to the so-called Reckless Operational Acts), and the Directors have not established as a matter of law the adequacy of their defenses. They may be able to establish defenses after discovery, on summary judgment, or at trial, but at this preliminary stage of the litigation they have not done so.

### 5. Group Pleading

Several of the Directors complain that the plaintiff has improperly pled allegations as to the Primary Directors and the Other Directors, rather than as to each director or officer individually. *See, e.g.,* Feeney Reply (dkt. 64), pp. 3:1–6:2.

The plaintiff argues persuasively that, to the extent that "group pleading" is a disfavored legal concept at all, it is appropriate here. *See* Opposition (dkt. 57), pp. 15:9–16:6; *see also In re Am. Apparel, Inc. S'holder Derivative Litig.*, No. CV 10-06576 MMM RCX, 2012 WL 9506072, at *41 (C.D. Cal.). When directors and officers have engaged in similar conduct, alleging claims as to the whole group of similarly situated directors and officers is sufficient. *See George v. Kraft Foods Global, Inc.*, 674 F.Supp.2d 1031, 1050 (N.D. Ill. 2009) ("because the determination of a party's fiduciary status with respect to a particular activity in this case is a fact-sensitive inquiry, such a determination is best left for a later stage of these proceedings" so "dismissal of the Defendants on this basis at this stage is premature.").

### 6. Stockholder ratification

Stockholder ratification does not apply to any claims of breaches of fiduciary duty while Debtor was insolvent. *See, e.g., In re JTS Corp.*, 305 B.R. 529, 539, 541 (Bankr. N.D. Cal. 2003) (recognizing that, when a corporation is insolvent, the trust fund doctrine "fundamentally alters the relationship between a corporation, its shareholders and its creditors" and that "corporate or shareholder ratification does not apply to creditors who would be prejudiced thereby."). *See also* Opposition (dkt. 57) pp. 18:13-20:14. *Compare GSM*, 2013 Bankr. Lexis 3298, at *129-30 (stockholders were free to

dispose of corporate assets however they chose, "so long as the corporation was not insolvent or rendered insolvent," and at trial plaintiff failed to prove insolvency, so even if acts were detrimental to the corporation, unanimous stockholder ratification meant that there was no legal recourse in favor of the corporation as a separate entity).

Without such a rule, the effect of the trust fund doctrine would be defeated by the very stockholders whose conduct is challenged, or the very directors and officers who acted for the stockholders' benefit in derogation of creditors' rights.  Ratification does not protect the Directors.

### G. Statutes of Limitations and Related Arguments

The plaintiff's arguments regarding the statutes of limitation, tolling, and related arguments are persuasive at this early stage of the litigation, for the most part.  *See* Opposition (dkt. 57), pp. 30:5-34:15.  There are two exceptions.

First, the continuous violation doctrine has not been sufficiently established.  *Id.,* pp. 32:14-33:18.  But that is only an alternative argument to the plaintiff's arguments regarding equitable tolling, the discovery rule, and the adverse domination doctrine, which are sufficiently persuasive for present purposes. *Id.,* pp. 31:8-32:13.  *See also, e.g., Prudential-LMI Commercial Ins. v. Superior Ct.,* 51 Cal.3d 674 (1990); *E-Fab, Inc. v. Accountants, Inc., Servs.*, 153 Cal.App.4th 1308 (2007); *Admiralty Fund v. Peerless Ins. Co.,* 143 Cal.App.3d 379 (1983); *and see April Enterprises, Inc. v. KTTV*, 147 Cal.App.3d 805, 827-33 (1983) (discovery rule explained, and applicable to claim for breach of fiduciary duty); *Schneider v. Union Oil Co. of Cal.*, 6 Cal.App.3d 987, 993-94 (1970) (summarizing authority that corporation's own innocence is insufficient to overcome discovery rule regarding breach of fiduciary duty claim); *Whitten v. Dabney*, 171 Cal. 621, 619 (1915) (knowledge by one stockholder of wrongful acts is not imputed to different stockholder); *Ashou v. Liberty Mutual Fire Ins. Co.,* 138 Cal.App.4th 748, 757 (2006) (explaining five policy considerations behind equitable tolling).  *See generally Aryeh v. Canon Bus. Solutions, Inc.*, 55 Cal.4th 1185, 1192 *et seq.* (2013) (explaining differences between discovery rule, equitable tolling, fraudulent

1  concealment, continuing violation, continuous accrual, etc.).

2       Second, as the plaintiff concedes, the so-called Original Transfers in Counts 18

3  and 19 of the complaint are beyond the two year reach back period for those claims.

4  *Id.,* p. 34:3-6.  The defendants' motions to dismiss will be granted as to those claims.

5       **H.  The Complaint States A Claim For Corporate Waste**

6       The directors argue that the plaintiff has not sufficiently alleged waste because

7  the allegations do not rise to the level that the challenged transactions were

8  "unconscionable" (dkt. 37, pp. 24:17-26:5; dkt. 41, p. 24:1-25; dkt. 42, pp. 15:18-17:3) or

9  that the facts alleged are insufficient to show that the transactions had no rational

10 business purpose (dkt. 43, pp. 19:7-20:13).  These contentions are unavailing.

11      "Claims of corporate waste in California are based upon Delaware state law."

12 *Swingless Golf Club Corp. v. Taylor*, 679 F.Supp.2d 1060, 1070 (N.D. Cal. 2009).

13 *Swingless Golf* continues:

14                To recover on a claim of corporate waste, [defendants] must
                 shoulder the burden of proving that the exchange was <u>so one sided</u>
15               that no business person of ordinary, sound judgment could
                 conclude that the corporation has received adequate consideration.
16               *See In re Walt Disney Co. Derivative Litig.,* 906 A.2d 27, 74
                 (Del.2006) (A claim of waste will arise only in the rare,
17               unconscionable case where directors <u>irrationally squander or give
                 away corporate assets</u>. This onerous standard for waste is a
18               corollary of the proposition that where business judgment
                 presumptions are applicable, the board's decision will be upheld
19               unless it cannot be attributed to any rational business purpose.).
                 [*Swingless Golf*, 679 F.Supp.2d 1060, 1070 (quoting *In re Asyst*
20               *Technologies, Inc. Derivative Litigation,* 2008 WL 2169021, at *10
                 (N.D.Cal.)) (emphasis added)].
21
        At the pleading stage the plaintiff need only state a plausible claim for relief, and
22
   as detailed above the complaint alleges numerous transactions that are self-interested
23
   or very one sided.  Hughes, for example, was allegedly self-interested in the CCCD
24
   Transfers, the RHM Software Rights Transfer, and the 2100 Grand Transfer.
25
   Additionally, and certain alleged transaction terms appear to have been so far below
26
   reasonable that they had no apparent business purpose (*e.g.*, transfers of valuable
27
   assets for $-0-, or the Loss of NOLs in a way that would "never" be done by other
28
   corporations).  The Directors allege that there were valid business purposes for what

Debtor did – *e.g.,* structuring transactions to satisfy the requirements of third party

lenders – but that is a factual issue that cannot be resolved on a motion to dismiss. *See*

*e.g.*, dkt. 37, p. 21:3-11.

There is one exception.  As with the breach of fiduciary duty claims, the

allegations related to the Reckless Operational Acts are not so egregious or out of the

ordinary to sustain a claim of waste, at least without subsidiary supporting allegations.

*See* Complaint ¶¶ 64, 65, 66, 69, 70.

As to the Other Directors, the complaint includes sufficient subsidiary allegations

to make plausible the assertions they knew or should have known of the corporate

waste, and are liable in the same manner as those directors who authorized the

transactions.  *See In re World Health Alternatives, Inc.*, 385 B.R. 576, 593 (Bankr. D.

Del. 2008) (even when there was no allegation that the corporate vice president and

general counsel "personally benefitted from the alleged expenditures[,] given the fact

that we must view the allegation in the light most favorable to the [plaintiff]," the court

denied the motion to dismiss waste claim against him).

### I.    The Complaint's Objections To The Directors' Proofs Of Claim Survive The Motions To Dismiss Or For A More Definite Statement

The Directors, in essence, contend that their claims against Debtor survive for

the same reasons that the plaintiff's claims against them fail.  For example, Feeney

argues that his claim based on indemnification should survive because the trustee has

not sufficiently alleged bad faith so as to disqualify him from indemnification under

applicable California law (dkt. 41, p. 26:6-20).  Weinberg argues, in essence, that the

Trustee's efforts to disallow his claim are derivative from the other allegations and

cannot be sustained (dkt. 43., pp. 21:6-13).  Because of the other rulings set forth

above, those arguments are unpersuasive at this preliminary stage of the litigation.

### J.  The Complaint Adequately States A Claim For Equitable Subordination

The Directors argue that the plaintiff has not sufficiently alleged bad faith or

inequitable conduct (*see* dkt. 41, p. 25:1-24; dkt. 43, pp. 20:14-21:5 (arguing that

Weinberg actually warned the remaining Directors regarding fiduciary obligations and attempted to get better terms for the CCCD Notes)) and that the plaintiff's equitable subordination claims are "wholly derivative" of the (purportedly defective) claims for breach of fiduciary duty and corporate waste and should be dismissed (dkt. 42, p. 17:5-13).

In the Ninth Circuit, a plaintiff must sufficiently allege three elements in order to state a claim for equitable subordination:

> Equitable subordination requires that: (1) the claimant who is to be subordinated has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants or an unfair advantage to the claimant to be subordinated; and (3) subordination is not inconsistent with bankruptcy law. [*Stoumbos v. Kilimnik*, 988 F.2d 949, 958 (9th Cir. 1993) (quoting *In re Universal Farming Indus.*, 873 F.2d 1334, 1337 (9th Cir.1989))].

The burden of establishing equitable subordination is very heavy. For example, even aiding and abetting fraud does not necessarily establish grounds for equitable subordination. *See In re First Alliance Mortg. Co.*, 471 F.3d 977, 1006-7 (9th Cir. 2006) (although "there is surely something 'inequitable' in an abstract sense about aiding and abetting fraud," that conduct did not "did not amount to the kind of fraud meant to be remedied by equitable subordination of bankruptcy claims") (citations omitted).

On the other hand, a wide range of inequitable conduct can, depending on the particular facts and circumstances, support a claim of equitable subordination. The issue is highly dependent on the specific facts presented. *See In re Granite Partners, LP*, 210 B.R. 508, 515 (Bankr. S.D.N.Y. 1997) ("allegations of aiding and abetting [a third party's] fraud also satisf[ied] the pleading requirement for equitable subordination"). In addition, when a complaint "seeks to subordinate 'a claim arising from the dealings between a debtor and an insider,' the court will give the insider's actions rigorous scrutiny." *Stoumbos*, 988 F.2d at 959 (quoting *In re Fabricators, Inc.*, 926 F.2d 1458, 1465 (5th Cir.1991)).

In this case the alleged transactions adequately establish possible grounds for equitable subordination. For example, according to the complaint, several of the

Directors personally engaged in self-dealing transactions without the requisite scrutiny and approval by disinterested board members (such as the CCCD Transfers, the CCCD Note Sale, and the RHM Software Rights Transfer) and allegedly they did so on terms that were entirely one sided in favor of themselves and disadvantage to other creditors such as unpaid employees.  Even those Directors who did not personally benefit allegedly abdicated their duties by permitting such one sided self-dealing to happen (repeatedly).  At this early stage of the litigation, when the well pled allegations in the complaint must be accepted as true, the Directors have not established how the complaint fails to state a claim for equitable subordination.

Although Weinberg asserts that he cautioned the remaining Directors to take care to comply with their fiduciary obligations, he too is alleged to have engaged in inequitable conduct.  He allegedly did not follow through when the other Directors (allegedly) failed to heed his advice, and allegedly he was on both sides of the Weinberg PTO payment and potentially received an unfair advantage over other claimants.

With regard to the remaining Directors, including Feeney (barely), this Bankruptcy Court is convinced that the plaintiff has adequately alleged inequitable conduct.  The plaintiff has not alleged any inequitable conduct other than their alleged failure to abide by *Caremark* and *Stone* duties, but those allegations in themselves may be sufficient to support a claim for equitable subordination.

*//*

1 | **VI.    CONCLUSION**

2  For the foregoing reasons, the motions to dismiss and motions for more definite

3 statements will be GRANTED IN PART and DENIED IN PART by separate orders.

4 Nevertheless, those orders will not be issued for the moment, because the parties

5 expect to engage in some limited discovery and attempted mediation before being faced

6 with potential deadlines to file motions for reconsideration (Rules 9023 and 9024) or to

7 seek whatever review they believe is appropriate by an appellate court or an Article III

8 Court.  Any related procedural issues will be addressed at the next status conference.

9                                                 ###

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24           Date: March 11, 2016
                                              Neil W. Bason
25                                            United States Bankruptcy Judge
26
27
28